**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Terilyn K. Wallis,

*Plaintiff,*

vs.

National Rural Utilities Cooperative Finance
Corporation,

*Defendant.*

Civil Action No. 1:22-cv-00838-PTG-WEF

**Oral Argument Requested**

---

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 2

        A.      CFC Is A Member-Owned Non-Profit Cooperative ............................... 2

        B.      Plaintiff's Employment with CFC ......................................................... 2

        C.      CFC Audits, then Retains a Third-Party Certified Fraud Examiner to
                Investigate Plaintiff's Expense Reimbursement Submissions ................ 4

                1.      CFC's Internal Audit Discovers Irregularities in Plaintiff's
                        Submissions ............................................................................. 4

                2.      CFC Retains a Third-Party Certified Fraud Examiner to Investigate
                        Plaintiff's Submissions ............................................................ 7

        D.      CFC Terminates Plaintiff's Employment ............................................ 13

        E.      Plaintiff's Allegations of Misconduct Against CFC and Complaints.................. 14

III.    ARGUMENT .............................................................................................. 17

        A.      Summary Judgment Standard ............................................................ 17

        B.      Plaintiff Failed to Exhaust Her Administrative Remedies Related to Her
                Retaliation Claim .............................................................................. 18

        C.      Plaintiff Cannot Make a Prima Facie Case of Sex Discrimination...................... 22

        D.      Plaintiff Cannot Make a Prima Facie Case of Retaliation .................................... 26

        E.      Plaintiff Cannot Demonstrate Pretext in CFC's Termination Decision............... 27

        F.      Plaintiff Cannot Demonstrate Pretext in CFC's Alleged Post-Termination
                Conduct ............................................................................................ 28

IV.     CONCLUSION ............................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Habashy v. Va. Dep't of Juv. Just.*,
   No. 7:13CV00459, 2015 WL 5916007 (W.D. Va. Oct. 8, 2015), *aff'd*,
   646 F. App'x 332 (4th Cir. 2016) ............................................................................27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...............................................................................................17

*Baiden-Adams v. Forsythe Transp., Inc.*,
   969 F. Supp. 2d 422 (E.D. Va. 2013) ....................................................................21

*Bryant v. Bell Atl. Md., Inc.*,
   288 F.3d 124 (4th Cir. 2002) ..................................................................................18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...............................................................................................23

*Chacko v. Patuxent Inst.*,
   429 F.3d 505 (4th Cir. 2005) ......................................................................... *passim*

*Coleman v. Md. Ct. of Appeals*,
   626 F.3d 187 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of
   Md.*, 566 U.S. 30 (2012) ........................................................................................23

*DeJarnette v. Corning Inc.*,
   133 F.3d 293 (4th Cir. 1998) ..................................................................................23

*Dulaney v. Packaging Corp. of Am.*,
   673 F.3d 323 (4th Cir. 2012) ..................................................................................17

*Foster v. Univ. of Md.-E. Shore*,
   787 F.3d 243 (4th Cir. 2015) ............................................................................23, 27

*Giannopoulos v. Brach & Brock Confections, Inc.*,
   109 F.3d 406 (7th Cir.1997) ...................................................................................23

*Hawkins v. PepsiCo, Inc.*,
   203 F.3d 274 (4th Cir. 2000) ..................................................................................27

*Hentosh v. Old Dominion Univ.*,
   767 F.3d 413 (4th Cir. 2014) ..................................................................................18

*Holland v. Wash. Homes, Inc.*,
   487 F.3d 208 (4th Cir. 2007) ..................................................................................27

*Hooven-Lewis v. Caldera*,
  249 F.3d 259 (4th Cir. 2001) ...............................................................17

*Jackson v. Sch. Bd. of City of Richmond*,
  No. 99–CV–642, 2000 WL 34292578 (E.D. Va. Mar. 15, 2000)...........................25

*Jiminez v. Mary Wash. Coll.*,
  57 F.3d 369 (4th Cir. 1995) ...............................................................23

*Johnson v. Portfolio Recovery Assocs., LLC*,
  682 F. Supp. 2d 560 (E.D. Va. 2009) .............................................20, 21

*Johnston v. Envision Physician Servs.*,
  No. 1:21-cv-1064, 2022 WL 3211435 (E.D. Va. Aug. 2, 2022), *aff'd sub nom.*
  *Johnston v. Envision Physician Servs., HR*, No. 22-1832, 2023 WL 315263
  (4th Cir. Jan. 19, 2023) .....................................................................26

*Lamb v. Modly*,
  No. 22-1308, 2023 WL 2263015 (4th Cir. Feb. 28, 2023) ...................................28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...........................................................................24

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)........................................................................ *passim*

*Merritt v. Old Dominion Freight Line, Inc.*,
  601 F.3d 289 (4th Cir. 2010) ...............................................................22

*Miller v. McWilliams*,
  No. 1:20-CV-0671, 2021 WL 3192164 (E.D. Va. July 28, 2021)........................23

*Norfolk S. Ry. Co. v. City of Alexandria*,
  608 F.3d 150 (4th Cir. 2010) ...............................................................17

*Okanes v. Soc'y for Worldwide Interbank Fin. Telecomm. SC*,
  No. 1:21-cv-0285, 2021 WL 9598562 (E.D. Va. June 7, 2021), *aff'd*,
  No. 21-2437, 2022 WL 11776672 (4th Cir. Oct. 20, 2022) ...................................21

*Parker v. Reema Consulting Servs., Inc.*,
  915 F.3d 297 (4th Cir. 2019) ...............................................................18

*Rhodes v. E.I. du Pont de Nemours & Co.*,
  636 F.3d 88 (4th Cir. 2011) ...............................................................23

*Smith v. First Union Nat'l Bank*,
  202 F.3d 234 (4th Cir. 2000) ...............................................................18

*Stewart v. Iancu*,
  912 F.3d 693 (4th Cir. 2019) ...............................................................19

*Strothers v. City of Laurel*,
   895 F.3d 317 (4th Cir. 2018) ............................................................26

*Sydnor v. Fairfax Cnty.*,
   681 F.3d 591 (4th Cir. 2012) ............................................................18

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
   57 F.3d 1317 (4th Cir. 1995) ............................................................24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ..........................................................................28

*Wai Man Tom v. Hosp. Ventures LLC*,
   980 F.3d 1027 (4th Cir. 2020) ..........................................................24

*Williams v. Cerberonics, Inc.*,
   871 F.2d 452 (4th Cir. 1989) ............................................................27

*Williams v. Mancom, Inc.*,
   323 F. Supp. 2d 693 (E.D. Va. 2004) ...............................................20

*Young v. Hous. Auth. of Balt. City*,
   No. WDQ–14–1764, 2015 WL 795132 (D. Md. Feb. 24, 2015)................20, 21, 22

**Statutes**

42 U.S.C. § 2000e-5 ...............................................................................18

**Other Authorities**

Fed. R. Civ. P. 56 ...................................................................................17

## I.  <u>INTRODUCTION</u>

Defendant National Rural Utilities Cooperative Finance Corporation ("CFC") is a member-owned, nonprofit cooperative that provides financial products and services to America's rural electric cooperatives.  CFC employed Plaintiff Terilyn Wallis ("Plaintiff") as a Regional Vice President ("RVP") from September 2012 until it terminated her employment on January 18, 2018 for business expense reimbursement fraud and other policy violations.  RVPs at CFC occupy a position of trust and work closely with CFC's member electric cooperatives to manage their financial portfolios and assist them with strategic financial planning.  CFC's trust in Plaintiff stemmed, in part, from her extensive experience as a chief financial officer, controller, compliance officer, and accountant, and her level of sophistication related to the finance and electric cooperative industries.

Plaintiff claims in this lawsuit that CFC discriminated against her due to her sex when it terminated her and paid her unequally to her male comparators, and retaliated against her for her post-termination filing of an administrative complaint by harming her ability to obtain new employment.  Summary judgment is appropriate here because the undisputed material facts demonstrate Plaintiff was fired for expense report fraud and other policy violations.  Plaintiff's misconduct is based on objective, verifiable facts, and no evidence supports her counter-narrative that discrimination played any role in the decision to terminate her employment.

Summary judgment also is appropriate on Plaintiff's retaliation claim and, to the extent alleged by Plaintiff.  Plaintiff did not include that claim in the administrative complaint she filed with the Wisconsin Department of Workforce Development on November 5, 2018 (the "Administrative Complaint").  She first alleged that CFC retaliated against her over three and a half years after discovering facts she believed might be the basis for her retaliation.  Therefore, Plaintiff failed to exhaust her administrative remedies and her retaliation claim is now time-barred.

Plaintiff's retaliation claim also fails as a matter of law because it is based on a factual impossibility. The conduct Plaintiff alleges was motivated by retaliation occurred months prior to her filing the Administrative Complaint; therefore, CFC could not possibly have engaged in that conduct due to Plaintiff filing the Administrative Complaint.

As described below, CFC terminated Plaintiff only because she committed fraud against it, as concluded by an independent, third-party Certified Fraud Examiner ("CFE"). That decision had nothing to do with Plaintiff's sex. No other male or female employee engaged in fraud against CFC. Therefore, CFC respectfully requests that the Court enter judgment in its favor.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     CFC Is A Member-Owned Non-Profit Cooperative

1.      CFC is a member-owned, nonprofit cooperative that provides financial products and services to America's rural electric cooperative network. CFC and its affiliates provide financing to approximately 1,500 member organizations in 49 states, the District of Columbia and two territories, so those organizations can acquire, construct, and operate electric distribution, generation, and transmission systems. Ex. 25 (Affidavit of Gary Bradbury ("Bradbury Aff.")) ¶ 5; Ex. 1 (Transcript of Plaintiff's Deposition ("Pl. Tr.")) at 34:17-36:5.

2.      CFC divides its Member Services Group, which includes its field staff who represent the company in face-to-face contact and business development with CFC's member customers, into Regions, and each region has its own RVP. Ex. 16 (Transcript of Rule 30(b)(6) Deposition of CFC Corporate Representative ("CFC Tr.")) at 28:3-30:3.

### B.     Plaintiff's Employment with CFC

3.      Plaintiff began her at-will employment with CFC as a RVP on September 10, 2012. Ex. 1 (Pl. Tr.) at 177:13-178:22; Ex. 5 (Offer Letter).

4.      Plaintiff obtained a Master of Business Administration degree (*id*. at 28:3-7), took the Certified Public Accountant ("CPA") examination (*id*. 40:5-17), and had a significant amount of experience as chief financial officer, controller, compliance officer, and accountant, which included overseeing organizations' internal controls, financial reporting and compliance, and various business expense reimbursement programs, among other duties (*id*. at 45:10-22, 51:6-53:17, 60:1-65:10, 67:16-70:13, 72:18-20, 74:9-83:20, 85:4-94:10, 97:21-99:6, 105:5-108:13, 112:21-113:22, 117:1-4, 118:13-123:7, 123:11-126:17), before her CFC employment.  *See also*, *id*. at 42:18-43:7, 43:15-20, 48:20-50:13; Exs. 2 (new resume), 3 (application) & 4 (old resume).

5.      Plaintiff's duties as a RVP included acting as a liaison with CFC's member electric cooperatives; creating and implementing strategic member development initiatives; consulting with member electric cooperatives regarding strategic financial planning and needs; contributing to CFC and industry conferences and task forces; and conducting CFC financial seminars and workshops; among others.  Ex. 1 (Pl. Tr.) at 184:8-186:13 & Ex. 6.

6.      Consistent with the other RVPs, Plaintiff's position required 80 percent domestic travel.  Ex. 6; Ex. 16 (CFC Tr.) at 200:8-201:12; Ex. 1 (Pl. Tr.) at 274:4-275:1, 275:17-19, 278:12-21 (Plaintiff volunteered for some additional training seminars and workshops beyond what some RVPs did, but at least two other RVPs performed similar duties).

7.      Plaintiff's assigned region as a CFC RVP included North Dakota, South Dakota, and half of Minnesota.  Ex. 1 (Pl. Tr.) at 183:1-184:7.

8.      CFC maintains employment policies that were provided to Plaintiff during her employment, including but not limited to its Ethics Policy (*id*. at 194:22-197:6 & Ex. 7), Code of Conduct and Business Ethics (Ex. 1 (Pl. Tr.) at 197:6-198:15 & Ex. 8), Corporate Travel Policy (Ex. 1 (Pl. Tr.) at 200:20-203:13 & Ex. 9), Employee Handbook (Ex. 1 (Pl. Tr.) at 203:22-207:17 & Exs. 10-11), Anti-Harassment Policy (Ex. 1 (Pl. Tr.) at 207:18-208:13 & Ex. 12), Complaints

Policy (Ex. 1 (Pl. Tr.) at 208:17-209:15 & Ex. 13), Open Door and Helpline Policy (Ex. 1 (Pl. Tr.)

at 209:16-210:19 & Ex. 14), and Whistleblower Reporting and Anti-Retaliation Policy (Ex. 1 (Pl.

Tr.) at 210:20-212:1 & Ex. 15).

      **C.**    **CFC Audits, then Retains a Third-Party Certified Fraud Examiner to Investigate Plaintiff's Expense Reimbursement Submissions**

            **1.**    **CFC's Internal Audit Discovers Irregularities in Plaintiff's Submissions**

9.      CFC's Internal Audit Department ("I/A") conducts two types of accounts payable

audits, which examine accounting records related to CFC's employees' expense reimbursement

request submissions and CFC's reimbursement payments:  (i) annual audits for the purpose of

compliance with the requirements of Sarbanes-Oxley Act ("SOX") Section 404 and CFC's SEC

Form 10-K reporting obligations ("SOX Audits"); and (ii) "operational" or "process" or "accounts

payable" audits (CFC and its deponents use these three terms interchangeably), which are broader

than the SOX Audits and which CFC does once every three years ("Operational Audits").  Ex. 16

(CFC Tr.) at 72:2-78:15; Ex. 19 (Transcript of Deposition of Gary Bradbury ("Bradbury Tr.")) at

12:6-16:4.

10.     When conducting an audit, I/A maintains its independence from CFC's

management, so management cannot have any influence over how I/A does its work.  Ex. 19

(Bradbury Tr.) at 24:3-26:4; *see also* Ex. 16 (CFC Tr.) at 114:1-16 ("We're just reporting on the

facts. . . . We have to be objective in this process.").

11.     In November 2017, CFC's I/A began its fiscal year 2018 Operational Audit (the

"2018 Operational Audit").  Ex. 16 (CFC Tr.) at 72:2-15 & Ex. 17 (I/A Audit Summary).

12.     Operational Audits look at accounts payable activity, including but not limited to

employee expense reimbursements and vendor payments, and the focus is CFC's accounting

-4-

department's processes and ensuring that employees are complying with them (including CFC's business expense reimbursement process).  Ex. 16 (CFC Tr.) at 74:6-75:9.

13.     Then-Vice President of Internal Audit and Enterprise Risk Management Gary Bradbury ("Bradbury"), who is a CPA, oversaw the 2018 Operational Audit, and I/A staff auditors Frank Xu ("Xu"), Garret Arnold ("Arnold"), who is a CFE, and Keaton Ley assisted.  *Id.* at 24:17-25:11, 84:17-85:17, 92:17-94:1, 115:2-117:1.

14.     CFC utilizes the data analytics software, IDEA, when it conducts Operational Audits.  *Id.* at 72:18-73:7; Ex. 19 (Bradbury Tr.) at 9:20-12:5, 19:17-21:9.

15.     The IDEA software analyzes bulk data and looks for anomalies in the data.  *Id.*

16.     I/A uploaded into IDEA all of the expense reimbursement submissions at the beginning of the 2018 Operational Audit for all of CFC's employees who submitted expense reimbursement requests between June 1, 2016 through October 31, 2017 (the "Review Period").  Ex. 16 (CFC Tr.) at 72:2-17, 73:20-74:10, 80:17-82:17, 106:19-107:14 & Ex. 17.

17.     I/A pulled the source information for the 2018 Operational Audit from CFC's Oracle Fusion database, which is CFC's electronic general ledger system, Ex. 16 (CFC Tr.) at 73:20-74:5; *see also id.* at 72:2-17, 73:20-74:10, 80:17-82:17, 106:19-107:14 & Ex. 17.

18.     The IDEA software analyzed all of the expense reimbursement requests that CFC employees submitted during the Review Period and searched for exact duplicates based on the employee's name and the dollar amount, to determine if any employee submitted a potentially duplicate expense reimbursement request.  Ex. 16 (CFC Tr.) at 81:16-83:1, 94:6-95:14.

19.     The IDEA software flagged 59 potentially duplicate expense reimbursement submissions.  *Id.*

20.     Xu then chose seven potentially duplicate expenses to analyze further as a sample of the 59 submissions—two were Plaintiff's, two were for another, male RVP, John Kimsey, and

the rest were one each for three other male employees. *Id.* at 83:16-85:12; *see also* Ex. 17.

21.     I/A used samples to inform I/A's auditors whether discrepancies the IDEA software flagged indicated a larger problem in the organization. Ex. 16 (CFC Tr.) at 83:16-84:9 ("[I]n the internal audits. . . . we do samples. And the samples. . . . inform us to see is that really going to be indicative of what we find in the populations. Because what we are trying to find out is that these expenses were filed with the appropriate supporting documentation in accordance with [CFC's] corporate travel practice. . . . [W]e have some criteria that we also apply for SOX, and so that 59 really falls within that five to ten sample selection – sample size criteria that we use. So that seven is what was right in the middle of that five to ten in terms of sample size requirement."); *see also id.* at 84:17-88:13 (explaining the process of choosing samples and explaining that if Xu found no discrepancies in the sample, I/A marked an "X" in the I/A Audit Summary (Ex. 17) to indicate that the sample was "tested without exception" (*i.e.*, with no evidence of a discrepancy), after Bradbury conducted a second-level review of Xu's findings).

22.     Xu reviewed the actual business expense reimbursement requests and the supporting documentation for the seven sample requests. Ex. 16 (CFC Tr.) at 88:4-13, 89:7-16.

23.     Only Plaintiff's expense reimbursement submissions had actual discrepancies in these seven samples, while the others had supporting documentation that demonstrated the expenses were not, in fact, duplicates. *Id.* at 88:4-92:16 & Ex. 17 (noting that four of the samples were "tested without exception," and one was for an expense below $25, which did not require documentation pursuant to CFC's Corporate Travel Practice).

24.     I/A then decided to expand the sample by five additional potentially duplicate expenses for Plaintiff only, using the same data set (*i.e.*, the set of 59 potentially duplicate expenses) the IDEA software generated, to determine how pervasive the issue with Plaintiff's expenses were. Ex. 16 (CFC Tr.) at 88:4-92:16 & Ex. 17.

25.     I/A prompted the IDEA software to randomly generate the additional, expanded five samples. Ex. 16 (CFC Tr.) at 97:13-98:5 & Ex. 17 (the five samples the IDEA software randomly generated are in the chart labelled "Expansion samples" at CFC003494, and additional detail about the expanded testing is included in the row labelled "X3" and the chart labelled "matched line items" at CFC003495).

26.     I/A found two additional discrepancies from the additional sample of five potentially duplicate expenses. Ex. 16 (CFC Tr.) at 91:15-92:16 ("[A]s we find something, we just have to dig a little bit further. . . . until we. . . . get an idea of what the scope of the issue is. . . . The testing results and exceptions drove the decision to do some more testing."); *see also id.* at 100:11-101:12, 104:13-105:5 & Ex. 17; *see also id. at* 91:10-14 (Had I/A found no additional discrepancies, it "probably would have stopped here, done, and then [it] would have likely gone back to the employee to seek reimbursement.").

27.     I/A discovered four discrepancies with Plaintiff's expense reimbursement submissions at this stage of the audit (but none for other employees). Ex. 16 (CFC Tr.) at 105:6-106:4, 114:17-115:14; 117:2-19.

28.     I/A then started reviewing the remainder of Plaintiff's 98 expense reimbursement submissions that she submitted during the Review Period. *Id.* at 116:16-118:10.

29.     For the next two weeks I/A reviewed the remainder of Plaintiff's expense reimbursement requests and the supporting documentation for them. *Id.* at 118:11-20.

30.     I/A continued to find discrepancies in Plaintiff's expense reimbursement submissions. *Id.*

> 2.     **CFC Retains a Third-Party Certified Fraud Examiner to Investigate Plaintiff's Submissions**

31.     In mid-December 2017, CFC retained a certified fraud examiner—*i.e.*, John Persil ("Persil") with CST Group—to investigate Plaintiff's expense reimbursement request

submissions.  *Id.* at 118:18-119:7, 122:9-124:1; Ex 20 (Transcript of Deposition of John Persil ("Persil Tr.")) at 27:16-22.

32.     CFC made the decision to retain Persil because I/A found a concerning pattern of Plaintiff submitting duplicate expense reimbursement requests for payment after reviewing her expense reimbursement submissions, and CFC wanted an independent auditor to review them.  Ex. 16 (CFC Tr.) at 118:18-119:7, 122:9-124:1; *see also id.* at 104:13-106:4.

33.     CFC also asked CST Group to look at a set of expense reimbursement requests for four of Plaintiff's comparators—who were all male RVPs who had the most expense reimbursement submissions by dollar amount during the Review Period, and who also had the same reporting structure as Plaintiff (the "Four Comparators")—to determine if the issue was more pervasive throughout CFC.  *Id.* at 119:8-121:5.

34.     Persil is a CPA and CFE, who is a member of several professional organizations, including the Association of Certified Fraud Examiners ("ACFE").  Ex. 20 (Persil Tr.) at 15:9-21:14.

35.     CST Group acted as an independent, third-party investigator.  *Id.* at 67:10-68:5, 158:17-159:3.

36.     Neither CST Group nor Persil had a prior relationship with CFC before CST Group was retained on December 22, 2017.  *Id.* at 28:5-15, 192:13-19.

37.     Persil described the approach I/A and CFC took in the I/A audit and his investigation of Plaintiff's expense reimbursement request submissions as follows:

> [T]he internal audit department and my team were very, very conservative. . . . [I]f we felt a transaction could not provide conclusive evidence, that transaction was removed, i.e., we identified it as we could not make any conclusion. . . . [I]f there's uncertainty, we exercise due professional care to make sure that we exclude those items. . . . I always had the impression with Garrett [Arnold] and Gary [Bradbury], that they were just as conservative as we were . . . [and] until we collectively absolutely agreed that we had a finding . . . we excluded that from. . . . our ultimate report.

*Id.* at 65:5-66:1; *see also id.* at 67:21-68:5 ("[W]e were all professional, very skeptical. . . . if a finding did not hit . . . on every level, we withdrew that finding because we were very conservative with regard to identifying what we called an 'irregularity' . . . .").

38.    The only direction CFC provided CST Group was to review all the expense reimbursement submissions Plaintiff submitted during her CFC employment, and to review all the expense reimbursement submissions the Four Comparators submitted when CFC utilized the Oracle Fusion system for expense reimbursement submissions.  Ex. 16 (CFC Tr.) at 125:16-128:3, 134:3-135:17, 153:3-154:7; Ex. 19 (Bradbury Tr.) at 41:11-22; Ex. 20 (Persil Tr.) at 35:1-36:3.

39.    CFC pulled the data for the Four Comparators from the Oracle Fusion system, which it started using for employees' expense reimbursement requests submissions in April 2016, because that data was the most readily accessible.  Ex. 16 (CFC Tr.) at 128:4-131:12; *see also id.* at 128:22-129:5 (However, "[h]ad we found any issues with these four comparators, I would have instructed [Persil] that we should be looking at broadening that time frame.  But again, we're letting the results dictate how much testing that we're going to do.")

40.    I/A started coordinating with Persil and for the next few weeks, provided CST Group documentation to allow it to complete its investigation.  *Id.* at 124:2-125:3; Ex. 20 (Persil Tr.) at 28:17-29:5, 32:17-34:22, 36:13-38:7, 42:7-14, 58:3-62:6, 63:15-64:1, 68:6-69:14, 74:13-77:19, 106:18-107:9.

41.    Persil and his team reviewed all of Plaintiff's expense reimbursement submissions and the supporting documentation for them, and the expense reimbursement submissions and the supporting documentation for the Four Comparators described above.  *Id.*

42.     CST Group met regularly with CFC to verify that there were actual expense report discrepancies in Plaintiff's expense reimbursement request submissions CST Group identified as

having issues by going through the supporting documentation for the expense reimbursement requests together. *Id.*

43.     Persil had preliminary findings by mid-January 2018, which included 54 issues with Plaintiff's expense reimbursement requests.  Ex. 16 (CFC Tr.) at 140:19-144:8, 157:11-158:10, 172:1-9, 173:15-174:4 & Ex. 18; Ex. 20 (Persil Tr.) at 54:18-55:1, 64:19-66:1, 92:14-93:2, 94:10-95:9, 117:7-119:18 & Ex. 21 (Summary of CST Group's Findings).

44.     Persil and his team compiled documentation that supported his preliminary findings for each of Plaintiff's problematic expense reimbursement requests.  *Id.*

45.     He requested a meeting with Bradbury and Arnold and met with them to discuss his preliminary conclusions.  *Id.*

46.     On or about January 17, 2018, Persil reported the preliminary results of his investigation to a larger group comprised of members of I/A and CFC's senior management.  He told this group that he had concluded that Plaintiff had engaged in fraud against CFC.  Ex. 16 (CFC Tr.) at 68:15-70:14, 131:13-132:7, 135:18-137:6, 137:16-138:10, 140:4-143:1, 143:11-150:12, 151:10-153:16, 158:19-161:8, 162:16-163:16, 164:12-166:21; Ex. 20 (Persil Tr.) at 21:3-21, 22:18-25:22, 26:20-27:10; Ex. 23 (June 2018 Report).

47.     Persil, along with CFC's then-Senior Vice President of Corporate Services (and head of Human Resources) Graceann Clendenen ("Clendenen"), then interviewed Plaintiff on January 18, 2018, to provide Plaintiff examples of Persil's findings and get her response to them. Ex. 16 (CFC Tr.) at 139:14-140:3, 167:5-168:22; Ex. 20 (Persil Tr.) at 26:1-19, 90:7-92:13, 96:2-101:18, 102:14-103:15, 107:22-108:11, 109:21-110:9, 110:18-111:22, 155:14-156:4; Ex. 24 (Transcript of Deposition of Graceann Clendenen ("Clendenen Tr.")) at 25:20-26:6, 27:7-28:4, 28:19-29:9, 31:3-33:1, 33:18-34:4.

48.     Persil interviewed Plaintiff as part of his normal process of investigation, consistent with the ACFE's guidance, which is to interview the person he is investigating only after gathering sufficient evidence to formulate his findings and conclusions (which Persil did).  Ex. 20 (Persil Tr.) at 19:1-9, 26:5-27:10, 76:22-77:19.

49.     Persil determined that Plaintiff's explanations during his interview with her, or lack thereof, did not change his conclusion that she had engaged in fraud.  *Id*. at 104:7-105:6 ("[T]he fact that there was limited response [from Plaintiff] to these specific exhibits led me to believe that I'm not. . . .  [getting an] accurate description of what happened other than her denial that, 'That's impossible.  That can't happen.'  But the reality is it did happen.").

50.     Persil finalized his conclusions that Plaintiff engaged in four fraudulent expense reimbursement schemes—classified as "fraudulent disbursements" by the ACFE:  (i) a multiple reimbursement expense scheme, through which an "[e]mployee submits the same expenses and/or receipts on multiple expense reports;" (ii) a fictitious expense scheme, through which an "[e]mployee seeks reimbursement for a fake purchase often backed up with fake receipts;" (iii) an overstated expense scheme, through which an employee submits a "[r]eimbursement request for a legitimate business expense, but for a trumped-up amount;" and (iv) a mischaracterized expense scheme, through which an "[e]mployee requests reimbursement for a personal expense but claims it to be business-related."  *Id*. at 21:3-21, 22:18-25:22; Ex. 23 (June 2018 Report) at CFC006057.

51.     CST Group's investigation did not find any "fraudulent disbursements" in the Four Comparators' expense reimbursement request submissions.  Ex. 20 (Persil Tr.) at 80:6-89:20, 123:20-124:15, 125:9-13; Ex. 23 June 2018 Report) at CFC006058.

52.     CST Group memorialized its findings in a report in February 2018.  I/A then engaged in a reconciliation process through which it reviewed each of the findings and supporting documentation in detail.  As part of that "due diligence" reconciliation process, I/A discussed three

findings with CST Group that it wanted CST Group to consider removing.  CST Group did, in fact, remove those findings, and re-published a modified report in June 2018.  Ex. 16 (CFC Tr.) at 154:8-157:10, 173:3-175:3, 175:20-176:13, 209:15-210:20 & Ex. 17 (explaining that the expense in the amount of $326.20 was removed from CST Group's findings after CFC discovered Plaintiff had reimbursed CFC for that amount); Ex. 19 (Bradbury Tr.) at 42:1-43:6 (describing reconciliation process and stating:  "we felt it was important to make sure we had the most accurate information in John [Persil]'s report, provided the details to John, and. . . he then updated his report, I believe it was in June of 2018"); Ex. 20 (Persil Tr.) at 183:16-184:6, 188:8-192:10 & Ex. 22 (February 2018 Report); Ex. 23 (June 2018 Report); Ex. 1 (Pl. Tr.) at 281:3-20, 282:8-285:22, 286:14-21, 292:13-294:18 (agreeing that CFC Group removed the $326.20 charge from its findings and that this expense is the one Plaintiff is referencing in paragraph 29 of her Amended Complaint).

53.    Members of CFC's management (and counsel) met on January 18, 2018, after Persil's conversation with Plaintiff, and a subsequent conversation Senior Vice President of Member Services Joel Allen ("Allen") and Chief Operating Officer John Evans ("Evans") had with Plaintiff, to discuss Persil's investigation and what discipline to impose upon Plaintiff.  Ex. 16 (CFC Tr.) 168:8-169:14 ("[T]here was a lot of hand wringing about [what to do].  Teri was a highly-valued employee.  Everybody thought her performance and what she did – she's a really good performer.  But you can't neglect what this is.  And this is clearly a violation of the code of conduct and our ethics policy.  This fraud was just so egregious, we have no choice but to render that termination decision.  And I have to tell you, it was not easy.  We had a lot of discussions about it.  It was hard, really hard."); *see also* Ex. 24 (Clendenen Tr.) at 25:20-26:6, 27:7-28:4, 28:19-29:9, 31:3-33:1, 33:18-34:4, 36:19-43:9, 48:2-49:20, 58:4-22.

**D.   CFC Terminates Plaintiff's Employment**

54.   CFC has zero tolerance for fraud, no matter the amount of the fraud.  Bradbury Tr. at 30:19-35:12; CFC Tr. at 189:3-9; *see also* Persil Tr. at 141:3-142:14.

55.   CFC's Chief Executive Officer ("CEO") Sheldon Petersen ("Petersen"), Evans, Clendenen, Allen, and internal legal counsel all had input into the decision to terminate Plaintiff, and Petersen made the final decision.  CFC Tr. at 65:18-66:14, 168:8-22, 169:1-171:17; *see also* Clendenen Tr. at 36:19-43:9, 48:2-49:20, 58:4-22.

56.   CFC terminated Plaintiff's employment on January 18, 2018 for committing fraud and other expense report submission irregularities, which violated CFC's Code of Conduct and Ethics Policy.  Ex. 16 (CFC Tr.) at 177:11-180:21, 181:13-184:7, 187:21-192:2.

57.   CFC's decision was based on: (i) the number of fraudulent expense reports Plaintiff submitted; (ii) the dollar value of the overpayments she received from CFC; (iii) the lack of documentation for some of her other expense reports; (iv) Plaintiff's lack of contrition and denials during her meeting with Persil, and a subsequent meeting with Evans and Allen; and (v) its obligations to its member cooperatives.  *Id.*; *see also id.* at 188:6-189:2 ("[W]hat if this got out into the membership.  We've got 950 members.  If they found out that someone had committed fraud and they were continuing to work here, that would be a serious erosion of trust with our members."); *see also* Ex. 8 at CFC003397 (CFC's Code of Conduct states in part that "[t]he integrity and accuracy of CFC financial statements is critical to the confidence of CFC's investors and members.  Accounting irregularities could raise red flags with CFC's investors and may cause a loss of confidence in the financial stability of the organization.  This can lead to higher prices for accessing credit in the capital markets and, in turn, drive up the cost of borrowing for CFC and our members."); *see also* Ex. 1 (Pl. Tr.) at 198:16-200:6 (Plaintiff agreeing with this statement from the Code of Conduct).

**E.**  **Plaintiff's Allegations of Misconduct Against CFC and Complaints**

58.  CFC has a number of policies in place that prohibit discrimination and retaliation, and which provide several avenues through which employees can report alleged discrimination, retaliation, or other unfair treatment—including, but not limited to reporting to an employee's manager, another manager, human resources, CFC's internal legal department, or an anonymous helpline. *See*, *e.g.*, Ex. 1 (Pl. Tr.) at 197:7-198:15 & Ex. 8 (CFC's Code of Conduct and Business Ethics); Ex. 1 (Pl. Tr.) at 203:22-207:17 & Exs. 10-11 (Employee Handbook); Ex. 1 (Pl. Tr.) at 207:18-208:13 & Ex. 12 (Anti-Harassment Policy); Ex. 1 (Pl. Tr.) at 208:17-209:15 & Ex. 13 (Complaints Policy); Ex. 1 (Pl. Tr.) at 209:16-210:19 & Ex. 14 (Open Door and Helpline Policy); Ex. 1 (Pl. Tr.) at 210:20-212:1 & Ex. 15 (Whistleblower Reporting and Anti-Retaliation Policy).

59.  Plaintiff made no complaints of discrimination or unfair treatment during her CFC employment.  Ex. 1 (Pl. Tr.) at 268:1-14.

60.  No one made any derogatory comments to Plaintiff about her sex during her CFC employment.  *Id*. at 267:20-22.

61.  Plaintiff filed her Administrative Complaint with the Wisconsin Department of Workforce Development Equal Rights Division ("Wisconsin DWD") and Equal Employment Opportunity Commission ("EEOC") on November 5, 2018.  Ex. 26 (Declaration of Jason Brown ("Brown Decl.")) ¶ 6 & Ex. 27 (Administrative Complaint).

62.  Plaintiff did not amend her Administrative Complaint to add a retaliation claim, and she discovered facts she believed might be the basis for her retaliation claim in or about February or March 2018—eight to nine months before she filed her Administrative Complaint, facts to which the parties stipulated.  *See* ECF 42 (Joint Stipulation); Ex. 1 (Pl. Tr.) at 320:16-336:21 (Plaintiff's testimony about the only two alleged instances of retaliation, which were both prior to filing her Administrative Complaint).

63.    Plaintiff did not allege in her Administrative Complaint that CFC retaliated against her.  *See* Ex. 27 (Administrative Complaint).

64.    Plaintiff's Administrative Complaint only alleges that CFC's decision to terminate her after the 2018 Operational Audit and CST Group investigation was due to sex discrimination. *Id.*

65.    Plaintiff only checked the box on the Administrative Complaint's form stating that she believed CFC discriminated against her due to her sex, and the narrative she included only alleges discrimination during her employment leading to her termination.  *Id*.

66.    Plaintiff did not check any of the boxes on the form indicating she also was alleging retaliation—*i.e.*, the "I filed a previous discrimination complaint," "I opposed discrimination in the workplace," or any of the four other check boxes following those two.  *Id*. (nor does the narrative attached to her Administrative Complaint mention anything related to retaliation).

67.    After investigating Plaintiff's Administrative Complaint, the Wisconsin DWD issued an Initial Determination—No Probable Cause on May 23, 2019, which found, in part, that there was no probable cause to believe CFC may have discriminated against Plaintiff.  Ex. 26 (Brown Decl.) ¶ 7 & Ex. 28.

68.    Plaintiff appealed the decision, and the agency set a hearing on the issue of probable cause to occur on February 4 and 5, 2020, which it subsequently rescheduled to June 29 and 30, 2021.  Ex. 26 (Brown Decl.) ¶ 8 & Exs. 29-30.

69.    On June 28, 2021, a day before the hearing, Plaintiff requested to withdraw her Administrative Complaint and requested a right to sue letter from the EEOC. Ex. 26 (Brown Decl.) ¶ 9 & Ex. 31.

70.    Plaintiff first alleged that CFC retaliated against her when she filed her original Complaint in this matter on November 3, 2021.  *See* ECF 1 ("Complaint") ¶¶ 64-68; ECF 42.

71.     In her Complaint she alleges that the basis for her retaliation claim is that "*[b]eginning in July of 2018* and continuing through September 2021, CFC has . . . retaliate[ed] against Wallis, because she filed a charge with the Equal Opportunity Commission." ECF 1 ¶ 65 (emphasis added).

72.     Plaintiff filed her Amended Complaint on September 23, 2022, which added further factual allegations related to her retaliation claim—that CFC "unlawfully retaliated against Plaintiff by preventing her from being hired within the rural electric cooperative industry. *See* ECF 30 ("Amended Complaint") ¶¶ 62-67, 77-82.

73.     Since Plaintiff's termination from CFC, she has:  (i) done business with at least 14 electric cooperatives who also are CFC members through her consulting firm (Ex. 1 (Pl. Tr.) at 137:1-141:12, 148:1-151:6); (ii) was chief financial officer for an electric cooperative for three years and nine months (*id.* at 144:16-145:11, 151:16-154:4); and (ii) turned down a chief executive officer position with another electric cooperative (*id.* at 370:10-372:22).

74.     The central theory for Plaintiff's sex discrimination claim is that the 2018 Operational Audit and CST Group's investigation unfairly targeted her because they did not consider the volume of her travel and business expense transactions in their findings, or the number of business accounts and electric cooperatives in her region, and did not give her sufficient time to respond to CST Group's fraud findings. Ex. 1 (Pl. Tr.) at 226:6-232:17, 237:7-239:2; *see also* Ex. 16 (CFC Tr.) at 165:8-166:8..

75.     In or about December 2017, Plaintiff and Vice President of Events and Training John Grant ("Grant") completed a presentation on a training panel together.  Grant complemented her on her excellent survey results, but stated "that's not going to happen again."  Amended Complaint ¶ 36; Ex. 1 (Pl. Tr.) at 255:7-256:20, 263:16-266:15.

76.     Plaintiff laughed at Grant's comment at the time and she testified that Grant "maybe" was joking, but she later speculated that the comment may have been due to him being intimidated that Plaintiff was getting her doctorate in adult education and was feeling threatened. Ex. 1 (Pl. Tr.) at 265:10-266:15 ("Q. And is that pure speculation on your part?  A. Pure speculation.").

77.     Other than the abovementioned allegations, Plaintiff is not claiming that anyone else mistreated her during her CFC employment. *Id*. at 267:16-19.

## III.   ARGUMENT

### A.     Summary Judgment Standard

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010).  Although the Court must view the record "in the light most favorable to the non-moving party," *Dulaney v. Packaging Corp. of America*, 673 F.3d 323, 325 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to overcome a motion for summary judgment, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) ("The mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment.  Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law . . . .").

The undisputed material facts demonstrate CFC is entitled to summary judgment.

### B.    Plaintiff Failed to Exhaust Her Administrative Remedies Related to Her Retaliation Claim

Plaintiff did not allege that CFC retaliated against her in her Administrative Complaint. *See generally* Ex. 27 (Administrative Complaint).  Those allegations are also not "reasonably related" to the allegations in her Administrative Complaint.  Therefore, Plaintiff has failed to exhaust her administrative remedies for that claim.

It is well settled that before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC.  42 U.S.C. § 2000e-5(b), (f). Typically, "a plaintiff fails to exhaust his administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012) (omission in original) (citation omitted).  Failing to do so results in a procedural bar "when the claims in [a plaintiff's] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge' . . . ." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (second alteration in original) (citation omitted).  "A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000).  "The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint." *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 416 (4th Cir. 2014); *see also Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132–33 (4th Cir. 2002) (holding the scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents).  "[F]actual allegations made in formal litigation must correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005); *see also id.* at 510–12 (holding that the plaintiff had failed to exhaust his administrative remedies where his EEOC charge alleged three specific instances of harassment by a supervisor and his federal complaint alleged long-term harassment by colleagues).  "Only 'those

discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'"  *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019) (citation omitted).

If the discrimination claims "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Chacko*, 429 F.3d at 509 (citation omitted).  "A claim will also typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits." *Id.*

Plaintiff filed her Administrative Complaint on November 5, 2018.  Undisputed Material Facts (UMF) ¶ 61.[1]  Despite Plaintiff discovering facts she believed might be the basis for her retaliation claim in or about February or March 2018—eight to nine months before she filed her Administrative Complaint—she neither included a retaliation claim in her Administrative Complaint, nor did she include any language indicating she was asserting a retaliation claim, nor did she amend her Administrative Complaint to add a retaliation claim.  UMF ¶¶ 62-66; *see also* ECF 42; Ex. 1 (Pl. Tr.) at 320:16-329:11 (describing allegations of retaliation related to work she performed as a contractor for the National Rural Electric Cooperative Association ("NRECA"), and that the basis for her allegation is that her communications with NRECA stopped in July or August 2018 after she had performed under that contract for several months, which Plaintiff attributes to CFC discussing Plaintiff's termination with NRECA);  Ex. 1 (Pl. Tr.) at 329:12-336:21 (describing allegations of retaliation related to Plaintiff's application to work for Wright-Hennepin Cooperative Electric Association, and alleging that the recruiter withdrew her application in or about August 2018 after someone from CFC allegedly informed Wright-Hennepin that she had

---

[1] CFC's "UMF" citations are to Section II. of this Memorandum.

engaged in unethical behavior at CFC).[2]  Plaintiff also did not allege any post-termination misconduct by CFC (her retaliation claims are all premised on post-termination misconduct). UMF ¶ 64; *see also* Ex. 27 (Administrative Complaint).

Plaintiff first alleged that CFC retaliated against her when she filed her original federal Complaint in this matter on November 3, 2021—*over three and a half years after discovering facts she believed might be the basis for her retaliation claim*—and did not add her allegations that CFC prevented her from working in the electric cooperative industry until she filed her Amended Complaint on September 23, 2022—nearly four years after she filed her Administrative Complaint.  UMF ¶¶ 70-72.  Therefore, the narrow issue for the Court to decide is whether Plaintiff's retaliation claim is "reasonably related" to the Administrative Complaint.  The facts demonstrate that it is not.

First, Plaintiff's retaliation claim is not "reasonably related to" and does not grow out of her allegations in her administrative charge.  *Chacko*, 429 F.3d at 506.  The administrative charge "frames the scope of future litigation."  *Id*.  While a plaintiff's "failure to check the 'retaliation' box on the charge form is not fatal to exhaustion of th[e] claim," "the narrative of the charge must either:  (1) specifically allege or describe retaliation; or (2) show that retaliation was a 'kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission.'"  *Young v. Hous. Auth. of Balt. City*, No. WDQ–14–1764, 2015 WL 795132, at *3 & n.14 (D. Md. Feb. 24, 2015) (quoting *Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 573 (E.D. Va. 2009)) (citing *Williams v. Mancom, Inc.*, 323 F. Supp. 2d 693, 695 n.2 (E.D. Va. 2004)); *see also Johnson*, 682 F. Supp. 2d at 575-77 (finding the plaintiff's retaliation claim cannot be fairly read as being

---

[2] Plaintiff's allegations are also belied by the fact that she worked with at least 14 electric cooperatives after her termination from CFC who also have a business relationship with CFC. UMF ¶ 73; *see also* Ex. 1 (Pl. Tr.) at 148:1-151:6.

related to or expected to follow from the administrative investigation of his race discrimination claim or any other allegations in the EEOC charge).

Plaintiff satisfies neither requirement here, as the Administrative Complaint references no "time frames, actors, [or] discriminatory conduct" to support a claim of Title VII retaliation, *Chacko*, 429 F.3d at 506, and makes no reference to retaliation. The alleged post-termination retaliation also does not "grow out of" or "bear relation to" the alleged sex discrimination occurring during Plaintiff's employment and culminating in her termination. *See, e.g.*, *Okanes v. Soc'y for Worldwide Interbank Fin. Telecomm. SC*, No. 1:21-cv-0285, 2021 WL 9598562, at *1 (E.D. Va. June 7, 2021) ("Retaliation . . . does not 'grow out of' or 'bear relation to' the alleged underlying sex discrimination claims [plaintiff] asserts." (citation omitted)), *aff'd*, No. 21-2437, 2022 WL 11776672 (4th Cir. Oct. 20, 2022); *Baiden-Adams v. Forsythe Transp., Inc.*, 969 F. Supp. 2d 422, 432 (E.D. Va. 2013) (subsequent retaliation claim regarding plaintiff's inquiries regarding pay not reasonably related to retaliation claim in EEOC charge related to plaintiff's efforts to prevent sexual harassment in the workplace); *Johnson*, 682 F. Supp. 2d at 575 (retaliation claim not reasonably related to race discrimination claim in EEOC charge); *Young*, 2015 WL 795132, at *3 (plaintiff's sex discrimination allegations in administrative complaint not reasonably related to subsequent retaliation claim). A reasonable EEOC or Wisconsin DWD investigation into Plaintiff's allegation that her termination was due to sex discrimination and CFC's internal audit and third-party investigation were pretextual would be unlikely to uncover CFC's purported post-termination retaliation (and, in fact, it did not, *see* UMF ¶ 67). No facts suggest the Title VII retaliation Plaintiff allegedly experienced arose from the same facts or from the same animus animating CFC's purported discrimination.

Therefore, dismissal of Plaintiff's retaliation claim is proper and harmonizes with the core function of Title VII's administrative exhaustion requirement, which is to afford an employer "an

-21-

initial opportunity to voluntarily and independently investigate and resolve the alleged

discriminatory actions." *Chacko*, 429 F.3d at 510; *see also Young*, 2015 WL 795132, at *3.

Plaintiff did not provide CFC that opportunity here and her retaliation claim is time-barred.[3]

### C.   Plaintiff Cannot Make a *Prima Facie* Case of Sex Discrimination

Plaintiff cannot make her *prima facie* case of discrimination related to CFC's decision to

terminate her for fraud and policy violations because there is no evidence that similarly situated

employees outside her protected class were treated differently.

Where, as here, Plaintiff offers no direct evidence of discrimination, the Court must analyze

her claims under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973); *see also Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289,

294 (4th Cir. 2010). Under *McDonnell Douglas*, the plaintiff must first establish facts sufficient

---

[3] Plaintiff's counsel clarified when the parties conferred regarding CFC's Motion, pursuant to Local Rule 7(e), that Plaintiff is not alleging a separate and distinct pay disparity sex discrimination claim, but rather is alleging the purported pay disparity as part of her damages theory for her other claims and as circumstantial evidence for those claims. Ex. 26 (Brown Decl.) ¶ 11; *see also* Amended Complaint ¶¶ 60, 73. Therefore, CFC is not including more fulsome arguments related to that claim here regarding her failure to administratively exhaust that claim, and lack of evidence to make her *prima facie* case and for pretext in CFC's decisions. To the extent Plaintiff will allege that evidence of the purported pay disparity supports her other claims, it does not. Plaintiff's starting salary with CFC was $120,000. Ex. 1 (Pl. Tr.) at 177:13-178:22 & Ex. 5. She received several increases to her base salary during her employment, and her salary was $157,500 at the end of her employment, which was a 31.25 percent increase from her starting salary. Ex. 1 (Pl. Tr.) at 188:9-191:10. She received other incentive compensation from CFC during her employment, which increased her total compensation by approximately $20,000 to $30,000 per year. *Id.* 1. Plaintiff received her last paycheck from CFC on February 1, 2018 (Ex. 25 (Bradbury Aff.) ¶ 6), and, therefore, that claim accrued on that date. Plaintiff first made pay disparity allegations against CFC when she filed her Amended Complaint on September 23, 2022—*over four and half years after Plaintiff received her last allegedly discriminatory paycheck from CFC* and *nearly four years after she filed her Administrative Complaint*. Ex. 27. Her pay disparity allegations in her Amended Complaint center around a conversation she had with former CFC RVP Michael Bunney ("Bunney") after CFC terminated her employment, whose compensation was greater than Plaintiff's. *Id.* ¶ 60. Bunney: (i) had 22 more years of tenure with CFC than Plaintiff; (ii) was a "strategic level" RVP whereas Plaintiff was not; and (iii) was previously a CEO of an electric cooperative, whereas Plaintiff had never been a CEO. Ex. 1 (Pl. Tr.) at 128:13-131:9, 133:5-8, 139:6-141:12, 313:18-320:15; Ex. 16 (CFC Tr.) at 203:5-207:18.

to state her *prima facie* case of discrimination. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If Plaintiff establishes her *prima facie* case, the burden shifts to CFC to show that its purportedly discriminatory action was in fact the result of a legitimate, non-discriminatory reason. *Id*. Once it does, the burden shifts back to Plaintiff to rebut CFC's evidence by demonstrating that its articulated legitimate, non-discriminatory reason was "not its true reason[], but [was] a pretext for discrimination." *Id*. (citations omitted).

To establish a *prima facie* claim for disparate treatment sex discrimination, Plaintiff must show: "(i) membership in a protected class; (ii) satisfactory job performance; (iii) adverse employment action; and (iv) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012).

Importantly, the "crucial inquiry is whether the employer acted based on an unlawfully discriminatory motive, 'not the wisdom or folly of the employer's business judgments.'" *Miller v. McWilliams*, No. 1:20-CV-0671, 2021 WL 3192164, at *5 (E.D. Va. July 28, 2021) (quoting *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410–11 (7th Cir. 1997) (recognizing that courts must "not sit as a kind of super-personnel department weighing the prudence of employment decisions" by second-guessing whether a particular employment decision was "wise, fair, or even correct")).

Where the non-moving party bears the burden of proof—as Plaintiff does in the first and third steps of the *McDonnell Douglas* burden-shifting framework—the party moving for summary judgment may prevail by showing an absence of evidence to support an essential element of that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986); *see also Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully

-23-

demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than just "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation omitted); *see also Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (a non-movant's conclusory assertions and denials are not sufficient to preclude an award or summary judgment for the movant). The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citation omitted).

CFC is not challenging that Plaintiff is a member of a protected class—she is a woman—or that CFC subjected her to an adverse employment action—CFC involuntarily terminated her for expense report fraud and policy violations. Rather, Plaintiff fails to make her *prima facie* case of sex discrimination because she cannot demonstrate that she was treated differently than similarly situated employees who were not women through any evidence that is beyond speculation or conjecture.

CFC terminated Plaintiff after its 2018 Operational Audit and CST Group's independent, third-party investigation—undertaken by auditing professionals and CFEs (Persil and Arnold)—found she committed over 50 instances of fraud, which caused CFC to pay her over $16,500 to which she was not entitled. UMF ¶¶ 9-57. The 2018 Operational Audit started with a review of *all of CFC's employees*' expense reimbursement submissions during the Review Period, but at every step of the process, *only Plaintiff's* had discrepancies. This is also true of CST Group's investigation. CFC did not "target" Plaintiff—it simply followed a trail of evidence, through a deliberate, data-driven process, that led to Plaintiff's terminable misconduct. She was treated

exactly the same as all of CFC's other employees who submitted expense reimbursement requests during the Review Period.  She was just the only CFC employee who committed fraud.

Plaintiff 's purported evidence of allegedly discriminatory conduct by CFC amounts to pure speculation, conjecture, and attempts to shift blame to others:  (i) that CFC should forgive some fraud due to the volume of her travel and expense reimbursement submissions, or allowed her more time to explain it (Ex. 1 (Pl. Tr.) at 226:6-232:17, 237:7-239:2);[4] (ii) that Grant's comment about her evaluation score after their presentation was somehow evidence of discrimination, even though she laughed at it at the time, agrees that he could have been joking, and he had no role whatsoever in her termination (Ex. 1 (Pl. Tr.) at 255:7-256:20, 263:16-266:15; UMF ¶¶ 46, 55, 75, 76); and (iii) that her managers should have caught her fraud sooner and CFC's travel agency's invoices should have been clearer (Ex. 1 (Pl. Tr.) at 214:1-216:12).[5]  But, as Plaintiff conceded, it was always her responsibility to submit truthful and accurate business expense reimbursement requests (Ex. 1 (Pl. Tr.) at 279:5-22) and she failed in that responsibility.

Finally, the fact that Clendenen, a woman in the same protected class as Plaintiff, provided input into, and supported, the decision to terminate Plaintiff further undermines her claim.  *See Jackson v. Sch. Bd. of City of Richmond*, No. 99–CV–642, 2000 WL 34292578, at *7 (E.D. Va. Mar. 15, 2000); *see also* Ex. 24 (Clendenen Tr.) at 36:19-43:9, 48:2-49:20, 58:4-22; Ex. 16 (CFC Tr.) at 170:5-22.

---

[4] But, "a duplicate is a duplicate whether someone submits ten expense reports or 200; they would be certainly subject to the same level of testing." Ex. 16 (CFC Trans.) at 98:6-99:11, 165:8-166:8; *see also id.* at 189:7-190:1 ("[T]here's no materiality for fraud, and there. . . is a zero tolerance for it.")

[5] Plaintiff's central gripe regarding the travel agency was that its invoices were allegedly confusing and she could not determine if the travel agency applied credits for change fees to subsequent invoices. Ex. 1 (Pl. Tr.) at 279:5-11.  However, CFC took the travel agency's change fees into account in its audit, as did CST Group, and still determined she committed fraud. Ex. 16 (CFC Tr.) at. at 101:13-103:2; Ex. 20 (Persil Tr.) at 133:5-20, 135:8-136:2. Plaintiff's accounting and finance background also contradict her purported "confusion" about the agency's invoices.

Plaintiff cannot show that she was treated differently than similarly situated male employees and her sex discrimination claim based on her termination fails as a matter of law.

### D.    Plaintiff Cannot Make a *Prima Facie* Case of Retaliation

Plaintiff cannot make her *prima facie* case of retaliation because there is no evidence of any causal connection between her protected activity—filing her Administrative Complaint in November 2018—and any adverse action by CFC.

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims as well. *See Johnston v. Envision Physician Servs.*, No. 1:21-cv-1064 (AJT/IDD), 2022 WL 3211435, at *4 (E.D. Va. Aug. 2, 2022), *aff'd sub nom. Johnston v. Envision Physician Servs., HR*, No. 22-1832, 2023 WL 315263 (4th Cir. Jan. 19, 2023).  To establish a *prima facie* case of retaliation, a plaintiff must prove that:  "(i) she engaged in a protected activity; (ii) the employer acted adversely against her; and (iii) there was a causal connection between the protected activity and the asserted adverse action."  *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (citation omitted).

As explained in more detail in Sections II.E and III.B above, it is factually impossible that CFC retaliated against Plaintiff in July or August 2018 (related to her work with NRECA and candidacy with Wright Hennepin) due to her Administrative Complaint, which she did not file *until November 2018*.  UMF ¶¶ 61-62, 70-72; *see* ECF 42.  Therefore, there is no causal connection between the only two allegedly retaliatory events about which Plaintiff testified—which occurred before she filed her Administrative Complaint—and her Administrative Complaint that she filed months later.

Additionally, even assuming Plaintiff's allegations to be true—that NRECA stopped giving her work after an unidentified person from CFC discussed her termination with an unidentified person from NRECA; and that a recruiter pulled her candidacy from a position with Wright Hennepin because an unidentified person from CFC told an unidentified person from

-26-

Wright Hennepin that Plaintiff was terminated for misconduct—Plaintiff has no evidence that any conversation between CFC and those third parties was a pretext for retaliation.[6]

Therefore, Plaintiff cannot meet her *prima facie* burden under *McDonnell Douglas* for her sex discrimination or retaliation claims.

### E.  Plaintiff Cannot Demonstrate Pretext in CFC's Termination Decision

Even if Plaintiff is able to meet her *prima facie* burden of sex discrimination, she will not be able to demonstrate that CFC's decision to terminate her was a pretext for discrimination. "[T]he causation standards for establishing a *prima facie* . . . case and proving pretext are not identical.  Rather, the burden for establishing causation at the *prima facie* stage is 'less onerous.'"  *Foster*, 787 F.3d at 251 (citation omitted).  At the pretext stage, the employee's circumstantial evidence of unlawful intent, is not sufficient to create a jury question.  *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 458 (4th Cir. 1989).  Again, "[i]t is the perception of the decisionmaker which is relevant."  *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (alteration in original) (citation omitted).  When an employer articulates a legitimate, non[-discriminatory] reason for an employment action, the issue is not whether the reason for the action was "wise, fair or even correct, ultimately, so long as it truly was the reason" for the action.  *See Al-Habashy v. Va. Dep't of Juv. Just.*, No. 7:13CV00459, 2015 WL 5916007, at *9 (W.D. Va. Oct. 8, 2015), *aff'd*, 646 F. App'x 332 (4th Cir. 2016) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)).

---

[6] Plaintiff's evidence related to the purported conversations between CFC and NRECA and Wright Hennepin is so attenuated that it is unreliable, and the Court should not consider it.  *See* Ex. 1 (Pl. Tr.) at 326:18-329:11 (NRECA had not promised Plaintiff any additional work under her consulting contract, and the alleged conversation forming the basis of her claim related to NRECA consists of third- or fourth-hand information and multiple levels of hearsay); *see also id.* at 333:4-335:4, 335:19-336:21 (Plaintiff again testifying about an alleged conversation consisting of multiple levels of hearsay, and that someone told Wright Hennepin's CEO that CFC terminated her for unethical behavior (which is a true statement)).

Plaintiff will be unable to establish pretext related to her discrimination claim for the same reasons that she cannot establish her *prima facie* case.

### F.     Plaintiff Cannot Demonstrate Pretext in CFC's Alleged Post-Termination Conduct

Even if Plaintiff is able to meet her *prima facie* case of post-termination retaliation, she will not be able to demonstrate that any conduct by CFC was a pretext for retaliation, which is required under the *McDonnell Douglas* burden-shifting framework. *See Lamb v. Modly*, No. 22-1308, 2023 WL 2263015, at *1 (4th Cir. Feb. 28, 2023). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Plaintiff will be unable to establish pretext related to her retaliation claim for the same reasons that she cannot establish her *prima facie* case.

## IV.     <u>CONCLUSION</u>

For all off the reasons stated herein, CFC respectfully requests that the Court grant it summary judgment.   Alternatively, CFC respectfully requests that the Court grant it partial summary judgment as appropriate.

Dated:  March 14, 2023            By:   <u>/s/ Susan F. Wiltsie</u>
                                  **HUNTON ANDREWS KURTH LLP**
                                  Susan F. Wiltsie (VSB No. 30390)
                                  Email:  swiltsie@hunton.com
                                  Jason P. Brown (admitted *pro hac vice*)
                                  Email:  brownj@hunton.com
                                  Steven DiBeneditto (VSB No. 92888)
                                  Email:  sdibeneditto@huntonak.com
                                  2200 Pennsylvania Avenue, NW
                                  Washington, D.C. 20037
                                  202.955.1500 – PHONE
                                  202.778.2201 – FACSIMILE

                                  *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2023, I electronically filed this document with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to counsel of record for all Parties.

By: _/s/ Susan F. Wiltsie_
Susan F. Wiltsie