# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - x

TERILYN K. WALLIS,            :

        Plaintiff,         :    CIVIL ACTION NO.

v.                           :    1:22-cv-00838-PTG-WEF

NATIONAL RURAL UTILITIES   :

COOPERATIVE FINANCE          :

CORPORATION,                 :

        Defendant.         :

- - - - - - - - - - - - - x


Videotaped Deposition of TERILYN K. WALLIS

Friday, January 20, 2023

10:02 a.m.


Job No.: 138046

Pages 1 through 382

Reported by:  Cassandra E. Ellis, CSR-HI #475,

CSR-CA #14448, CCR-WA #3484, RPR #823848, RMR,

CRR, Realtime Systems Administrator

Wallis, Terilyn                                          February 20, 2023

2

```
 1              Deposition of TERILYN K. WALLIS,

 2     held pursuant to agreement, before Cassandra E.

 3     Ellis, Certified Shorthand Reporter -- Hawaii

 4     #475, Certified Court Reporter - Washington

 5     #3484, Certified Shorthand Reporter - California

 6     - #14448, Registered Professional Reporter

 7     #823848, Registered Merit Reporter, Certified

 8     Realtime Reporter, Realtime Systems

 9     Administrator, and Notary Public of the District

10     of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22
```

Wallis, Terilyn                                    February 20, 2023

3

```
1                    A P P E A R A N C E S
2          ON BEHALF OF PLAINTIFF:
3                ANITA MAZUMDAR CHAMBERS, ESQUIRE
4                THE EMPLOYMENT LAW GROUP, P.C.
5                1717 K Street, Northwest
6                Washington, D.C.  20006
7                (202) 713-0814
8                Achambers@employmentlawgroup.com
9
10         ON BEHALF OF DEFENDANT:
11               JASON P. BROWN, ESQUIRE (pro hac vice)
12               SUSAN S. WILTSIE, ESQUIRE
13               HUNTON ANDREWS KURTH LLP
14               2200 Pennsylvania Avenue, Northwest
15               Washington, D.C.  20037
16               (202) 955-1870
17               Brownj@hunton.com
18               Swiltsie@HuntonAK.com
19
20    ALSO PRESENT:
21    Joseph E. Ellis, Certified Legal Video Specialist
22    Kate Sigmund
```

Wallis, Terilyn                                          February 20, 2023

28

1    school in 1990, completed that degree by 1993,

2    year-end 1993.

3              My next formal education was at

4    University of St. Thomas, in St. Paul, where I

5    obtained my master in business administration

6    with a concentration in finance.  I completed

7    that roughly in the 2000, 2001 timeframe.

8              And then the next formal education

9    that I completed was finished in 2021, when I

10   finished my EDD in adult education or my

11   doctorate degree.

12        Q.   Where did you receive an EDD?  What

13   does that stand for?

14        A.   That's an education -- doctorate in

15   education.

16        Q.   And who did you -- who did you

17   receive your doctorate from?

18        A.   Capella.

19        Q.   And how long were you working on

20   that doctorate?  How long was the coursework and

21   research and all that good stuff?

22        A.   Yeah, it started maybe in 2013 or

Wallis, Terilyn                                    February 20, 2023

34

1    correlated to NRECA, the National Trade

2    Association for Electric Cooperatives program.

3           Q.   NRECA, is that National Rural

4    Electric Cooperative Association?

5           A.   Correct.

6           Q.   And MIP, is that Management

7    Internship Program?

8           A.   Correct.

9           Q.   What was the NRECA's MIP program,

10   what was the purpose of that, from what you

11   remember?

12          A.   The purpose of the MIP program is

13   to prepare employees of the cooperative network

14   who are ready to lead at an executive level with

15   a comprehensive experience surrounding what all

16   would be involved in managing a cooperative.

17          Q.   We're going to be talking about

18   electric cooperatives throughout the day.  Can

19   you just explain, generally, what an electric

20   cooperative is?

21          A.   Sure.  An electric cooperative

22   provides -- well, first of all, we need to

Wallis, Terilyn                                  February 20, 2023

35

1    delineate between a distribution electric

2    cooperative, a generation cooperative, and a

3    transmission cooperative.

4              So a distribution cooperative is

5    responsible to have the infrastructure in place

6    to be able to provide power from the substation

7    where the transmission comes in, and get that

8    power out to the individual member owners of the

9    cooperative, whether they are residential,

10   seasonal, irrigation, large commercial, small

11   commercial or highway lighting.

12             There are also cooperatives that

13   provide transmission services.  And transmission

14   services take the electricity from the point of

15   generation to those substations where it breaks

16   it down and gets it ready for it to be at a

17   voltage that would be appropriate for

18   distribution.

19             And then there are also generation

20   cooperatives.  Those cooperatives are going to

21   own or contract for the actual electricity,

22   whether they generate it themselves or whether

Wallis, Terilyn                                    February 20, 2023

36

1      they buy it off the power market or a

2      combination of both, they ensure that the

3      electricity is available to be able to put

4      through the transmission lines, ultimately put

5      it to the distribution side of things.

6           Q.   Thank you.

7                Okay.  So just getting back to my

8      question about your certifications, we just

9      talked about the MIP that you got in 2009; do

10     you have any other certifications?

11          A.   I recently have been working on a

12     certificate from UW Parkside, regarding the

13     topic of customer service or exceptional

14     service, and that would be an executive

15     certificate, as well.

16          Q.   What is that executive certificate?

17          A.   It's what I just mentioned, it's

18     that -- it's in -- it's a specific certification

19     for customer -- excellent customer experience or

20     so to speak.

21          Q.   I'm just on wondering if that --

22     I'm just wondering if that certificate has a

Wallis, Terilyn                                    February 20, 2023

40

1           A.    No.

2           Q.    Do you have any -- any licenses,

3    professional licenses?

4           A.    I do not.

5           Q.    Did you ever sit for the CPA

6    examination?

7           A.    I did sit for the CPA examination,

8    one time, in 1994.

9           Q.    Do you recall if you passed?

10          A.    I passed two of the sections, two

11   of the four sections.

12          Q.    And then did you just decide, at

13   that point, not to retry the other two?

14          A.    I decided at that point that I was

15   not interested in doing public accounting.   I

16   was interested in doing corporate accounting and

17   went back to get my master's degree.

18          Q.    So after 1994, that first time you

19   sat for the CPA, did you ever try again?

20          A.    No.

21                MR. BROWN:  All right.  I am going

22   to introduce the first exhibit, which I will

Wallis, Terilyn                                              February 20, 2023

42

1    and let me know if it's a true and correct copy

2    of the document you produced in this matter.  So

3    let me know if you need me to blow it up or when

4    I should scroll so you can do that.

5           **A.    You can scroll.**

6               MR. BROWN:  Okay.  And I'm sorry,

7    actually, could we go off the record for two

8    minutes.

9               THE VIDEOGRAPHER:  Yes.  The time

10   is 10:38 a.m.

11               We are off the record.

12               (Discussion held off the record.)

13               THE VIDEOGRAPHER:  The time is

14   10:39 a.m.

15               We are back on the record.

16               Please proceed.

17   BY MR. BROWN:

18          Q.   Okay.  We had a discussion off the

19   record about exhibit marking.  I am going to

20   introduce this as Exhibit 8.

21               Ms. Wallis, what is this document?

22          **A.    A current resumé.**

Wallis, Terilyn                                    February 20, 2023

43

1          Q.   And do you recognize this document?

2               Sorry, I should have asked that

3     first.

4          **A.   I do.**

5          Q.   And does it appear to be a true and

6     correct copy of your resumé?

7          **A.   Yes.**

8          Q.   Okay.  Please feel free to

9     reference the resumé.  I'm going to be asking

10    you a series of questions about your

11    professional background.  If you need me to

12    scroll, just let me know and I'll scroll to the

13    right spot, if that helps refresh your

14    recollection.

15              MR. BROWN:  All right.  And I'm

16    also going to introduce another exhibit, which

17    also Ms. Wallis's application, which I'll

18    identify as Exhibit 9.

19              (Exhibit No. 9 was marked for

20    identification.)

21    BY MR. BROWN:

22         Q.   Ms. Wallis, can you see the

Wallis, Terilyn                                    February 20, 2023

45

1    on the last page, which is Bates stamped

2    CFC6076?

3           A.    It appears so.

4           Q.    Let's start with your first job

5    after college.  And again, please feel free to

6    reference your resumé or the application if you

7    need to refresh your recollection.  Just, if

8    you're going to do that, please let us know what

9    you're doing so it's clear on the record.

10          So can you tell me what your first

11   job was after college?

12          A.    I worked for a small accounting

13   firm called John R. Meyer Accounting.

14          Q.    And what was your position?

15          A.    Accountant.

16          Q.    What were your duties that you

17   recall in that job?

18          A.    We did individual tax returns, some

19   small business tax returns, provided accounting

20   services to businesses, provided payroll service

21   to businesses, provided tax filings for -- or

22   payroll tax filings for businesses.

Wallis, Terilyn                                    February 20, 2023

48

1    probably 1996.

2         Q.   Okay.  Would looking at your resumé

3    or application help refresh your recollection?

4         A.   If it's on there, yeah.

5         Q.   Okay.  Please feel free to look at

6    one or either of those.  Just let me know which

7    one you want to see.

8         A.   It's -- it would be a -- if it is

9    on the application here, you can scroll up to

10   it.  So if you scroll down to the bottom that's

11   where it begins.  That's how many places there

12   were.  So there's waste management at the

13   bottom.  You're scrolling back and forth around

14   it.

15        Q.   It looks like it starts at waste

16   management.  Can we look at your resumé?

17        A.   My resumé is not going to have

18   further detail.

19        Q.   Oh, okay.  Got it.  Okay.

20             Well, then, let's do this:  I will

21   introduce the next exhibit, which I believe is

22   exhibit -- I'll identify as Exhibit 10.

Wallis, Terilyn                                    February 20, 2023

49

1              (Exhibit No. 10 was marked for

2     identification.)

3   BY MR. BROWN:

4         Q.   Which is Ms. Wallis's older resumé.

5              Ms. Wallis, I'll scroll through

6     this.  Just let me know if you need me to stop

7     or slow down.

8              Okay.  You know what, I don't see

9     it on there, either.

10             All right.  So you said that your

11    recollection -- I believe your best recollection

12    is that it was sometime in 1996 that you left

13    HealthEast?

14         **A.   I would have left there and gone**

15    **immediately to waste management, which is on the**

16    **application for CFC.**

17         Q.   You know, I'm sorry, I was just

18    showing you the new one again.  Okay.  So here's

19    the old one.  And again, this is -- I'm

20    identifying this one as Exhibit 10.

21             Okay.  So I believe this is the

22    section of your resumé -- well, I'm sorry, let

Wallis, Terilyn                                    February 20, 2023

50

1    me do this:  I just scrolled through the two

2    pages of this document; do you recognize this

3    document?

4              **A.   I do.**

5              Q.   What is it?

6              **A.   An old resumé.**

7              Q.   And does this appear to be a true

8    and correct copy of the resumé that you

9    submitted to CFC in conjunction with your

10   application, which would have been in or about,

11   I think, 2012?

12             **A.   Quite possible that that would be**

13   **it, yes.**

14             Q.   Okay.  Do you have any reason to

15   doubt that it's that same resumé?

16             **A.   No.**

17             Q.   Okay.  All right.  So I'm scrolling

18   to the second page of that document, marked

19   Wallis 2.  And does reviewing this section of

20   your -- I'll just call it the old resumé -- does

21   this refresh your recollection about your end

22   date of your employment with HealthEast?

Wallis, Terilyn                                          February 20, 2023

51

1              **A.   Right, that specific information**

2      **would be there on that resumé.**

3              Q.   Okay.  So was your end date in

4      August of 1996?

5              **A.   Yes.**

6              Q.   Okay.  What were your duties or,

7      sorry, what was your position with HealthEast?

8              **A.   Senior accountant.**

9              Q.   And what were your duties?

10             **A.   To support the clinics that that**

11     **hospital system owned, and provide accounting**

12     **services for each one of the individual**

13     **entities, to meet and discuss the financial**

14     **situation and factors at each one of their**

15     **locations, and to forecast and strategize how**

16     **to -- to best run those businesses.**

17             Q.   Okay.  Let's take those in order.

18                  You said that part of your job

19     responsibility -- job responsibilities for

20     HealthEast was to provide accounting services.

21                  What accounting services would you

22     provide as the senior accountant for HealthEast?

Wallis, Terilyn                                  February 20, 2023

52

1          A.    So for the most part that would be

2     indicated in line number one, under the

3     description, to review account reconciliations,

4     to prepare journal entries, and to prepare the

5     financial statements.

6          Q.    Okay.  So are you referring to

7     the -- the first bullet, underneath HealthEast,

8     on your old resumé, which is Exhibit 10?

9          A.    Yes, because that's the position

10    you asked me about.

11         Q.    Right.  I'm just clarifying what

12    you're looking at; is that right?

13         A.    Correct.

14         Q.    Okay.  Were there any other

15    accounting services that you provide as a senior

16    accountant for HealthEast?

17         A.    In addition to the individual

18    clinics that we worked with, an example would be

19    the third bullet point down, also under the

20    senior accountant position, where it talks about

21    implemented and maintained database for 75

22    physician investment portfolios.

Wallis, Terilyn                          February 20, 2023

53

1          So there would have been accounting

2    work to go along with maintaining that database

3    and increasing and decreasing those individual

4    portfolios for each physician.

5          Another example would be from a

6    division level, for physician services division,

7    doing analysis and accounting of reimbursements

8    from the payors that they had and reconciling

9    how much was being received versus how much

10   we -- was being billed to the various insurance

11   companies and places where they received

12   payment.

13          In addition, the second to the

14   bottom bullet point indicates that inside of our

15   division we also did the accounting for the

16   employee health plan, which had a separate

17   corporate name called HealthEast Care, Inc.

18        Q.   Just to drill down on one of the

19   things you mentioned, I think you said one of

20   your job responsibilities was reconciling

21   reimbursements.

22          When you're talking about

Wallis, Terilyn                                    February 20, 2023

60

1          Q.    And was that for waste management

2     in Minnesota?

3          A.    Correct.

4          Q.    And did you start that position in

5     or about August of 1996?

6          A.    Yes.

7          Q.    Did you leave that position in or

8     about August of '97?

9          A.    Yes.

10          Q.    Okay.  And you mentioned your job

11     for waste management was an assistant

12     controller, and you don't need to answer this

13     because I should be asking you about your memory

14     before you look at the document.

15          Do you -- what is your recollection

16     of the duties that you had for waste management?

17     And if you need to look at your resumé just let

18     me know.  I'll scroll back down.  I just don't

19     want to muddy up the transcript.

20          A.    Well, waste management of Minnesota

21     was considered to be one division of waste

22     management.  They're obviously a large corporate

Wallis, Terilyn                                      February 20, 2023

61

1      entity.  And we provided the accounting services

2      for the locations in and around the Twin Cities

3      Metro area.

4              Q.   And what were -- do you recall

5      anything else about your -- your duties for

6      waste management?

7              A.   Well, I was, at this point, now,

8      supervising and overseeing the individual

9      functions, areas like payroll, accounts payable,

10     general accounting.  In addition, I was

11     providing an updated forecast, on a monthly

12     basis, for what we anticipated was going to

13     happen in the next month, and then we rolled

14     that forward for the next rolling 12 months, to

15     prepare and to budget and project what was going

16     to happen in the future.

17                  So as a combination of historical,

18     dealing with the actual transactions as they

19     came in, and then having a position where I

20     could utilize that forward-thinking ability of

21     what was going to happen in the business.

22              Q.   Did you have any direct reports?

Wallis, Terilyn                                          February 20, 2023

62

1          A.    Several.

2          Q.    How many, do you recall?

3          A.    About nine.

4          Q.    And did you have anybody, other

5     than your nine direct reports, that indirectly

6     reported in to you?

7          A.    I did not.

8          Q.    So you had -- you had nine people,

9     about nine people, total, who reported in to you

10    into any -- in any form?

11         A.    Correct.

12         Q.    Okay.  Did your -- did your duties

13    include running or participating in internal

14    audits?

15         A.    No.

16         Q.    Did your duties include overseeing

17    or participating in internal controls or

18    compliance?

19         A.    I would have had duties in regards

20    to internal controls, to ensure that we had good

21    internal controls in place I would work in

22    tandem with the controller to ensure that our

Wallis, Terilyn                                    February 20, 2023

63

1       Minnesota locations had good internal controls.

2            Q.   Do you recall, specifically, what

3       some of those internal controls were?  And I'm

4       just looking for sort of general categories.

5            A.   Sure.  We received cash from time

6       to time, from customers that would come in the

7       door, so wanted to ensure that we had good

8       internal controls for incoming cash that it was

9       getting posted to the accounts receivable.

10               We needed to make sure that we had

11      good internal controls for our payroll, so that

12      we were properly stating where our employees'

13      time -- what kind of categories it was being

14      charged to, that that was accurate, so we had

15      procedures and we tested that to make sure that

16      it looked like the employees understood and knew

17      where to charge their time.

18               And then that same concept would

19      follow through with the invoices that we were

20      receiving to ensure that those that incurred the

21      actual cost at the organization understood the

22      different categories of expense and that we had

Wallis, Terilyn                                    February 20, 2023

64

1    good delineation and explanations for how they

2    should code their invoices so that when accounts

3    payable paid them we had a solid understanding

4    of different categories of expenses.

5              Q.    And I'm sorry, I may have missed

6    it, but was that latter duty, did that have to

7    do with personal -- or sorry -- with business

8    expenses incurred by certain employees or was

9    that something else?

10             A.    It would have been business

11   expenses, for the most part.  Although,

12   overseeing both payroll and accounts payable, if

13   an employee had an expense to be reimbursed for

14   some reason, then it would have come through the

15   accounts payable and payroll process.

16                   As far as, you know, travel- and

17   employee-related expenses, waste management did

18   have a corporate credit card, so the expenses

19   would have been charged to that corporate credit

20   card and then reconciled at the end of the

21   month.

22             Q.    Did your duties include internal

Wallis, Terilyn                                February 20, 2023

65

1    controls related to fraud prevention and

2    mitigation?

3           A.   I think internal controls,

4    generally, are intending to make sure that

5    things get accurately represented on the

6    financial statements.  And if there's a

7    possibility that something could go wrong in

8    that, fraud or otherwise, good internal controls

9    are setting up a system so that the best outcome

10   is going to happen.

11          Q.   Are there any duties that you

12   recall having that we haven't discussed?

13          A.   Not of significance.

14          Q.   Did you -- were you reporting into

15   the controller at all times that you worked for

16   waste management of Minnesota?

17          A.   I did report to the controller.

18          Q.   And was that the same person over

19   that year?

20          A.   That person did leave maybe about

21   two months prior to my departure.  And then at

22   that point --

Wallis, Terilyn                              February 20, 2023

67

1    would have been waste management, corporate,

2    they would have had an executive level.  I do

3    not know how many layers that the corporate

4    total waste management would have had for --

5    for -- for different executives.

6              But the individual or the out --

7    boots-on-the-ground locations would have had a

8    management team, that -- that would have been

9    considered the executive level at that

10   particular site.  And I was not on the top

11   management.  I was a direct report to that

12   management team.

13             Where that fit in the grand scheme

14   of waste management's total corporate layout, I

15   don't know.

16        Q.    Why did you leave that position?

17        A.    I left that position because it was

18   brought to my attention that there was a

19   position back close to where I grew up, at an

20   electric cooperative, and that position would

21   probably not come open for quite some time

22   again, and it was an opportunity for me to make

Wallis, Terilyn                                    February 20, 2023

68

1      a lifestyle change of living from the Twin

2      Cities to living in a more rural area.

3              Q.   And that electric cooperative, was

4      that Polk-Burnett?

5              A.   Yes.

6              Q.   And when did you start with

7      Polk-Burnett?

8              A.   In 1997, in August.

9              Q.   And how long did you work for

10     Polk-Burnett?

11             A.   Until 2011, mid year.

12             Q.   So approximately July of 2011?

13             A.   Approximately.

14             Q.   What was your position with

15     Polk-Burnett Electric Cooperative?

16             A.   When I first started initially

17     my -- I was hired with the title of controller,

18     and then moved into the chief financial officer

19     position at the time of retirement of the

20     outgoing CFO.

21             Q.   When did you get the -- and that

22     was a promotion; right?

Wallis, Terilyn                                February 20, 2023

69

1          A.   Right.

2          Q.   When did you become the CFO?

3          A.   I would have -- I don't recall the

4    exact date, maybe 1999 or so.

5          Q.   Okay.  So do you recall it being

6    within the first couple of years of your career

7    with Polk-Burnett?

8          A.   Yes.

9          Q.   Okay.  So were you the CFO for,

10   jeeze, nine or ten years with Polk-Burnett, does

11   that sound about right?

12         A.   Right.  Yes.

13         Q.   Okay.  Let's get -- let's take your

14   controller duties and your CFO duties

15   separately.  I know they probably overlap, but

16   where we can let's try to delineate what was

17   your controller duties and then what was your

18   CFO duties.

19              So starting with controller, what

20   do you recall your duties being for the first

21   couple of years of your Polk-Burnett employment?

22         A.   My initial duties were really to

Wallis, Terilyn                                    February 20, 2023

70

1    understand each one of the systems and areas of

2    the organization and the functions that they

3    provided both to the business, overall, but then

4    how that fed into the accounting systems and how

5    that impacted our overall financial situation.

6              And so I would consider that to be

7    a little bit more learning and task-oriented

8    time, and that was done by design, as an

9    orientation, so that I had a solid understanding

10   of exactly how things worked so that when I

11   would move into the CFO role I had that -- that

12   foundation and didn't have to do that from the

13   ground up to learn all of the systems.

14        Q.   When you were the controller, who

15   did you report in to, who was your direct

16   manager?

17        A.   Yeah, I reported to someone outside

18   of the accounting department, her name was Nancy

19   Hardinberg (phonetic).  I did not report to the

20   CFO.

21        Q.   What was -- and I'm sorry, I -- I

22   forgot her last name -- Nancy's job title?

Wallis, Terilyn                                    February 20, 2023

72

1      she decide, which is why there was, you know,

2      she knew that I was the heir apparent, she was

3      extremely supportive, trained me in every

4      possible way, but the rest of the management

5      team wanted to give me a broad view of the

6      organization and they felt that would be best

7      done by reporting to someone other than the

8      outgoing CFO.

9              Q.   Ms. Wallis, I've taken screen share

10     off, which had Exhibits 8 through 10, just

11     because it's -- the Zoom platform's a little bit

12     better without screen share, but if you need to

13     refer to any of those documents, your

14     application or your two resumés, just let me

15     know.

16             A.   Okay.

17             Q.   Okay.  So is there anything else --

18     well, let me ask you this:  Who did you report

19     to when you were the chief financial officer?

20             A.   I reported to the CEO.  And the

21     CEO, first of all, was very involved in my

22     hiring, originally.  His name was Steve Glaim.

Wallis, Terilyn                                    February 20, 2023

74

1          **A.    Bill.**

2          Q.    Oh, Bill?  I'm sorry.

3                Okay.  What was Bill's first name?

4          **A.    Bill.**

5          Q.    I'm sorry, what was Bill's full

6     name?

7          **A.    I don't recall.**

8          Q.    Okay.  We can move on.

9                What were your duties as the chief

10    financial officer?

11         **A.    My duties as the chief financial**

12    **officer were two-fold, so first, having full**

13    **responsibility for overseeing and administering**

14    **the department and functions, and the**

15    **accounting, payroll, accounts payable, billing**

16    **functions, customer service, cash, part -- part**

17    **of the human resources.**

18               **I did not do the administrative**

19    **side of human resources, meaning my department**

20    **wasn't in charge of signing people up for**

21    **insurance or changing any status, but we took**

22    **care of the rest of the human resource**

Wallis, Terilyn                                    February 20, 2023

75

1    functions.  So we took -- took care of the

2    details of making all of those things happen,

3    making sure that there were systems in place.

4                    And then my second responsibility

5    was to be a part of the senior management team.

6    And as part of the senior management team I

7    coordinated my efforts with the leadership team

8    to -- to provide support to our general manager,

9    and not only make sure that the finances were

10   being taken care of and administered in the way

11   that our strategic initiatives, through our

12   board of directors and through our objectives

13   and our business plans, wanted those things to

14   be executed, but we also planned for the future,

15   so provided input, I did analysis, researched

16   projects to -- to help provide input for

17   decision-making at the board table, for what

18   would be the next best steps, from a business

19   perspective, for the cooperative.  And I did

20   that, of course, in conjunction with the rest of

21   the management team.

22                    So obviously offered expertise in

Wallis, Terilyn                                February 20, 2023

76

1      the area of finance and accounting, but we

2      worked in a team to help support the general

3      manager.

4           Q.   And getting back to your -- your

5      controller, the time you were the controller,

6      did you have direct reports during those couple

7      years you were the controller for Polk-Burnett?

8           A.   I did not have direct reports until

9      I became the CFO.

10          Q.   And then, when you became the CFO,

11     how many -- how many direct reports did you

12     have?

13          A.   Somewhere around 12 to 14.

14          Q.   And did any of your 12 to 14 direct

15     reports have direct reports that reported to

16     them?

17          A.   Yes.  Under the -- the billing side

18     there would have been about three underneath the

19     billing supervisor, billing manager.

20          Q.   So how many people, total, reported

21     in to you, either directly or indirectly?

22          A.   No, up to 15, right around a

Wallis, Terilyn                                    February 20, 2023

77

1     **maximum of 15.**

2           Q.   When you were the CFO, I think you

3     already mentioned this but I just want to make

4     sure, were you in charge of all the accounting

5     operations of the organization?

6           **A.   Yes, I was.**

7           Q.   Was it your responsibility to

8     create and produce financial reports?

9           **A.   Yes, it was.**

10          Q.   Maintain a system of accounting

11    records?

12          **A.   Yes, it was.**

13          Q.   Maintain a set of controls designed

14    to mitigate risk for the organization?

15          **A.   Yes, it was.**

16          Q.   And in maintaining those controls,

17    was the purpose also to ensure the accuracy of

18    the facts that the organization reported,

19    publicly or to its members?

20          **A.   There was one word I didn't**

21    **understand you to -- did you say facts,**

22    **f-a-c-t-s or FAQs.**

Wallis, Terilyn                                    February 20, 2023

78

1          Q.    Yes, the accuracy of facts is what

2    I said.

3          A.    Okay.   Yes.

4          Q.    On your -- on your resumé -- and

5    again, I'm happy to open it, if you want to

6    confirm what I'm saying -- but you mentioned as

7    one of the bullets underneath Polk-Burnett was

8    that one of your job responsibilities was the

9    design and implementation of internal control

10   functions?

11         A.    Yes.

12         Q.    What -- what were those internal

13   control functions that you designed and

14   implemented?

15         A.    Sure.   From a general perspective,

16   first of all, my responsibility was to ensure

17   that we did have internal controls in place to

18   both mitigate risk and now, at this point, my

19   job responsibility is to recognize that fraud

20   could exist and to prevent fraud, as best as I

21   possibly could, in areas where I could identify

22   risk.

Wallis, Terilyn                                    February 20, 2023

79

1              The -- the biggest risk that I had

2       to work with in the design of internal controls

3       is that a rural electric cooperative has a small

4       number of employees, and so when you have a less

5       number of employees the ability to separate

6       tasks becomes more challenging because you

7       simply don't have as many people to separate

8       those tasks, to be able to ensure the best

9       internal control and, as a result of that,

10      mitigate your risk, you know, as best as you

11      possibly could.

12              So areas such as cash management

13      were one of the examples where I spent quite a

14      bit of time, because a member could walk in the

15      door with cash, and they did regularly, and that

16      cash was being handed to another human, and so

17      we needed to make sure that we had good

18      processes in place to make sure that that cash

19      was getting in the cash drawer and not getting

20      into someone's pocket.

21              I have another example of, you

22      know, inventory coming in is where I spent quite

Wallis, Terilyn                              February 20, 2023

80

1    a bit of time.  We also owned multiple

2    subsidiaries in my time there, but one of the

3    subsidiaries we owned was a propane gas company,

4    and that propane gas company would receive

5    liquid propane gas into bulk tanks, then that

6    would move from the bulk plant or bulk tanks

7    into individual bobtail trucks.  Those bobtail

8    trucks would then deliver that gas to individual

9    small tanks that would be in rural locations

10   where there's not natural gas, and maintaining

11   internal controls so that the gas that came in

12   at those bulk plants transferred to those

13   bobtails, transferred to those member locations,

14   and -- and to monitor and watch for the

15   potential for there to be loss there was an area

16   where I spent a good amount of time

17              And then some areas where I spent

18   less time would be functions that were highly

19   integrated, where I felt that there was less

20   risk.

21              So for example, you know, invoices

22   coming in, we had a solid purchase order system

Wallis, Terilyn                                   February 20, 2023

81

1      at Polk-Burnett, where the individual that was

2      making a purchase over a certain dollar amount,

3      and our dollar amount was pretty low at that

4      time, they were required to initiate a purchase

5      order.  That purchase order needed to have two

6      levels of approval before the item could be

7      ordered.  And then that purchase order was

8      automatically submitted into accounting.  And

9      then when the invoice would come into accounting

10     it would match up to the purchase order, and we

11     monitored variances between how much the

12     purchase order said and how much the actual

13     invoice was.

14              So that one ran with -- because I

15     had a lot more system in place, I didn't have to

16     do as much manual review of that particular

17     process, I would only have to review things that

18     would get, you know, more confusing, maybe, for

19     the purchasing side of things.

20              For example, if the individual

21     purchasing the items didn't know if sales tax

22     was or was not included or didn't know if

Wallis, Terilyn                                    February 20, 2023

82

1    freight was or wasn't included, you know, that

2    might drive the actual price of the -- the

3    invoice, in the end, to be higher, and so that

4    would be an acceptable -- you know, maybe --

5    maybe it was, you know, greater than our two

6    percent variance, but we could review those and

7    understand and educate to go along with them.

8              So lots of different systems that

9    we had to both design and monitor, from -- from

10   an internal control perspective.  And -- and

11   specifically in the idea of making sure that

12   nothing was stolen, that was taken into

13   consideration, as well.

14        Q.   Thank you.  Was the general purpose

15   of all those internal controls you just

16   described, was that generally to prevent fraud,

17   waste, abuse and mismanagement?

18        A.   You know, maybe that is one way

19   to -- to look at it.  I guess I would consider

20   those descriptions to be negative connotations

21   of ways to look at it.

22              Our -- our real desire, as an

Wallis, Terilyn                                February 20, 2023

83

1    electric cooperative, was to make sure that we

2    were being fiduciary responsibility with the

3    resources that our members had entrusted us

4    with.

5                So my view would have been more

6    that if the members had provided dollars to the

7    cooperative through their rates, for expenses,

8    yes, I'm monitoring those to make sure we have a

9    good system, as I described.  But I'm also

10   making sure that if the members provided dollars

11   to the cooperative, that were going to be used

12   to build infrastructure, that we had those

13   dollars available, that -- that our systems were

14   working properly and that -- that those dollars

15   that were set to do that were actually getting

16   into the available dollars to be able to build

17   new infrastructure pools and continuing property

18   records, the very most expensive thing that the

19   member owners of the cooperative have to invest

20   in.

21        Q.   Was Polk-Burnett Electric

22   Cooperative one of the electric cooperatives

Wallis, Terilyn                                              February 20, 2023

85

1          those loans and new loans were with CFC.

2                    Long answer, but yes, my time there

3          was using CFC as their main lending source.

4               Q.   As the chief financial officer,

5          were you -- well, let me ask you this:  Did

6          Polk-Burnett have any annual reporting

7          requirements to any -- to the SEC or any other

8          federal regulators?

9               A.   Polk-Burnett had to file a Form 990

10         to the Internal Revenue Service.  They had to

11         file a 990T to the IRS, of course they had

12         payroll-related filings.

13                   Polk-Burnett also owned

14         subsidiaries that were for-profit subsidiaries,

15         so we had filings to go along with those.

16         Tax-wise, as well as potentially, because the

17         propane is in the energy industry, there would

18         have been additional government entities that

19         would have been asking for information.

20                   We would have been providing

21         information to several different agencies of the

22         federal government regarding energy efficiency

Wallis, Terilyn                                    February 20, 2023

86

1    programs, rebates, change in kilowatt hours.

2              So we had quite a bit of reporting

3    to the federal government.  But we did not

4    report to the SEC because individual electric

5    cooperatives, for the most part, are not under

6    the SEC rulings and filings.

7              Q.   And as the CFO did you oversee

8    those annual filing and reporting requirements?

9              A.   I would oversee those, in some

10   cases I would complete those filings, in other

11   cases we would contract support to get those

12   filings completed by either a law firm or an

13   accounting firm, depending specifically on what

14   it was.

15             Q.   When you were the CFO, did you

16   oversee any annual or regular financial audits?

17             A.   I was in charge of the annual

18   financial audit each year while I was at the

19   cooperative.

20             Q.   And were there any other regular

21   audits that you oversaw?  And by regular, it can

22   be every year, every couple of years, I'm just

Wallis, Terilyn                              February 20, 2023

87

1    wondering if there was anything else,

2    audit-wise, that you oversaw?

3         A.    The only other one that really

4    comes to mind is a routine and regular audit,

5    was worker's comp related and insurance related.

6    Sales tax, I mean, sales tax really isn't

7    scheduled, but in my tenure there we had

8    multiple state sales tax audits, as well.

9         Q.    What is the purpose of the annual

10   financial audits?

11        A.    The purpose of the annual financial

12   audit is to ensure that the numbers that are --

13   that are being prepared are materially correct.

14        Q.    Did you oversee the process through

15   which employees were reimbursed for business

16   expenses?

17        A.    As -- yes.

18        Q.    And what was that process?

19        A.    Yeah, so if an employee incurred an

20   expense, let's say that they went to a

21   conference, they -- and I'll just give you an

22   example, let's say that they would have driven

Wallis, Terilyn                                    February 20, 2023

88

1    to the conference, stayed in a hotel, eaten some

2    meals, and had the registration for the

3    conference, so first of all, the last one I

4    mentioned was the registration of the

5    conference, that the registration of the

6    conference would have been paid for through the

7    purchase order requisition process that I

8    mentioned earlier.

9              So the employee would have gone to

10   their supervisor to make sure that it was going

11   to be approved, and a purchase order would have

12   gone through our system, and a check would have

13   been cut back, at that point, in order register

14   for the particular program that they were going

15   to or if it needed to be made on a corporate

16   credit card payment if it was a -- if it was a

17   national-type training that they might have been

18   going to.  So that's how that cost would have

19   been incurred.

20             Then, when it came to

21   transportation costs, the cooperative owned

22   their own fleet of vehicles, and we asked that

Wallis, Terilyn                                    February 20, 2023

89

1      employees always drove those vehicles so that

2      they had the best possible insurance should a --

3      should an accident happen.  So there was no

4      necessary reimbursement for -- for vehicle

5      transportation, because we would have always

6      ensured at the co-op that it was full of gas.

7      And unless they were going far away then they

8      would have used their corporate credit card to

9      purchase the fuel that would have gone in, and

10     that would have been similar to them making food

11     purchases.

12              They may have paid for their hotel

13     or, if we could have paid for their hotel with

14     our executive assistant, who reported to our

15     general manager, that individual coordinated

16     much of the travel arrangements for conferences

17     and, oftentimes, put those hotel costs on the

18     that corporate credit card, and we could track

19     them that way.

20              So when an employee got back from a

21     conference, what they would have to submit into

22     accounting would have been their actual receipt

Wallis, Terilyn                                    February 20, 2023

90

1    for any fuel that they would have purchased, any

2    meals that they would have eaten, and

3    potentially any hotel room stay that they would

4    have had.

5              And then, when the invoice from the

6    credit card was received, at the end of the

7    month, then inside of the accounting department

8    our most entry-level position would have matched

9    up each one of those particular receipts.  And I

10   think defining receipt here, I will do that in

11   just a minute.  Those receipts were then

12   attached to that particular credit card

13   statement.  And then that credit card statement

14   was then signed off on by the -- that employee's

15   direct manager and also the senior-level staff

16   person above that.  So there was a double

17   signature so that those invoices could be

18   reviewed, as well.

19             And just back to clarify how we

20   looked at receipts, is that in order to become

21   compliant with the Internal Revenue Service

22   code, as far as business expenses, because I

Wallis, Terilyn                                    February 20, 2023

91

1      actually did experience us being a taxable

2      cooperative, and not just a 990 non-taxable

3      cooperative, we were very aware of what the

4      business requirements were for submitting

5      invoices.

6                 And so employees needed to submit

7      invoices that were a detailed record of what had

8      been purchased.  So if they stopped for lunch,

9      and they ordered an entree and they ordered a

10     drink, then the receipt should delineate the

11     entree and a pop, and total it, tax, and then

12     the amount of tip that they had on there, and

13     then a grand total.

14                So our employees were expected to

15     provide a receipt.  And our definition of a

16     receipt was that it would have had that detailed

17     information on it, because we also had a

18     corporate policy that said that there would be

19     no alcohol purchased on a credit card of an

20     employee that the cooperative would pay for, and

21     then we had a separate insert inside of that

22     that said that if an employee was travelling

Wallis, Terilyn                                    February 20, 2023

92

1      with a senior leader or with the general

2      manager, and there happened to be a group

3      dinner, where the senior leadership team or the

4      general manager was in attendance, then there

5      was an allotment for -- I don't remember right

6      now if it was one or two drinks.  And then that

7      was the only time that alcohol could be

8      purchased at the corporate level

9               So we were also reviewing those

10     invoices so that it wasn't saying grand total

11     for the meal and they had a liquid dinner.  We

12     knew that they had eaten food and had complied

13     with our -- with our policy.

14               So those were each individually

15     checked and then, as I said, literally attached

16     to the corporate invoice.  All of those

17     individual employees, their statements were

18     reviewed by their direct supervisor, and if they

19     were the direct supervisor then it went to the

20     senior executive person, and then that was

21     packaged with all of the invoices for everyone

22     that had a corporate credit card and had charges

Wallis, Terilyn                                    February 20, 2023

93

1     for the month to the grand total invoice that

2     the cooperative received for the month.

3          Q.   When you oversaw the process for

4     Polk-Burnett, for reimbursement of business

5     expenses, was it the employee's responsibility

6     to submit accurate business expense requests?

7          A.   Sure.  It -- it was -- it was a

8     dual system.  So it was the responsibility of

9     the employee to provide -- to provide

10    documentation.  And then the second check that

11    went along with that is that there was a person

12    in accounting that -- that matched that to what

13    the -- what the credit card statement, when it

14    came in, showed.

15               And then, if those two things

16    didn't match, then the employee was, you know,

17    alerted, whether we saw them in the hallway or

18    if we sent them a quick message, and let them

19    know that -- that the two items didn't match,

20    and that we were going to need to figure out a

21    way to get those to match, whether that meant

22    calling back to the restaurant and asking for

Wallis, Terilyn                                    February 20, 2023

94

1      the detailed printout, which is possible with

2      the -- with the numbers that are on the credit

3      card statement, or if the employee just said,

4      oh, I didn't realize you needed to have my

5      detailed receipt.  Let me grab it out of the

6      vehicle.

7                  So it was, yes, the employee needed

8      to turn things in, and then it was also the

9      employer's responsibility to ensure that they

10     matched up.

11           Q.   Okay.  So let me unpack that a bit.

12                  Was it ultimately the

13     responsibility of the employee, who sought

14     payment from Polk-Burnett, to submit accurate

15     paperwork to get that reimbursement?  And by

16     accurate paperwork, I mean the expense request,

17     itself, as well as the supporting documentation,

18     was that ultimately the responsibility of the

19     employee.

20           A.   So I -- I -- I think we have a gap

21     in one -- one key component here, is that the

22     employee was not seeking reimbursement.  The

Wallis, Terilyn                                February 20, 2023

97

1      think of any examples where the cooperative

2      would have put the employee in a situation where

3      they were incurring a cost for the company that

4      the company would then reimburse them for, so

5      I'm not saying that it did not happen ever, if

6      there would have been a very extenuating

7      circumstance such as someone's credit card not

8      working when they were out of town, but it would

9      have been very rare.

10         Q.   Did Polk-Burnett issue every

11     employee a corporate credit card?

12         A.   They did not issue every employee a

13     corporate credit card.  But those employees that

14     did not have an employee credit card would have

15     never attended training without their supervisor

16     also attending that training, and that

17     supervisor was then responsible to take care of

18     any of those costs that would have been

19     incurred.

20         Q.   Okay.  We can move on.

21              Were you -- I think you mentioned

22     this earlier, but I want to make sure -- were

Wallis, Terilyn                                    February 20, 2023

98

1    you in charge of payroll as the chief financial

2    officer?

3              A.    Yes.

4              Q.    Were you also in charge of accounts

5    receivable?

6              A.    For -- not all of the time that I

7    was at Polk-Burnett was I in charge of the

8    collection process.  I mean, ultimately, I was

9    in -- I was overseeing receivables on the

10   balance sheet.

11             But there were the -- it's not

12   atypical for some of the -- the -- the positions

13   that served the members to maybe kind of shift

14   or go between working for finance and accounting

15   or working for member services.

16             And so when I started, those

17   positions were under finance and accounting, for

18   awhile they moved under our member services

19   area, because that individual had less people

20   reporting to them, and then they shifted back

21   later, after some staffing changes.

22             So most of the time I was there

Wallis, Terilyn                                    February 20, 2023

99

1    accounts receivable reported to me, as far as

2    collections goes, but a little bit of the time

3    it didn't.

4            Q.    Okay.  Were you also responsible

5    for preparing annual budgets?

6            A.    Yes.

7            Q.    Why did you leave the CFO position

8    at Polk-Burnett?

9            A.    Yeah, I left the CFO position, and

10   left the industry for a little while, because of

11   some happenings that were going on at the

12   cooperative.

13              So at the time that the general

14   manager, Steve Glaim, the CEO that I had worked

15   for the majority of my time, retired, then the

16   cooperative ended up hiring a new CEO.

17              And at the time that that hire was

18   made, what I'm about to say is public record,

19   because it ultimately comes out in a lawsuit,

20   the general or the new incoming CEO general

21   manager was asked to do some very specific

22   things, requests from the board, as far as

Wallis, Terilyn                                    February 20, 2023

105

1   BY MR. BROWN:

2          Q.   Ms. Wallis, I just have a couple

3   more questions about your Polk-Burnett

4   employment, and then I'm going to move on.

5               Getting back to the expense

6   reimbursement process that we discussed earlier,

7   if you found that an employee didn't have

8   sufficient documentation or had not submitted

9   sufficient documentation or that the employee

10  had put an expense on the corporate credit card

11  that was not reimbursable under the Polk-Burnett

12  policy, what would happen?

13         A.   We would -- if it was a paperwork

14  issue, then accounting would work with that

15  individual to get the -- get the paperwork that

16  was needed.  We would work together to -- to

17  make that happen.  If it was a choice in maybe

18  what was spent, then we would take that example

19  and we would give it to the supervisor, and then

20  the supervisor would have a conversation with

21  the employee.

22               And if there needed to be a message

Wallis, Terilyn                                    February 20, 2023

106

1    in the employee's file about that conversation,

2    and an agreement that that would not happen

3    again, that could happen or if -- I don't have

4    any examples where the cooperative had a

5    conversation with the employee and that there

6    was a repeat issue, ever, after that, where we

7    either had to make the choice -- the policy

8    provided for the option to not pay for that, but

9    we never had that situation arise in -- in my --

10   my time there.

11        Q.   Okay.  Let's take the example you

12   used before, where an employee drinks their

13   lunch instead of, you know, buying food.

14        A.   Yes.

15        Q.   So that, you know, buying alcohol,

16   as you stated earlier, was not a reimbursable

17   expense under Polk-Burnett's policy; right?

18        A.   Correct.

19        Q.   So in that circumstance, would

20   Polk-Burnett just pay the credit card bill

21   anyway or would Polk-Burnett seek reimbursement

22   from the employee?

Wallis, Terilyn                                    February 20, 2023

107

1          A.   If -- if there had been alcohol

2     charged to the credit card in an inappropriate

3     situation, then the employee would be asked

4     to -- they would be asked if they drank the

5     alcohol, and I don't have any examples where the

6     employee denied it, and then we would simply ask

7     the employee if there was any reason they didn't

8     think it was fair for them to reimburse the

9     co-op for that particular expense, and then they

10    would bring their cash up to the front desk.

11         Q.   Okay.  So then it -- do you -- do

12    you recall that occurring or are we kind of

13    talking about a hypothetical, at this point?

14         A.   It -- it -- it definitely occurred

15    once or twice, while I was there.  And, quite

16    frankly, the scenario is that when we have line

17    staffs, linemen that were out at training, they

18    didn't go to training very often.

19              And so if they went to a group

20    dinner, all linemen from all co-ops, and they

21    got individual receipts from the, you know,

22    sitting down and having the meal, more than

Wallis, Terilyn                                    February 20, 2023

108

1    anything they -- the couple of times we ran into

2    it, they didn't feel that they were in a

3    situation with a large group where it would be

4    appropriate to split their meal from their

5    drinks, which is what they did 99.999 percent of

6    the time, and they knew that if they brought it

7    back to the co-op it was usually them

8    proactively saying:  Here's what happened when

9    we went to the training, and we have our --

10   our -- our one or two beers on here, and we need

11   to pay for it, rarely did it happen that a slip

12   would have been turned in where it was like, oh,

13   we need to ask you about this.

14        Q.   Did -- did Polk-Burnett classify

15   your termination as an involuntary termination,

16   a voluntary termination or something else?

17        A.   Something -- we just did a

18   separation.

19        Q.   Okay.  Did you get a separation

20   agreement?

21        A.   I did get a separation agreement.

22        Q.   And do you recall what your

Wallis, Terilyn                                February 20, 2023

112

1    you will be terminated as of this date, and this

2    is the reason for it, separate and apart from

3    your separation agreement?

4          **A.   No.**

5          Q.   Did you apply for unemployment

6    insurance after you terminated from

7    Polk-Burnett?

8          **A.   I went to -- no.  I may have**

9    **applied for unemployment insurance, but I**

10   **immediately went to work.**

11         Q.   Did -- okay.  So -- so do you

12   recall applying for unemployment insurance,

13   after your termination from Polk-Burnett?  I

14   think earlier you said you didn't, but then you

15   said you might have, but then you went

16   immediately to work?

17         **A.   I actually don't recall if I did or**

18   **did not apply for unemployment insurance, but I**

19   **do know that I was employed within a couple of**

20   **weeks after leaving there.**

21         Q.   Okay.  What was your next position,

22   after you left -- after you left Polk-Burnett?

Wallis, Terilyn                                February 20, 2023

113

1          A.   For a short period of time, I
2     worked for Weir Minerals.
3          Q.   Okay.  Did you work for St. Croix
4     Regional Medical Center before Weir?
5          A.   So I worked for Weir a couple of
6     weeks prior to -- or I worked for Weir a couple
7     of months, actually, prior to securing the
8     full-time director position at St. Croix Medical
9     Center.
10              I continued --
11         Q.   Okay.
12         A.   -- to work for Weir Minerals, doing
13    some subcontract.  They -- they were short
14    finance and accounting staff, as I transitioned
15    over to the hospital.  And the reason I
16    transitioned to the hospital is because I had
17    experience in healthcare accounting, and
18    preferred that particular job and, quite
19    frankly, was very surprised that as soon as I
20    was open for employment multiple people in the
21    community contacted me and asked me if I would
22    be willing to come to work for them.

Wallis, Terilyn                                    February 20, 2023

117

1          Q.   Okay.  What were your duties as the
2     assistant controller for Weir?
3          **A.   Accounting for two manufacturing**
4     **facilities in the local area.**
5          Q.   And did you have any other duties?
6          **A.   No.**
7          Q.   Okay.  Were the -- the assistant
8     controller responsibilities that you performed
9     for Weir, did that include any responsibilities
10    relating to internal controls or compliance?
11         **A.   No.**
12         Q.   How about audits, internal audits?
13         **A.   No.**
14         Q.   Expense reimbursements?
15         **A.   No.**
16         Q.   So were your duties more just sort
17    of general accounting, maintaining the general
18    ledger, that kind of thing or, you know, what
19    was it?
20         **A.   Either general accounting or cost**
21    **accounting for manufacturing.**
22         Q.   Okay.  And did have any direct

Wallis, Terilyn                                    February 20, 2023

118

1    reports?

2          A.    No.

3          Q.    And why did you leave that position

4    with Weir?

5          A.    I stated that just a few minutes

6    ago, that St. Croix Regional Medical Center was

7    going through the hiring process at the same

8    time, and they've -- they finalized their offer

9    to me, and I had healthcare experience, and the

10   work environment was much preferred to me over a

11   manufacturing environment, which I didn't have

12   experience in.

13         Q.    Okay.  So when did you start with

14   St. Croix Regional Medical Center?

15         A.    That fall, the date that's on my

16   resumé.

17         Q.    Okay.  I'll represent to you that

18   your resumé says October of '11; does that sound

19   right?

20         A.    It does.

21         Q.    And when did you stop working at

22   St. Croix?

Wallis, Terilyn                                    February 20, 2023

119

1          **A.   I stopped working at St. Croix at**

2    **the end of -- for -- I stopped working at St.**

3    **Croix full time at the end of August of 2012.**

4          Q.   Did you work for St. Croix,

5    afterwards, part-time?

6          **A.   I did work for them part-time,**

7    **finishing up a few just very small projects for**

8    **the next weeks.**

9          Q.   And did your part-time St. Croix

10   employment coincide, at all, with your CFC

11   employment?

12         **A.   I was working for CFC, at that time**

13   **I would have only done the St. Croix work on a**

14   **weekend, on a Saturday, possibly a Sunday, but**

15   **likely a Saturday.**

16         Q.   How long do you estimate your

17   period of employment overlapped between

18   St. Croix and CFC?

19         **A.   Two to three weeks.**

20         Q.   What was your position with

21   St. Croix?

22         **A.   Whatever it says on the resumé, it**

120

1    **was, I think, a director of accounting.  I don't**

2    **recall the exact title.**

3         Q.   Okay.  I'll -- I'll represent to

4    you that it says director of finance, corporate

5    compliance officer; does that sound right?

6         **A.   It does.**

7         Q.   Okay.  Was that -- were those

8    positions that you held at the same time or were

9    you first a director of finance and then the

10   corporate compliance officer?

11        **A.   They were positions that I held at**

12   **the same time.**

13        Q.   Okay.  And did they have duties

14   that were separate from each other?  Can you

15   kind of distinguish in your own mind what was a

16   director of finance job and what was the

17   corporate compliance job?

18        **A.   The director of finance**

19   **responsibilities would be very similar to the**

20   **description I provided for you that my**

21   **responsibilities were at Polk-Burnett.  The**

22   **organization is significantly larger than what**

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Wallis, Terilyn                                    February 20, 2023

121

1    the rural electric co-op in a local area is for

2    a number of employees, so at that same level of

3    responsibilities.

4                    I did report to a CFO while I was

5    at St. Croix Regional Medical Center, but I was

6    considered to be on the management team there,

7    as well.  They had a management team that was

8    more than 25 individuals large.  Out of that

9    team of 25 individuals, three or four of them

10   were considered to be their executive team, one

11   of those was the CFO, one of those was the CEO,

12   and then there was one or two on the operational

13   sides of things, so I was the next layer or

14   level down from that, so that would have been my

15   departmental responsibilities.

16                    And it's not uncommon in

17   organizations of that size that the corporate

18   compliance is attached as part of a financial

19   position.  So I --

20          Q.    So what was the --

21          A.    Those duties --

22          Q.    Go ahead, I didn't mean to

Wallis, Terilyn                                    February 20, 2023

122

1    interrupt.

2              A.    Those duties were in addition to

3    the duties of the finance needs.

4              Q.    And what were those duties as a

5    corporate compliance officer?

6              A.    Those duties were to ensure that

7    there were internal controls in place, through

8    documentation.  That documentation was then

9    utilized in the audit process, the regular

10   accounting audit process, and tested, so that

11   became their documented procedures for -- for

12   doing things.

13              And then the position would have

14   also responded and been a part of the team,

15   should a situation have arisen, either

16   internally or externally, either identified --

17   the individual identified or anonymous.

18              If there was notification that

19   there was a potential compliance issue, then I

20   would have coordinated the team that would have

21   looked into that particular situation, and that

22   did not happen in my time there.

Wallis, Terilyn                                    February 20, 2023

123

1          Q.   How many direct reports did you

2     have for your St. Croix employment?

3          **A.   A few, if my resumé indicates a**

4     **specific amount I know I had one or two**

5     **accounting individuals, an accounts payable**

6     **person, and I don't recall if there was anyone**

7     **else.**

8          Q.   Did you have any other employees

9     indirectly reporting to you?

10         **A.   No.**

11         Q.   Okay.  I believe you testified

12    earlier that your director of finance

13    responsibilities for St. Croix were similar to

14    your responsibilities that you performed for

15    Polk-Burnett, is that also true of your

16    corporate compliance officer responsibilities,

17    were those similar to your Polk-Burnett

18    responsibilities?

19              We talked about a lot of internal

20    controls before, I'm just wondering if there's a

21    way to make this more efficient.

22         **A.   I would -- I would generally say**

Wallis, Terilyn                                        February 20, 2023

124

1    that the functions were similar in that it was

2    for sure documenting the different processes,

3    analyzing those processes for potential risks

4    and weaknesses, working internally with groups

5    of employees to improve those gaps in -- in the

6    process, and I would generally consider them to

7    be quite similar.

8           Q.   Okay.  And were you -- did you

9    oversee the process through which employees were

10   reimbursed for business expenses for St. Croix?

11          A.   So the process for employees to be

12   reimbursed was very similar to Polk-Burnett in

13   that the organization had processes in place so

14   that the costs that they were incurring they

15   were -- they had processes to ensure that if

16   they were incurring the costs they were either

17   paying for that through the accounts payable

18   system in process or they were paying for them

19   through their corporate credit card process.

20              The only exception that I would

21   delineate between Polk-Burnett and the hospital

22   was that the hospital did not have a fleet of

Wallis, Terilyn                                February 20, 2023

125

1    vehicles, and so if an employee did attend a

2    meeting or a conference, whether that was

3    locally or at the state level or at the national

4    level, and if they drove their own vehicle

5    there, they would submit in their payroll system

6    the date that they drove their vehicle, the

7    number of miles, and then on a return trip what

8    day they returned back and the number of miles.

9    And as I indicated, that went into our payroll

10   processing system, and that payment was made

11   from there.

12             The supervisor was responsible to

13   review that additional input of information to

14   ensure that they agreed that the mileage that

15   was input there was appropriate.  And the

16   payroll process was administered or the actual

17   processing of that was done in the human

18   resources department, not inside the accounting

19   department, where my responsibilities were.

20        Q.   Okay.  So let me unpack that a bit.

21             When we were talking because the

22   Polk-Burnett process, what you described, and

Wallis, Terilyn                          February 20, 2023

126

1    you can correct me if I'm wrong, was essentially

2    a corporate credit card system wherein all

3    employees incurred business expenses through

4    their -- through their corporate credit card.

5              Was the system at St. Croix similar

6    in nature or did some employees use personal

7    credit cards to incur business expenses and then

8    they sought reimbursement from St. Croix.

9         **A.   The system of the company having**

10   **corporate credit cards was the same.   And they**

11   **did not have employees at St. Croix that**

12   **incurred expenses on behalf of the hospital that**

13   **then had to be submitted and reimbursed.**

14             **So the only exception to that was**

15   **not -- it was not charges to a credit card for**

16   **expenditures, it was just mileage being**

17   **reimbursed to the employee.**

18        Q.   Okay.   And were there any other

19   expenses that employees incurred on a -- you

20   know, personally, advice on their corporate

21   credit card, that St. Croix would reimburse?

22        **A.   Could you clarify that question,**

Wallis, Terilyn                              February 20, 2023

128

1    **the employee on any differences and to rectify**

2    **them however they did.  I would not have been**

3    **involved with that.**

4          Q.   Okay.  And why did you leave the

5    position at St. Croix?

6          **A.   I left the position at St. Croix to**

7    **come to work for CFC.**

8          Q.   Okay.  So that brings us to your

9    CFC employment.

10          Have we talked about all of your

11   post-college, pre-CFC employment?

12          **A.   I think so.**

13          Q.   Okay.  So let's just -- let's skip

14   CFC for a minute, and talk about Terilyn Wallis

15   Consulting, is that a -- an entity that you

16   created?

17          **A.   Correct.**

18          Q.   And is that a sole proprietorship

19   or what is the -- what is the nature of that

20   entity, is it an LLC?  I'm just wondering what

21   the form of that entity is.

22          **A.   It is an LLC.**

Wallis, Terilyn                                    February 20, 2023

129

1          Q.    Okay.  And where are you

2     registered?

3          **A.    State of Wisconsin.**

4          Q.    Okay.  When did you create that

5     entity?

6          **A.    Early in 2018, after being**

7     **terminated from CFC.**

8          Q.    Okay.  So that would have been in

9     or about January of '18?

10         **A.    Correct.**

11         Q.    Okay.  What kind of consulting

12    services did you perform through Terilyn Wallis

13    Consulting?

14         **A.    I provide training and education**

15    **services to employees of cooperatives in the**

16    **areas of finance, accounting, and work orders.**

17    **Works orders is the biggest process that**

18    **distribution electric cooperative engages in.**

19              **I can be engaged to provide**

20    **strategic services for the cooperative, meaning**

21    **assisting the cooperative, determine their**

22    **strategic direction, their strategic objectives**

Wallis, Terilyn                                February 20, 2023

130

1    and goals.

2              I can help the cooperative develop

3    a comprehensive business plan.  I can work with

4    the details of the business plan on financial

5    and accounting needs, some human resources

6    needs, human resource planning needs, from an

7    operations perspective, planning and forecasting

8    and budgeting for work plan projects and future

9    projects of their system.

10             I can do detailed accounting work

11   if -- if that is needed and necessary.  I can

12   assist electric cooperatives with their

13   individual processes, such as maybe their

14   materials process, as they look at their

15   internal controls and they evaluate whether or

16   not something is material or significant on

17   their inventory listing, and if they should keep

18   it as an inventory material or if they should

19   make it a stock item.

20             I help them make sure that they

21   don't lose the ability to capitalize any asset

22   that they assemble out on their distribution

Wallis, Terilyn                                    February 20, 2023

131

1    system, so that the assets of their cooperative
2    are stated as fairly and as accurately as they
3    possibly can be, and that the cooperative does
4    not take on expenses in areas where they could
5    be capitalizing that and recovering those costs
6    over 30 years.
7              I provide webinars, I provide
8    on-site training, and I provide consulting work
9    of that nature.
10         Q.   Have you provide -- have you
11   provided services as a consultant or independent
12   contractor through any other entity, other than
13   Terilyn Wallis Consulting, since your CFC
14   termination?
15         A.   Are you asking me if my consulting
16   firm has been a subcontractor for other
17   entities?
18         Q.   I'm just asking if you provided any
19   consulting or contractor services other than
20   through the entity you created.
21         A.   It has been through the entity I
22   have created, yes.

Wallis, Terilyn                              February 20, 2023

133

1    to them in their relationship.  I don't discuss

2    that with any cooperative.

3            Q.   Okay.  Then let me ask you a

4    different question.

5                 Do you perform consulting services

6    through Terilyn Wallace Consulting for electric

7    cooperatives that CFC provides loan funds for?

8            A.   Yes.

9            Q.   How many, would you estimate?

10           A.   I would be unable to estimate that

11   number, because without doing some research as

12   far as how -- how many different cooperatives

13   have potentially attended a webinar or a

14   workshop that I have provided, that the

15   statewide association provides, I would not be

16   able to answer that question even with a guess,

17   currently.

18           Q.   Okay.  And let me ask you another

19   question.

20                When you provide consulting

21   services through Terilyn Wallace Consulting are

22   you -- do you have a client?

Wallis, Terilyn                                February 20, 2023

137

1          Q.   So is your best estimate that it's

2    somewhere between five and ten electric

3    cooperatives that you've done business with

4    through Terilyn Wallace Consulting that CFC also

5    does business with?

6               MS. CHAMBERS:  Objection,

7    mischaracterizes the testimony.  You can answer.

8          **A.   I would like a moment to think,**

9    **that's what's happening.**

10         Q.   Okay.

11         **A.   I will say that my response is --**

12   **falls more on the spectrum of a guess, which is**

13   **what you asked me not to do.**

14         Q.   Ms. Wallis, like I said at the

15   beginning, I'm not asking for you to guess.  I'm

16   asking for your best estimate based on your

17   recollection.

18         **A.   Okay.**

19         Q.   Is it between five to ten --

20         **A.   I can't --**

21         Q.   -- over the life between Terilyn

22   Wallis Consulting and CFC.

Wallis, Terilyn                                February 20, 2023

138

1          A.   I can't answer that question with

2     an estimate.

3          Q.   Okay.  But you know for sure that

4     it's over five?

5          A.   I have provided direct consulting

6     services to electric cooperative, to more than

7     five electric cooperatives that are likely

8     members of CFC, true.

9          Q.   Okay.  Could it be more than ten?

10              MS. CHAMBERS:  Objection, asked and

11    answered.

12         A.   My -- I don't want to guess, and

13    that would -- and that's what the answer would

14    be, so I -- you're asking me to continue to

15    answer a question that I'm telling you is a

16    guess that I don't know the answer to.

17         Q.   I'm asking you different questions

18    every time, Ms. Wallis.  I would just ask that

19    you listen to the specific questions I ask you

20    and answer that question, okay?

21              Can you -- can you name any of

22    them?

Wallis, Terilyn                              February 20, 2023

139

1          A.    I can.

2          Q.    Okay.  Which are they?

3                THE WITNESS:  Anita, is this

4     relevant?

5                MS. CHAMBERS:  You can answer.

6          A.    North Itasca Electric Cooperative

7     Arrowhead Electric Cooperative, Cavalier

8     Electric Cooperative, Vernon Electric

9     Cooperative, Adams-Columbia Electric

10    Cooperative, Eastern Iowa Electric Cooperative,

11    Access Energy Electric Cooperative, Northeast

12    Power.

13                Quite frankly, several of the

14    statewides are also members of CFC, so I know

15    you're frustrated at my answer, but your

16    question is very confusing.

17          Q.    Okay.

18          A.    Statewides --

19          Q.    Okay.  The only thing I've asked

20    you to do -- Ms. Wallis, the only thing I've

21    asked you to do right now, in response to my

22    question, is list out the electric

Wallis, Terilyn                                    February 20, 2023

140

1    cooperatives -- electric cooperatives that you

2    recall working on for your consulting business

3    and that CFC also does business with, so you've

4    listed, I think, eight, currently; are there any

5    others?

6         A.   Graystone Electric Cooperative,

7    Blue Ridge Electric Cooperative.  There is

8    another one in Georgia, Jefferson, I think, or

9    they're in Jefferson City, I don't remember, but

10   in Georgia.  Bear Tooth Electric Cooperative,

11   Anchorage Alaska, I don't remember the co-op

12   name.

13             That's all I can be think of.

14        Q.   Okay.  Could there be others?

15        A.   There could be others.

16        Q.   Okay.  So you just listed 13

17   co-ops, is -- but -- well, let me just ask you

18   this:  Do you have any sense, in your own mind,

19   how many more there could be?

20        A.   Not very many, for direct

21   contracted services, very limited.

22        Q.   So less than five additional ones?

Wallis, Terilyn                                    February 20, 2023

141

1        A.    Correct.

2        Q.    Okay.  So do you think it's

3   somewhere between 13 and 18 electric

4   cooperatives that you've done business with

5   through your consulting company that CFC also

6   does business with?

7        **A.    That would be a rough estimate, but**

8   **I would be uncomfortable saying that I'm**

9   **committed to that number.  It's not**

10  **significantly more than that, but I cannot say**

11  **that it for sure fits between 13 and 18 with**

12  **absolute 100 percent positivity.**

13       Q.    Okay.  What is giving you pause?

14       **A.    Unable to recall over the last five**

15  **years where else I may have been engaged.**

16       Q.    Okay.  But it's at least 13; right?

17       **A.    I have listed ones that came to**

18  **mind easily, yes.**

19       Q.    Okay.  So when you testified

20  earlier that you couldn't remember whether it

21  was ten or more that's -- that wasn't true;

22  right?

Wallis, Terilyn                                    February 20, 2023

144

1    Wallis Consulting?

2         **A.    I believe Chippewa Valley Technical**

3    **College, the fall or the summer of 2018.**

4         Q.    And what was your position with

5    Chippewa?

6         **A.    To teach two classes.**

7         Q.    Were you an adjunct professor or

8    what was your position?

9         **A.    Just an instructor.**

10        Q.    Okay.  And is that something that

11   you still do?

12        **A.    No.**

13        Q.    How long did you instruct at

14   Chippewa?

15        **A.    Just over two semesters.**

16        Q.    Okay.  So what's the next position

17   you got after Chippewa?

18        **A.    I did accept a position at**

19   **Consolidated Electric Cooperative in Mount**

20   **Gilead, Ohio.**

21        Q.    And when was that that you started

22   working for Consolidated Cooperative?

Wallis, Terilyn                                February 20, 2023

145

1          A.    As an employee, I began working for

2    consolidated in October of 2018.

3          Q.    Was there any period of time that

4    you worked for consolidated not as an employee?

5          A.    Yes.

6          Q.    And what was the nature of that

7    work?

8          A.    Consulting work.

9          Q.    For Terilyn Wallis Consulting?

10         A.    Yeah, they should go on the other

11    list.

12         Q.    Okay.  So let's go back to that

13    list.  I believe Consolidated would be the 14th

14    electric cooperative -- cooperative you

15    mentioned, is it now your best estimate that

16    there were 14 or more electric cooperatives that

17    you've done business with through Terilyn

18    Wallace Consulting that CFC also does business

19    with?

20         A.    I cannot confirm if CFC does

21    business with all 14 of those.  I can confirm

22    that they are electric cooperatives in the same

Wallis, Terilyn                                    February 20, 2023

148

1          Q.   Okay.  Ms. Wallis, I think I need

2     to go back now, and I want to make sure, again,

3     that we have the same baseline of knowledge.

4               And do you recall earlier, at the

5     beginning of the deposition, where I asked you

6     or admonished you if you don't understand my

7     question seek clarification or otherwise I'm

8     going to assume that you understood the question

9     as I asked it, it now sounds like you're saying

10    you did not understand the question earlier, so

11    I'm going to go back and repeat it, and I would

12    appreciate you to provide a fulsome, accurate

13    response to what I think is a very simple

14    question, which is:  Which electric cooperatives

15    did you do business with, through Terilyn Wallis

16    Consulting, that CFC also did business with?

17         A.   Could you --

18         Q.   And when I say that CFC did

19    business with, I mean any sort of business

20    transaction, whether it's providing loan funds

21    or something else; do you understand the

22    question?

Wallis, Terilyn                                    February 20, 2023

149

1          A.   I need to understand from your

2     question if you are including purchasing a

3     membership as one of those examples.

4          Q.   Is purchasing a membership that

5     is -- is that something that CFC oversees, is it

6     purchasing a membership through CFC?

7          A.   The -- the action of the

8     cooperative being a member of CFC, are you

9     including that in your definition is what I need

10    clarification from you on.

11         Q.   Okay.  Yes.

12              Now do you understand the question?

13         A.   So as I understand your question,

14    if a cooperative has a membership, as an

15    example, with these cooperatives, even if they

16    do not have a loan portfolio, but they either

17    have a membership and/or old CTCs, certificates

18    of ownership, you want them to be included in my

19    response as a yes?

20         Q.   Yes.

21         A.   Okay.

22         Q.   At least initially, let's go

Wallis, Terilyn                                     February 20, 2023

150

1     through that list.

2           A.   To my knowledge, all of them that

3     are listed there, I think, have a membership to

4     CFC.

5           Q.   Okay.

6           A.   Beyond the membership, I have no

7     knowledge.

8           Q.   Okay.  So let me, again, make sure

9     I understand your testimony.

10          You believe that the 14 people --

11    sorry -- the 14 electric cooperatives that you

12    mentioned earlier, they're all CFC members; is

13    that right?  That's -- that's -- you believe

14    that to be true?

15          A.   I -- I would estimate that that is

16    accurate, as accurate as I can do.

17          Q.   Okay.  But there may be others; is

18    that right?

19          A.   May be other what?

20          Q.   Other electric cooperatives that

21    you do business with through Terilyn Wallis

22    Consulting that CFC also has a relationship with

Wallis, Terilyn                                    February 20, 2023

151

1   as a business relationship or as a member?

2        A.    True.  We have a number of 14 or so

3   on your list.  There could be a few more.  And

4   what I've committed to is not cutting that off

5   at 18, but it is not a number that is

6   significantly greater than 18.

7        Q.    Okay.  And then of the 14 to 18

8   that it could be, I believe your testimony was

9   that you don't have any direct knowledge of

10  whether those 14 to 18 electric cooperatives

11  also have some sort of a financial relationship

12  through CFC, whether it's by CFC providing loan

13  funds or some other financial service.

14       A.    Correct.

15       Q.    Okay.  Thank you.

16             All right.  Getting back to

17  consolidated cooperative, then, what was your

18  position with that company, with that

19  cooperative?  Sorry, go ahead.

20       A.    Is the question done?  I'm just

21  making sure I don't interrupt.

22       Q.    Yes.  What was your position?

Wallis, Terilyn                                    February 20, 2023

152

1      A.   Chief financial officer and chief

2  human resource officer.

3      Q.   What were your duties as the chief

4  financial officer for consolidated cooperative?

5      A.   Very similar to what has been

6  described for other chief financial officer or

7  director of finance roles that we've already

8  discussed.

9      Q.   Okay.  So are they -- were your

10 duties as the CFO for Consolidated Cooperative

11 similar to your CFO duties for the same -- or

12 sorry -- your CFO duties for Polk-Burnett and

13 your director of finance duties for St. Croix;

14 is that your testimony?

15     A.   They would essentially be -- be

16 similar.

17     Q.   Okay.  All right.  So then let's

18 put aside the CFO job.  What were your duties as

19 chief human resources officer?

20     A.   Duties as human -- chief human

21 resources officer were to oversee one human

22 resource specialist, to ensure that the

Wallis, Terilyn                                  February 20, 2023

153

1    processes of hiring, onboarding, training and

2    education, documentation of training and

3    education, annual reviews, compensation plan

4    administration, reportings and filings, benefits

5    were administered for the organization.

6            Q.   Your -- your resumé -- your new

7    resumé also lists a subsidiary's business

8    manager title, what was that?

9            A.   Consolidated cooperative wholly

10   owns subsidiaries for a propane gas company

11   called Cooperative Gas, a natural gas company

12   called Bright Energy, a fiber company called

13   Fiber Cooperative, and also a people fund that

14   provided donations back to the local community.

15               So the responsibility of the -- the

16   three businesses, the two gas businesses and the

17   fiber business, I oversaw and coordinated those

18   operations, as well.

19           Q.   Okay.  Are you still employed by

20   Consolidated?

21           A.   No.  I left there last summer.

22           Q.   When did you leave Consolidated,

Wallis, Terilyn                                    February 20, 2023

154

1    can you give a better estimate than summer of

2    '22?

3            A.    Second week of July or something

4    like that.

5            Q.    And I'm just looking for sort of

6    the basis for why you -- why you left,

7    involuntary, resignation or otherwise, why did

8    you leave that position?

9            A.    Resignation.

10           Q.    Okay.  Was there a reason that you

11   resigned from that job, was there something else

12   you had lined up?

13           A.    There was a reason that I resigned

14   from the job, yes.

15           Q.    What was it?

16           A.    That, for the most part, the needs

17   that the cooperative had in hiring me had

18   been -- the work that I had agreed to do back in

19   2018, for the most part, had come into action,

20   and the specific change needs that they were

21   asking of me were pretty well complete.

22           Q.    Okay.  What was the next position

Wallis, Terilyn                                February 20, 2023

177

1          A.   I assume that the person that I

2     would have reported to directly, because they

3     were the manager of that area or overseeing that

4     area, being Steve Kettler, that he would have

5     made the hiring decision for his direct reports.

6          Q.   And do you know if anyone else had

7     any input into the decision to hire you?

8          A.   I would assume that if CFC was

9     using a multi-stop interviewing process, the day

10    that I came to the headquarters or office, that

11    there would be other -- other people

12    participating in that.

13          MR. BROWN:   Okay.  I've just opened

14    another document on the screen, which is -- I'll

15    identify as Exhibit 11, it's an offer letter

16    Bates stamped CFC6077 to 6078.

17          Ms. Wallis I'm going to slowly

18    scroll through this, just let me know if you

19    need me to stop or go back anywhere.

20          (Exhibit No. 11 was marked for

21    identification.)

22    ///

Wallis, Terilyn                                    February 20, 2023

178

1    BY MR. BROWN:

2          Q.   Do you recognize this document?

3          **A.   I recognize it now, as you bring it**

4    **up, that it would have been an offer letter at**

5    **that time.**

6          Q.   And does it appear to be a true and

7    correct copy of the offer letter that CFC

8    extended to you in June of 2012?

9          **A.   Yes.**

10         Q.   Okay.  And is that your signature

11   at the bottom of CFC6078?

12         **A.   Appears to be my signature.**

13         Q.   All right.  And it looks like you

14   signed it on June 28th of '12; is that right?

15         **A.   It appears that way.**

16         Q.   Okay.  I'm going to go back up.  Do

17   you see the start date for your employment?

18         **A.   I do.**

19         Q.   Okay.  Does it -- do you -- do you

20   recall actually starting on or about September

21   10th, 2012?

22         **A.   Yes, I do.**

Wallis, Terilyn                                    February 20, 2023

183

1          A.    Initially, I covered northern

2     Minnesota, half of North Dakota, and all of

3     South Dakota.

4          Q.    And did that change at any time?

5          A.    Couple of times.

6          Q.    Can you just sort of tell me what

7     the changes were and when you recall those

8     happening, to the best of your recollection?

9          A.    Yeah, dates I don't recall

10    specifically of them happening, but there was a

11    transition where I took on all of North Dakota

12    at a -- at one point, and that was at the point

13    that Jim Kaufman went back into retirement, so

14    he worked for CFC, he went back, he worked for

15    CFC and retired, he came back and worked for

16    them for awhile, and when he retired for the

17    second time he was covering western North

18    Dakota, which included one of the largest

19    borrowers of the CFC, at the time, when he

20    retired I took on that western area of North

21    Dakota, as well.

22               And then, at another point, and I

Wallis, Terilyn                                    February 20, 2023

184

1   don't remember the timeline on this, I also

2   added a number of Minnesota cooperatives, so

3   that I moved up to having 50 percent of the

4   Minnesota distribution cooperatives and the

5   statewide in that transition, that was taking

6   those accounts more away from Mike Bunney, and

7   turning them over to underneath me.

8              MR. BROWN:  Okay.  I am going to

9   introduce the next Exhibit in order, which I

10  believe is 12.

11             Ms. Wallis, I brought a document up

12  on the screen titled:  Position profile, which

13  is Bates CFC6104 to 6105.  I'm now going to

14  scroll through this slowly for you, and just let

15  me know if you need me to stop or go back.

16             (Exhibit No. 12 was marked for

17  identification.)

18             THE WITNESS:  Actually, can you --

19  can you -- the numbers that you just referenced,

20  where -- where -- I don't understand where

21  you're referencing those.

22  ///

Wallis, Terilyn                                          February 20, 2023

185

```
 1    BY MR. BROWN;
 2          Q.   Oh, I'm sorry.  So those are Bates
 3    stamped numbers at the bottom, before we produce
 4    the documents we added these Bates stamped so we
 5    can easily identify the documents.  So when I
 6    refer to that number it's this little number at
 7    the bottom of the page?
 8          A.   That's just your law firm
 9    identifying those numbers.
10          Q.   Correct.
11          A.   Okay.
12          Q.   So that would not have appeared on
13    the document when you first saw it?
14          A.   Okay.  So then this document is the
15    position profile.
16          Q.   Okay.  And does it appear to be a
17    true and correct copy of the position profile
18    for your position at the beginning of your
19    employment with CFC?  And you can reference the
20    date here at the bottom, if that helps.
21          A.   Can you scroll up, please?
22          Q.   Yes.
```

Wallis, Terilyn                                    February 20, 2023

186

1          **A.    Can you scroll down, please?**

2          Q.    Yes.

3          **A.    Okay.**

4          Q.    Do you want me to keep going?

5          **A.    Yeah, I'll read the whole document,**

6    **if you don't mind.**

7          Q.    Yeah, no problem.

8          **A.    I'm good.**

9          Q.    Okay.  So the question was:  Does

10   this appear to be a true and correct copy of the

11   position profile for your position at the

12   beginning of your employment?

13         **A.    Yes.**

14         Q.    Okay.  And I know that, you know,

15   you're -- you had some additional

16   responsibilities, but does -- do these -- the

17   job responsibilities on this document accurately

18   reflect -- reflect what your responsibilities

19   were as an RVP for CFC?

20         **A.    Yes.**

21              MR. BROWN:  Okay.  I'm going to

22   close that.  I'm now going to open another

Wallis, Terilyn                          February 20, 2023

188

1    is not a document you created, this is a

2    document that came from CFC, but do you see your

3    name about -- well, I'm highlighting it right

4    now.

5              I'm just going to direct your

6    attention to this line, because I'm going to ask

7    you some questions about your salary, okay?

8         **A.    Okay.**

9         Q.   Was your starting salary with CFC

10   $120,000?

11        **A.    Yes.**

12        Q.   And do you recall your salary as of

13   2015?

14        **A.    Not without looking here, I mean, I**

15   **would look at that.**

16        Q.   Okay.  Got it.  Does $142,203.60

17   sound about right?

18        **A.    It does sound about right.**

19        Q.   Okay.  And do you also recall

20   receiving an additional $21,745.89 in

21   compensation, in the form of incentive

22   compensation, in 2015?

Wallis, Terilyn                                    February 20, 2023

189

```
 1                    And I'll just tell you what I did,
 2        I subtracted this number, right here, your gross
 3        earnings from your base salary, to get that
 4        number.  So does that sound right, that you
 5        received about $22,000 in additional incentive
 6        compensation for 2015?
 7             A.   Yeah, I think the only -- it --
 8        it's minor, but I'll identify it as I don't know
 9        which years I received a couple spot awards that
10        I think were -- I don't remember the dollar
11        amounts, anywhere from $200 to $1,000, and
12        they're in there one or two years, so as long as
13        we agree that that could be in one of those
14        years, I'm good.
15             Q.   Sure.  Right.  So when I say
16        incentive compensation, I mean compensation
17        through, you know, a long form -- long-term or
18        short-term incentive compensation plans, bottom
19        work bonuses, anything like that, anything in
20        addition to your base salary is what I'm talking
21        about when I say incentive comp; does that make
22        sense?
```

Wallis, Terilyn                                    February 20, 2023

190

1          **A.    Sure.**

2          Q.    Okay.  Do you recall if you

3     received a salary increase for 2016?

4          **A.    I would -- I would say that I did,**

5     **I don't recall the amount.**

6          Q.    Okay.  And I'll try to orient us

7     again, here.

8              Okay.  This -- this document shows

9     that your salary, as of the end of '16, was

10    $150,000; does that sound right?

11         **A.    That sounds reasonable, yep.**

12         Q.    Okay.  And then, again, I -- I --

13    all I did was subtract this gross earnings

14    number from your base.  So do you think it is

15    accurate that you received an additional

16    $28,832.92 in incentive compensation for 2016?

17         **A.    Yes, sure.**

18         Q.    Okay.  Do you recall if you

19    received a salary increase for 2017?

20         **A.    I'm pretty sure I did.**

21         Q.    Okay.  And is it your recollection

22    that your salary in 2017 was $157,500?

Wallis, Terilyn                              February 20, 2023

191

1          A.   I didn't recall that, but it does

2     not seem that that would be -- there's no reason

3     for me to believe that that's not accurate.

4          Q.   Okay.  And again, same -- same sort

5     of calculus, but -- or subtraction, not

6     calculus, but I subtracted your gross earnings

7     in '17 from your base, did you also receive an

8     additional $28,985.07 in incentive compensation

9     for 2017?

10         A.   Very possible.

11         Q.   Okay.  We've already talked about

12    Steve Kettler; is he trustworthy, in your

13    opinion?

14         A.   Yeah.

15         Q.   What about Dan Cawood?

16         A.   No reason to believe -- I have no

17    experiences otherwise.

18         Q.   Okay.  Who is Sheldon Peterson?

19         A.   Former CEO.

20         Q.   Is he trustworthy -- trustworthy,

21    in your opinion?

22         A.   I don't have a lot of personal

Wallis, Terilyn                          February 20, 2023

194

1    human resources.

2         Q.   Is she trustworthy, in your

3    opinion?

4         A.   I have no idea.  I don't know her,

5    so I have to go -- I don't know that I had --

6    you know, I had about the same amount of

7    exchanges with her as John Evans, so I won't --

8    I don't have any personal experiences to share

9    with -- on her, either.  I would have to assume

10   that an organization would go through the same

11   process to put someone in a position like that.

12             MR. BROWN:  Okay.  Can we go off

13   the record, please?

14             THE VIDEOGRAPHER:  Yes.  The time

15   is 1:43 p.m.

16             We are off the record.

17             (Recess.)

18             THE VIDEOGRAPHER:  The time is 2:16

19   p.m.

20             We're back on the record.

21             Please proceed.

22             MR. BROWN:  Ms. Wallis, I'm going

Wallis, Terilyn                                  February 20, 2023

195

1    to go through some policy documents right now,

2    so I'm going to introduce the next exhibit in

3    order, which is Exhibit 14.  I'm going to pull

4    that up on the screen share right now.

5                 (Exhibit No. 14 was marked for

6    identification.)

7    BY MR. BROWN:

8         Q.   Okay.  Ms. Wallis, do you see the

9    document on the screen titled:  Ethics policy,

10   Bates stamped CFC3372 to 3379?

11        **A.   I do.**

12        Q.   Okay.  I'm going to scroll through

13   this.  It's an 8-page document.  I'm going to

14   move pretty quickly, because I'm not planning on

15   asking you any questions about the content of

16   this, at this point.  I just want to make sure

17   you recognize the document.

18        **A.   Could you scroll all the way -- oh,**

19   **sorry.  Could you scroll all the way to the top,**

20   **just to review that first page for just one**

21   **moment?**

22        Q.   Yes.

Wallis, Terilyn                                    February 20, 2023

196

```
 1              A.    Real quick?

 2                    And then just scroll just a little

 3        bit going down, a little bit more, to the

 4        next -- just looking at the break to the second

 5        page.

 6              Q.    Let me --

 7              A.    Okay.  I'm good.

 8              Q.    Okay.  Do you recognize this

 9        document?

10              A.    Yes.

11              Q.    What is it?

12              A.    It's the ethics policy.

13              Q.    And does it appear to be a true and

14        correct copy of the ethics policy for CFC that

15        existed on or about December 6th, 2011?

16              A.    Yes.

17              Q.    Going to the last page of Exhibit

18        14, is that your signature at the bottom of

19        CFC3379?

20              A.    Appears to be, yes.

21              Q.    Okay.  And have you read CFC's

22        ethics policy?
```

Wallis, Terilyn                                    February 20, 2023

197

1          **A.   At that time, I did.  I also likely**

2   **read it at the time that Andrea did a deposition**

3   **with me.**

4          Q.   Okay.  And do you understand the

5   ethics policy?

6          **A.   Yes.**

7          MR. BROWN:  All right.  The next

8   exhibit I'm going to intro do you see is Exhibit

9   15, titled:  Code of conduct and business

10  ethics, and it's Bates stamped CFC3380 to 3398.

11          (Exhibit No. 15 was marked for

12  identification.)

13  BY MR. BROWN:

14          Q.   Okay.  Ms. Wallis, this is a much

15  longer document.  I'm going to do the same

16  thing.  I'll scroll through it pretty quickly,

17  just so you can see the document and recognize

18  it.

19          **A.   Yes, I recognize this document from**

20  **the items that you sent over to the Employment**

21  **Law Group in the batch.**

22          Q.   Okay.  Okay.  So I'm just going to

Wallis, Terilyn                                    February 20, 2023

198

1    keep looking through it, quickly, just so we're

2    on the same page.

3              Okay.  What is this document?

4         A.   **Maybe the code of conduct document**

5    **of whatever's on the front cover.**

6         Q.   Okay.  And does it appear to be a

7    true and correct copy of the code of conduct

8    that existed during your employment with CFC?

9         A.   **It does.**

10        Q.   Have you read CFC's code of

11   conduct?

12        A.   **In the past, I have.**

13        Q.   Did CFC provide you a copy?

14        A.   **Yes, or it would have been**

15   **available on the internet.**

16        Q.   Okay.  I'm going to direct your

17   attention to CFC3397.  Can you please -- and

18   I'll blow it up a little bit -- can you direct

19   your attention to the language underneath the

20   Q&A, called accounting irregularities, and just

21   review that, just read it to yourself and let me

22   know when you're finished.

Wallis, Terilyn                                    February 20, 2023

199

1           **A.    Okay.**

2           Q.    Do you see where it states, quote,

3    the integrity and accuracy of CFC financial

4    statements is critical to the competence of

5    CFC's investors and members, close quote?

6           **A.    Yes.**

7           Q.    Do you agree with that statement?

8           **A.    I do.**

9           Q.    Do you see where it states that

10   account -- quote, accounting irregularities

11   could raise red flags with CFC's investors, and

12   may cause a loss of confidence in the financial

13   stability of the organization, close quote?

14          **A.    Yes.**

15          Q.    Do you agree with that statement?

16          **A.    Yes.**

17          Q.    Do you see where it states that

18   this can lead to higher prices for accessing

19   credit in the capital markets and, in turn,

20   drive up the costs of borrowing for CFC and our

21   members, close quote?

22          **A.    Yes.**

Wallis, Terilyn                                    February 20, 2023

200

1          Q.   Do you agree with that statement?

2          **A.   Yes.**

3          Q.   Do accounting irregularities, in

4    your experience, include fraud or errors in

5    preparing the financial statement?

6          **A.   Yes.**

7          Q.   In your experience, could an

8    accounting irregularity include a

9    misrepresentation or a false statement regarding

10   a matter contained in CFC's financial records,

11   reports, or audits?

12         **A.   Can you repeat that, slowly.**

13         Q.   Sure.  In your experience -- sure.

14              In your experience, can an

15   accounting irregularity include a

16   misrepresentation or false statement regarding a

17   matter contained in CFC's financial records,

18   reports or audit documents?

19         **A.   Yes, it -- it could include that.**

20              MR. BROWN:  Okay.  The next

21   document I'd like to show you is -- and I'm

22   identifying it as Exhibit 16 -- it's titled:

Wallis, Terilyn                                    February 20, 2023

201

1      Corporate practice, corporate travel policy, and

2      Bates stamped CFC3339 to 3346.

3                 (Exhibit No. 16 was marked for

4      identification.)

5   BY MR. BROWN:

6            Q.   All right.  Ms. Wallis, I'm going

7      to again scroll through this document, which is

8      eight pages.  And then let me know if you

9      recognize it.

10                MR. BROWN:  And for the court

11     reporter, I just note that this is a

12     confidential document.  I would like to treat it

13     as confidential.

14                And I'm sorry, while -- while we're

15     at it, I would also like to treat the -- and I'm

16     sorry, just bear with me, Ms. Wallis -- I'd also

17     like to treat Exhibit 13 as confidential, the

18     RVP report.

19                THE REPORTER:  Okay.

20                (Confidential documents Exhibit 13

21     and 16.)

22     ///

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Wallis, Terilyn                                    February 20, 2023

202

1    BY MR. BROWN:

2           Q.   Okay.  Ms. Wallis, I've now

3    scrolled through the entire document; do you

4    recognize it?

5           **A.   I have a clarifying question on the**

6    **document.**

7           Q.   Okay.

8           **A.   I do recognize it, and could you**

9    **clarify for me if this is the same document that**

10   **is at the back of the employee handbook or is**

11   **this a longer version of the full policy and**

12   **then a portion of it is in the back of the**

13   **employee handbook?  And maybe we'll get to that**

14   **in your exhibits.**

15          Q.   I will introduce the handbook

16   later, but my recollection, this is a more

17   fulsome statement of the travel policy.  But

18   there's also a travel policy section of the

19   handbook that is consistent with this.

20          **A.   Okay.  I do recognize this travel**

21   **policy.**

22          Q.   What is it?

Wallis, Terilyn                                      February 20, 2023

203

1          **A.    The corporate travel policy.**

2          Q.    It is --

3          **A.    And with portions --**

4          Q.    Go ahead.

5          **A.    With portions of this -- I think**

6    **it's portions of this in the employee handbook,**

7    **towards the back, as well.**

8          Q.    Okay.  And does this appear to be a

9    true and correct copy of the corporate travel

10   policy that existed on or about October 18th,

11   2017, to the end of your employment with CFC?

12         **A.    I have no reason to believe it**

13   **would not be that document, agree.**

14         Q.    Okay.  Have you read CFC's

15   corporate travel policy?

16         **A.    I'm sure I did, years ago.**

17         Q.    And was there anything in there

18   that you didn't understand --

19         **A.    I don't recall --**

20         Q.    -- when you read it?

21         **A.    -- it if there was.**

22              MR. BROWN:  Okay.  And so the next

Wallis, Terilyn                                    February 20, 2023

204

1   document will be -- I'll identify as Exhibit 17,

2   and these are excerpts from CFC's employee

3   handbook.  And the Bates range is CFC6561 to

4   6690.

5               (Exhibit No. 17 was marked for

6   identification.)

7   BY MR. BROWN:

8        Q.   Ms. Wallis, this isn't the entire

9   handbook, because it's lengthy, but I'm just

10  going to scroll through it so you can kind of

11  see the excerpts that I pulled out.

12              And we'll go back over a few of

13  these, but I'm just showing you these for the

14  purposes of identifying the documents.

15              Okay.  So Ms. Wallis, to your

16  point, here's the excerpt --

17       **A.   Okay.**

18       Q.   -- from the corporate trial

19  practice lawsuit.  Okay.  That's the end of the

20  document; do you recognize this document?

21       **A.   I do.**

22       Q.   What is it?

Wallis, Terilyn                                        February 20, 2023

205

1          A.    The employee handbook.

2          Q.    And does it appear to be a true and

3     correct copy of excerpts from the handbook that

4     existed towards the end of your employment at

5     CFC?

6          A.    I have no reason to believe it

7     would not be, yes, it looks appropriate.

8          Q.    Okay.  Did you ever read the

9     handbook or portions of it?

10         A.    Portions of it, I don't know if I

11    read the whole handbook.

12         Q.    Did CFC provide you a copy of the

13    handbook?

14         A.    I think they provided a copy of

15    this back in 2012, on a CD disc, on a CD, and

16    not in print form.

17         Q.    Okay.  So they gave you -- they

18    gave you the means to access it, but they didn't

19    actually give you a hard copy version of it?

20         A.    Right.

21         Q.    Okay.  The portions that you

22    reviewed, did you understand the contents?

Wallis, Terilyn                                    February 20, 2023

206

1           **A.    Yes.**

2           Q.   Were you aware that CFC has an open

3    door policy to management and HR if you have any

4    concerns or complaints?

5           **A.    Yes.**

6           Q.   So you knew that you could contact

7    your management or HR if you were issues with

8    your employment?

9           **A.    Yes.**

10          Q.   Were you aware that CFC has an

11   equal opportunity -- equal employment

12   opportunity policy and a policy prohibiting

13   discrimination?

14          **A.    Yes.**

15          Q.   And are you aware that as part of

16   that policy you are required to report any

17   discrimination to CFC?

18          **A.    Yes.**

19          MR. BROWN:  The next document I

20   would like to show you is a one-page document,

21   titled:  Employee -- employee acknowledgment

22   form, and it's Bates stamped CFC6160.

Wallis, Terilyn                                    February 20, 2023

207

1                      (Exhibit No. 18 was marked for

2        identification.)

3     BY MR. BROWN:

4              Q.   Ms. Wallis, can you review this

5        one-page document, and I'll make it larger for

6        you.  And let me know -- too large -- and then

7        let me know when you're done.

8              **A.   I've read it.**

9              Q.   Do you recognize this document?

10             **A.   I recognize this document, yes.**

11             Q.   What is it?

12             **A.   An employee acknowledgment form.**

13             Q.   And does this appear to be a true

14       and correct copy of the employee acknowledgment

15       form that you signed on or about September 13th,

16       2012?

17             **A.   That appears to be true.**

18             MR. BROWN:  Okay.  The next

19       document I would like to identify is Exhibit 19,

20       which is titled:  Antiharassment policy.  And

21       it's Bates stamped CFC6325 to 6328.

22                      (Exhibit No. 19 was marked for

Wallis, Terilyn                                February 20, 2023

208

1      identification.)

2    BY MR. BROWN:

3          Q.   Ms. Wallis, I'm just going to

4    scroll through this, as well.  And you can let

5    me know, it's a four-page document; do you

6    recognize this document?

7          **A.   Yes.**

8          Q.   And what is it?

9          **A.   It's the antiharassment policy.**

10         Q.   And does it appear to be a true and

11   correct copy of CFC's antiharassment policy?

12         **A.   I have no reason to believe it is**

13   **not, looks good.**

14              MR. BROWN:  Okay.  The next

15   document -- I'm sorry, let me just mark a few

16   more, just bear with me for a minute.

17              Okay.  Ms. Wallis, I'm going to

18   share my screen again.  The next document I'd

19   like you to review is called -- well, I'll

20   identify it as Exhibit 20, and it's titled:

21   Complaints regarding accounting, auditing,

22   internal accounting control, irregularities, and

Wallis, Terilyn                                    February 20, 2023

209

1    anti-retaliation, and it is Bates stamped 6372

2    to 60 -- sorry -- CFC6372 to 6374.

3              (Exhibit No. 20 was marked for

4    identification.)

5    BY MR. BROWN:

6         Q.   Ms. Wallis, I'm going to scroll

7    through this 3-page document.

8              Do you recognize this document?

9         **A.   Not really.**

10        Q.   Okay.  Do you know if you've ever

11   reviewed this policy?

12        **A.   I -- I don't recall reviewing it,**

13   **but I'm not saying that it wasn't part of the**

14   **package and I didn't review it at the time.  I**

15   **just don't recall this particular policy.**

16             MR. BROWN:  Okay.  The next

17   document I'd like to show you I'm going to

18   identify as Exhibit 21, which is titled:

19   Corporate practice, CFC open door and help line

20   reporting, and it's Bates stamped CFC6510 to

21   6514.  And I'm going to scroll through this

22   five-page document so Ms. Wallis can review it.

Wallis, Terilyn                                              February 20, 2023

210

1                    (Exhibit No. 21 was marked for

2        identification.)

3                    THE WITNESS:  I think -- sorry, can

4        you slow down or just go back up to the top,

5        real quick, and we'll catch up fast, again.

6        Yeah, we're good.

7                    MR. BROWN:  Oh, okay.  And for the

8        court reporter, I would like to treat this

9        document as confidential.

10                    (Confidential document Exhibit 21.)

11      BY MR. BROWN:

12                Q.   Do you recognize this document?

13                **A.   This would be a document that I'm**

14      **guessing I have seen in the past.  I -- I don't**

15      **recall reading it for -- yeah.**

16                Q.   Okay.  Do you have any reason to

17      doubt that this is a true and correct copy of

18      CFC's open door and help line reporting policy?

19                **A.   I do not have any reason.**

20                    MR. BROWN:  Okay.  Okay.  And then

21      the final policy I would like to show you right

22      now is -- I'll identify it as Exhibit 22,

Wallis, Terilyn                                    February 20, 2023

211

1       titled:  Whistle blower reporting and

2       anti-retaliation, which is Bates stamped CFC6354

3       to 6356, and scrolling through this three-page

4       document so Ms. Wallis can review it.

5                    (Exhibit No. 22 was marked for

6       identification.)

7    BY MR. BROWN:

8            Q.   Ms. Wallis, do you recognize this

9       document?

10           **A.   I do.**

11           Q.   What is it?

12           **A.   The whistle blower -- blower**

13      **reporting and anti-retaliation policy.**

14           Q.   And does it appear to be a true and

15      correct copy of the whistle blower reporting and

16      anti-retaliation policy that existed on or about

17      December 5th, 2016?

18           **A.   That would be reasonable to assume,**

19      **yes.**

20           Q.   Okay.  So were you aware that CFC

21      had a policy in place to protect whistle blowers

22      in reporting violations of law and misconduct?

Wallis, Terilyn                               February 20, 2023

212

1          **A.    Yes.**

2          Q.    Okay.  When you were working for

3    CFC did you always use your personal credit card

4    for the business expenses you incurred for your

5    work?

6          **A.    Yes.**

7          Q.    Did you ever request a company

8    card?

9          **A.    No.**

10         Q.    A company credit card?

11              Can you -- and I'm not asking about

12   CFC's process for processing expense

13   reimbursements, I'm asking you about what your

14   process was to prepare and submit your expense

15   reimbursement reports.

16              Can you walk me through the process

17   that you used to -- to submit your expense

18   reimbursement requests?

19         **A.    Yes.  Well, this process changed in**

20   **my time at CFC.  When I began at CFC the expense**

21   **submission process was 100 percent paper**

22   **submission.  And then, later on, I believe they**

Wallis, Terilyn                                    February 20, 2023

214

1              A.    The part of the process that

2       changed for my expense report, not necessarily

3       me prepping the expense report, is that a paper

4       expense report would be submitted to Rodney

5       Sanford, who is an assistant inside of the

6       member services group.

7                    And for my first years of

8       employment at CFC, one of his responsibilities,

9       with the submission of the Excel spreadsheet

10      manual total page or pages for reimbursement was

11      he would then review those individual

12      submissions, and he would provide feedback and

13      actually correct those documents for differences

14      that he found in that preliminary review.

15                   So for example, if he found that

16      you submitted a detailed receipt, but you

17      entered in the grand total of the food and drink

18      at the restaurant, but you didn't include maybe

19      the tip, and, therefore, you had shorted

20      yourself the reimbursement for the tip, he would

21      recognize that and he would either call you or

22      he would actually ask you if he could change the

Wallis, Terilyn                                    February 20, 2023

215

1    document and then submit -- submit it once he

2    had gone through and reviewed everything that

3    you had submitted.

4              Whereas, later on, once the

5    electronic version of submitting sheets,

6    expenses was implemented, there was great

7    discussion, significant discussion about this

8    change at one of the RVP -- we kind of called

9    them summits or conferences -- where we would

10   gather out at the CFC headquarters for updates

11   and things like that.

12             When we got trained on this new

13   Oracle Fusion option there was no double

14   checking process.  There was no review of your

15   expenditures, as there had been in the past.

16   And once you submitted them, they were directly

17   going into CFC's approval process system.

18             But generally, how the receipts

19   were put together, was similar for me.  And the

20   only other process that really adjusted during

21   my time at CFC is numerous times, because of the

22   amount of air travel that I did, and because of

Wallis, Terilyn                                    February 20, 2023

216

1      when I was hired, it was requested that I use

2      CFC's corporate travel agency, FCM, FMC,

3      whatever the name is, SCM travel, there were

4      times where I was either not getting e-mails or

5      getting accurate information regarding my

6      receipts, and I complained about that a number

7      of times along the way.

8                   So that was a frustration, and that

9      would sometimes delay me submitting those

10     airline expenses.  But otherwise the process of

11     submitting was the same from start to finish of

12     being there.

13          Q.   Okay.  You said you complained

14     about getting receipts from the travel agency;

15     did I have that right?

16          A.   Right.  At times the --

17          Q.   What did --

18          A.   The actual invoice didn't come into

19     my --

20          Q.   Ms. Wallis, I just asked you a yes

21     or no question.  I'm trying to move along,

22     here --

Wallis, Terilyn                                    February 20, 2023

226

1    accounting credentials, without looking at them.

2          Q.   Okay.  So are you aware that he's

3    also a certified fraud examiner?

4          A.   Not without looking at -- at more

5    details to know.

6          Q.   Okay.  Is it true that you allege,

7    generally, that the internal audit in CST

8    Group's investigation was discriminatory in

9    nature?

10         A.   Yes.

11         Q.   Why do you think so?

12         A.   My understanding of what CFC did

13   for a test, was CFC ran a report to determine

14   how many times there were duplicate, meaning

15   equal, charges, that were submitted for expense

16   reimbursement.

17              And through that initial -- that

18   that's what the test is, and that particular

19   approach to a test is discriminatory because

20   once the results of that test were known my

21   number of transactions inside of that test were

22   significantly greater than anyone else's inside

Wallis, Terilyn                                    February 20, 2023

227

```
 1    of that.

 2                    And the reasons that my duplicates

 3    were greater, the basis for that or the

 4    reasoning for that, was never considered or

 5    taken out of the test.  It was assumed that

 6    duplicate charges equals great potential for

 7    fraud.

 8         Q.    Okay.  So let me try to unpack that

 9    to make sure I understand.

10                    Is it -- is it your contention that

11    it wasn't the audit, itself, or the

12    investigation, itself, that was discriminatory,

13    it was the fact that CFC did not come to you and

14    ask for your explanation for the duplicates, at

15    least not before January of '18; is that your

16    contention why the audit and the investigation

17    was discriminatory?

18                    MS. CHAMBERS:  Objection,

19    mischaracterizes -- I'm sorry.

20                    Objection, mischaracterizes the

21    evidence or the testimony.

22                    You can answer.
```

Wallis, Terilyn                                    February 20, 2023

228

1          A.    It would be both.  Not -- not one

2     or -- or -- it would be both the test as well as

3     me as a participant in the test.

4          Q.    Okay.  Because I think what you

5     just testified about would be the latter, right,

6     that you were not a participant?

7               What about the test, itself, was

8     discriminatory in nature, in your opinion?

9          A.    The test looked for duplicates in

10    the assignments that I had, and the

11    responsibilities that I had as an RVP.  While

12    they may be similar, they may be the same job

13    description that you said earlier, that job

14    description flat out said that there would be a

15    lot of ambiguity within the job.

16               And so my particular

17    responsibilities were that I -- I, number one,

18    had a service area that I flew to extensively,

19    where others would not have been flying to get

20    to their location, meaning, I would have

21    repetitive flights to the same places time and

22    time again.  Those flights might have the exact

Wallis, Terilyn                                February 20, 2023

229

1       same price tag, multiple times.

2                  Whereas, someone that might be

3       driving a car to their -- to their locations,

4       they might be filling their gas tanks, but the

5       likelihood of them always having the same dollar

6       amount to go along with that would have been

7       less likely.

8                  And then, from there, I had more

9       accounts than any other RVP.  I had more

10      cooperatives assigned to me, specifically, and

11      so I was extremely busy.

12                 And as you look at the duplicates

13      that -- that came through, you will notice that

14      my eating was significantly different than other

15      people's eating patterns.  Many of the

16      duplicates that would have popped up would have

17      been quick, fast food, eating by myself to get

18      from location A to B to C, and it was not

19      uncharacteristic for me to get to three

20      locations in one day.

21                 Whereas, another RVP might go to

22      one location that day.  They might take someone

Henderson Legal Services, Inc.

Wallis, Terilyn                                    February 20, 2023

230

1      to lunch.  They're always going to a different

2      restaurant.  It's a very laid back day.  And

3      each restaurant that they go to is going to be a

4      different number of people sitting down to eat

5      and a different price tag at each unique

6      restaurant, where mine was very similar

7      restaurants that were fast food.

8              So the likelihood -- and there was

9      an example given a week or so ago, when Gary did

10     his deposition, like, 159 or so duplicates were

11     found.  Well, you know, if you -- if you ran

12     my -- my expenses just for three years, I had

13     well over 215, and they are duplicates

14     because -- not because -- not because I did

15     anything wrong, because that is what my work

16     was.

17             And in addition to that, I was

18     trying to very quickly get done with my work so

19     that I could also contribute to CFC by doing

20     strategic planning services and also contribute

21     by doing training and teaching, because we had a

22     philosophy of be everywhere all the time.  And I

Wallis, Terilyn                                    February 20, 2023

231

1    was able to do that very efficiently and very

2    well.

3              So my travel trends were going to

4    be significantly different than others.

5         Q.   Okay.  Ms. Wallis, do you then

6    admit that you did, in fact, submit duplicate

7    expense reimbursements?

8         A.   I am admitting that the submissions

9    that I had had the same dollar amount.  It does

10   not mean that they are for the same transaction.

11        Q.   Okay.  Are you aware that CST Group

12   and CFC both found that you had multiple

13   instances of submitting expense reimbursements

14   for the exact same transactions, after analyzing

15   the supporting documentation?

16        A.   I'm aware that that -- that I was

17   told that after -- after the fact.

18        Q.   Okay.  Do you have any reason to

19   doubt their findings?

20        A.   Well, after numerous times of

21   asking for a full record of those findings, it

22   was very difficult to get -- get that, and --

Wallis, Terilyn                                 February 20, 2023

232

1    and then the copy, this was quite some time ago,

2    the copy quality of what was produced was

3    illegible to be able to read each one of those

4    receipts.  So I -- I would not be able to

5    confirm if those had been submitted that way.

6              And then the second question that

7    comes into play is if those were submitted in

8    error, not in fraud, then why is it that when

9    each one of the transactions on my American

10   Express are added up they don't show that?

11        Q.   Okay.  Ms. Wallis, you -- we talked

12   about a couple of reasons that you believe CFC's

13   actions were discriminatory in nature against

14   you; is there anything else in the internal

15   audit or the CST Group investigation that you

16   think indicates discrimination against you?

17        A.   No.

18             MR. BROWN:  Okay.  Going to

19   introduce the next exhibit in order, which is

20   Exhibit 23, which is titled:  Top 25 employee

21   expense reimbursements, and it's Bates stamped

22   CFC6560.

Wallis, Terilyn                                     February 20, 2023

237

1    that CFC considered CST Group's findings, that's

2    my question.

3              MS. CHAMBERS:  My objection is it

4    lacks foundation, but you can answer.

5         **A.   I don't have any reason to believe**

6    **that CFC would not have used that information.**

7              Q.   We understand that you've taken

8    issue with some of CFC's decisions related to

9    the internal audit and CST Group's third-party

10   investigation.  Which of CFC's decisions or

11   actions related to the internal audit or CFC

12   investigations do you believe indicate

13   discrimination?

14              I think we've talked about CFC not

15   approaching you earlier, to get your

16   explanation, and then, of course, we have your

17   termination.

18              Is there anything else?  Are there

19   any other decisions by CFC, in conjunction with

20   the audit or the CST Group investigation, that

21   you think indicates discrimination?

22         **A.   Well, that my -- my volume of**

Wallis, Terilyn                                    February 20, 2023

238

1   travel was not taken into consideration in

2   proportion to others, that the cost of my travel

3   was higher than others.

4            And my example of that is that you

5   will not find anyone on this list, with the

6   exception of John Kimsey, I'll put him as an

7   exception, the -- the highest people in one

8   through five needed to fly Delta Airlines, and

9   their flights are significantly more expensive

10  than a Southwest Airlines.

11           And so the prices -- there was --

12  what was taken into consideration didn't

13  consider how much travel we needed to do, where

14  that travel was, and the fact that there could

15  have been what -- what you're viewing in your

16  tests as duplicates is actually the same amount

17  of money being spent for services on -- similar

18  services, but it wasn't at the -- it wasn't the

19  same time.  And that was considered to meet the

20  test that they were -- that there was fraudulent

21  activity.

22           So my numbers automatically would

Wallis, Terilyn                                    February 20, 2023

239

1    have been significantly higher than anyone

2    else's.

3            Q.   Okay.  Are there any other

4    decisions that CFC made, in conjunction with the

5    audit, the investigation, that you believe

6    indicates discrimination, other than what we've

7    already discussed?

8            A.   Yes.

9            Q.   What?

10           A.   Once the termination was complete,

11   and the employee group was rather shocked by the

12   termination, two events happened after that,

13   that I had comments just randomly come back to

14   me, and the -- one of those --

15           Q.   Ms. Wallis, just please listen to

16   my question.  I promise you we're going to get

17   to that.

18               What I asked you was:  Was there

19   anything, in conjunction with the audit or CST

20   Group's investigation, that you believe

21   indicates discrimination.

22               And you started to talk about stuff

Wallis, Terilyn                                      February 20, 2023

255

1    the 8,000 documents that we produced, but noted.

2    BY MR. BROWN:

3            Q.    Who at CFC do you believe

4    mistreated you?

5            **A.    What is your definition of**

6    **mistreat?**

7            Q.    Who at CFC committed any act

8    against you that you considered to be unlawful

9    and part of your lawsuit?

10           **A.    Yeah, so a comment -- an**

11   **inappropriate comment that was made to me was**

12   **made by John Grant, in December of 2017, on my**

13   **final appearance in the field to provide a**

14   **director training program.**

15                **It was a comment that I'm sure**

16   **you're aware of, in regards to the amount of --**

17   **the ratings and my scores, which had been very**

18   **high.  I had been on a run of great results,**

19   **which was one of CFC's pillars or strategic**

20   **objectives to have scores, and mine was**

21   **definitely north of that expectation.**

22                **So John just said, in John's way,**

Wallis, Terilyn                                    February 20, 2023

256

1    well, that's not going to happen.  Now, at the

2    time that John said it, I laughed at it, because

3    I wouldn't believe that someone that I would

4    work with, that we're all trying to reach high

5    scores, would be doing that to be derogatory.

6    But after the fact, that definitely is

7    inappropriate, so that -- that's one instance.

8              And -- and the testing that was

9    done, that was -- was administered by -- by Gary

10   Bradbury, for the reasons that I've already

11   stated, don't take into consideration the

12   specifics that I had assignments that would have

13   caused my duplicate submissions.

14             My actual duplicate, that the same

15   dollar amount would be repetitive, and that I

16   would automatically show up in that report,

17   which was the basis to do the next test, that

18   that -- that that was an acceptable test,

19   without any sort of modification or analysis

20   after simply doing the duplicate run.

21        Q.   Are you aware that at every step of

22   CFC's internal audit and the CST Group

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Wallis, Terilyn                                    February 20, 2023

263

1    was terminated.

2              Q.    Okay.  Getting back to that first

3    meeting, briefly, with -- between Joel Allen and

4    the RVPs, were there female RVPs present as well

5    as male RVPs present?

6              A.    At most -- I don't know if BobbiJo

7    Jeffries was present or not.  She would have

8    been the only female RVP employed at that time.

9              Q.    Okay.  So do you think that there

10   was at least one present during that meeting?

11             A.    I don't know, unless either she was

12   there or she wasn't there.

13             Q.    Okay.  So you don't have any

14   personal knowledge of who was in that meeting?

15             A.    No.

16             Q.    Okay.  Let's get back to the -- the

17   John Grant comment.

18                   So in your complaint you say:  In

19   or around December of '17, after successfully

20   completing an educational panel together, John

21   Grant complimented your excellent survey

22   results, but noted to her that, quote, that's

Wallis, Terilyn                                    February 20, 2023

264

1    not going to happen again; is that your

2    recollection?

3              A.    Yes.

4         Q.    Were you and John Grant friendly?

5              A.    Yeah, I think I was about as

6    friendly to John Grant as anyone around there.

7         Q.    Okay.  Did you consider him a

8    friend?

9              A.    I considered him a coworker.  A

10   personal friend, no.

11        Q.    Were both of you presenters on that

12   educational panel?

13             A.    Together, we were, we had a --

14   segments that we co-taught together.

15        Q.    And you both received survey

16   results after that panel, which expressed

17   feedback for both you and Mr. Grant; right?

18             A.    Yes, as well as numerous ones

19   leading up to that day.

20        Q.    And the feedback for your

21   presentation was better than the feedback that

22   John received; is that right?

Wallis, Terilyn                                    February 20, 2023

265

1          **A.    Yeah, in the few leading up to that**
2     **one in December, at the time that John made the**
3     **comment to me the December event was not over,**
4     **so I don't know what the score of that ever was.**
5          Q.    Okay.  So then after John noticed
6     that you got very good survey feedback, and that
7     it was better than his, he said:  That's not
8     going to happen again; right?
9          **A.    Yeah.**
10          Q.    Was he -- could it be possible that
11    he was joking?
12          **A.    Well, I sure laughed at it, at the**
13    **time.**
14          Q.    Okay.  Right.  So do you think that
15    Mr. Evans left that interaction, thinking:  I
16    made a joke, and Terilyn thought it was funny?
17                MS. CHAMBERS:  Not Evans.
18                MR. BROWN:  Sorry, John Graham.
19    Sorry.
20                THE WITNESS:  Want to repeat your
21    question, just so it's clear.
22                MR. BROWN:  Sure.

Wallis, Terilyn                              February 20, 2023

266

1    BY MR. BROWN:

2           Q.   Is it possible that Mr. Grant left

3    that meeting with you thinking nothing had

4    happened, that he simply made a joke and you

5    laughed at it?

6           **A.   Maybe, or John Grant felt**

7    **intimidated that I was getting my doctorate**

8    **degree in adult education, and I was very**

9    **interested in developing training and education**

10   **programs that were valued by our member owners,**

11   **and he didn't have that background, and maybe he**

12   **was feeling threatened.**

13          Q.   And is that pure speculation on

14   your part?

15          **A.   Pure speculation.**

16          Q.   Wasn't this just friendly banter,

17   that he would get better survey results than you

18   the next time?

19          **A.   I don't know that you could assume**

20   **that with John Grant.  He could be all over the**

21   **board in his comments.  There -- I wouldn't -- I**

22   **wouldn't classify or characterize John Grant as**

Wallis, Terilyn                                    February 20, 2023

267

1        always just plain being humorous.

2               Q.   Did he say anything about your sex

3        during that meeting?

4               A.   He did not, during that meeting.

5               Q.   Why do you think Mr. Grant's

6        comment was discriminatory or retaliatory in

7        nature, is there anything other than what we've

8        discussed?

9               A.   No.

10              Q.   Do you know if Mr. Grant made the

11       decision to terminate your employment?

12              A.   I would think he would not have the

13       primary decision to that.  He would not have,

14       from a training and education perspective,

15       anything but positive reports.

16              Q.   Okay.  Is there anyone else that

17       you believe mistreated you at CFC, that we

18       haven't talked about already?

19              A.   No.

20              Q.   Did you ever hear anyone at CFC

21       make a derogatory comment about your sex?

22              A.   No.

Wallis, Terilyn                                    February 20, 2023

268

1          Q.   Did you complain to anyone at CFC

2     during your employment, about unfair treatment?

3          **A.   No.**

4          Q.   Did you ever tell anyone at CFC

5     that you believed you were being discriminated

6     against during your employment?

7          **A.   Could you repeat that question?**

8          Q.   Sure.  The previous question was

9     whether you ever reported any complaints of

10    discrimination, now I'm asking you, during your

11    CFC employment did you ever discussed with

12    anyone that you believed you were being

13    discriminated against because of your sex?

14         **A.   No.**

15         Q.   Okay.

16              THE WITNESS:  Could we take a

17    bathroom break when it works, soon?

18              MR. BROWN:  Sure.  Yep, now is a

19    good time.

20              Five minutes?  Ten minutes?

21              THE WITNESS:  Five minutes is good

22    with me.

Wallis, Terilyn                                February 20, 2023

274

1              MR. BROWN:  So we can, again, talk

2     about that off the record.

3     BY MR. BROWN:

4          Q.   All right.  In your complaint you

5     also allege that you were -- you were given

6     additional job duties, which were not given to

7     other RVPs; is that right?

8          **A.   Yes.**

9          Q.   Okay.  And then you say:  Those

10    additional job duties include conducting

11    workshops, training seminars, speaking

12    engagements, and strategic planning engagements,

13    development and delivery of education

14    curriculum, assessing joint programming capstone

15    projects, conducting financial forecast

16    modeling, member product development and other

17    responsibilities at various conferences for

18    utilities.

19              Didn't you volunteer for many of

20    these duties?

21          **A.   Did I volunteer to do more work**

22    **than other people?  I volunteered at all times**

Wallis, Terilyn                                    February 20, 2023

275

1    **to do what I'm capable of doing.**

2             Q.   Ms. Wallis, again, that was not the

3    question that I asked you.  And I would

4    appreciate it, again, this is the fourth time

5    I've had to admonish you, because you're giving

6    non-responsive answers, and you've been doing it

7    throughout the day, and I've been very patient

8    with you.

9             But now that we're running out of

10   time, I need you to listen to the questions and

11   answer them as I ask them, okay?  Can we agree

12   to do that, please?

13            **A.   As long as you're not creating a**

14   **different context for the information --**

15            Q.   Okay.  I'm going to move on.

16            **A.   -- if that's untrue.**

17            Q.   Ms. Wallis, did you volunteer for

18   any of these duties?

19            **A.   Yes.**

20            Q.   Who assigned them to you?

21            **A.   It would depend on what the duty**

22   **was.**

Wallis, Terilyn                                February 20, 2023

278

1    else also performed the same duties that you

2    believe were additional duties?

3           A.   I think we would find very limited

4    example of anyone having the broad and similar

5    full-scale skill set that I did.

6           Q.   Are you certain that John Kimsey

7    did not also perform some of these duties?

8           A.   I'm sure.

9           Q.   Are you certain that Eric Anderson

10   did not perform some of these duties?

11          A.   I am sure.

12          Q.   Are you certain that Daniel

13   Kessler, Junior, did not also perform some of

14   these duties?

15          A.   He -- he did some of them.

16          Q.   Are you certain that Aaron

17   Stallings did not also perform some of these

18   duties?

19          A.   He did some of them, and management

20   also spoke to me about his weaknesses and why

21   they would reassign me to some of his.

22          Q.   Okay.  I didn't ask that, but thank

Wallis, Terilyn                                February 20, 2023

279

1     you.

2              Are you certain that other RVPs did

3     not also perform some of these duties?

4         A.    Yes.

5         Q.    Okay.  You also allege that, quote,

6     it was the travel -- the travel agency's

7     responsibility to review and apply any travel

8     credits to future travel purchases that resulted

9     from changes in Wallis's work schedule and

10    travel; is that right?

11        A.    **That is my understanding.**

12        Q.    Okay.  Do you believe it was the

13    travel agency's responsibility to submit

14    truthful and accurate business expense

15    reimbursement submissions for you?

16        A.    **No.**

17        Q.    Do you understand that

18    responsibility remained with you at all times?

19        A.    **I understand that that**

20    **responsibility laid with me at all times.  And**

21    **the employee handbook also lays out how that**

22    **additionally works.**

Wallis, Terilyn                                February 20, 2023

281

```
1           Q.   Oh, I'm sorry.  I should share my

2      screen.

3                Okay.  Can you see the document

4      now?

5           A.   I can.

6           Q.   Have you seen this document before?

7           A.   I have.

8           Q.   Please direct your attention --

9      I'll try -- I'll make it larger.

10               Okay.  Can you please direct your

11     attention to the middle of this first page,

12     where there's a handwritten A next to some data;

13     do you see that, about midway down?

14          A.   Yes.

15          Q.   Okay.  And this looks like it's an

16     expense in the amount of $326.20; is that right?

17          A.   Yes.

18          Q.   And you understand that you are

19     party 1402 on this spreadsheet?

20          A.   Yes.

21               MR. BROWN:  Okay.  Now, going to

22     introduce the next exhibit in order, which is
```

Wallis, Terilyn                          February 20, 2023

282

1    26.

2              Oops.  Okay.  Never mind, same

3    document.  All right.  Never mind.  Oh, you know

4    what, sorry, let me do something real quick.

5    Okay.  I just deleted the first two pages of

6    that document, which are the same as the

7    previous document.

8              Okay.  Do you see -- I'm going to

9    scroll through the first five or six pages, but

10   I want to direct your attention to the first

11   page of this document, titled:  Internal audit

12   findings support, and it's Bates stamped

13   starting 3696

14             Okay.  I'm going to direct your

15   attention to the A up here at the top right of

16   that document, and I'm going to scroll down and

17   ask you to notice the $326 here, for a flight,

18   and then I'm going to continue to scroll just to

19   show you the rest of the supporting

20   documentation for A.

21             Okay.  And again, I'll point to the

22   $326.20, again, on 3502, Bates stamped 3502.

Wallis, Terilyn                                      February 20, 2023

283

1      And I think that's the end of that.

2              (Exhibit No. 26 was marked for

3      identification.)

4  BY MR. BROWN:

5          Q.   Okay.  Are these the -- is this the

6      charge, the duplicate expense, that you alleged

7      you reimbursed to CFC, which is in your

8      allegation in paragraph 29 of your complaint, is

9      this --

10             **A.   I will check.**

11             **(Reporter admonishment re talking**

12     **at the same time.)**

13  BY MR. BROWN:

14         Q.   Yeah, is this the -- is this the

15     expense that you're referencing in paragraph 29

16     of your complaint, that I just read to you a few

17     minutes ago?

18             **A.   I would have to also have the**

19     **complaint, and then look at it to make sure that**

20     **it is aligning.  I --**

21         Q.   Okay.  Let me go off share for a

22     minute, and I'll open the complaint.

Wallis, Terilyn                              February 20, 2023

284

1              Okay.  I'm not going to mark this

2    as an exhibit, but Ms. Wallis, do you see the

3    document on the screen?

4         A.   I do.

5         Q.   And do you see it's titled:  First

6    amended complaint, and your demand?

7         A.   Yes.

8         Q.   Okay.  Is this a true and correct

9    copy of your amended complaint in this matter?

10        A.   I believe so.

11        Q.   Okay.  So going to paragraph 29,

12   can you please review that paragraph and let me

13   know when you're finished?

14        A.   Finished.

15        Q.   Okay.  So is the $326 and 27 -- I'm

16   sorry -- the $326.20 charge, that has the A next

17   to it, on the internal audit findings, is that

18   the same expense that you're referencing in

19   paragraph 29 of your complaint?

20        A.   Yes.

21        Q.   Okay.  All right.  Do you see the

22   handwritten note at the bottom of exhibit --

Wallis, Terilyn                                    February 20, 2023

285

1    sorry -- I believe it's Exhibit 25, the internal

2    audit findings?

3              A.   I see the note at the bottom.

4              Q.   Okay.  So the note states:  We

5    later discovered, during the investigation, that

6    the duplicate expense was reimbursed to CFC by

7    the employee.  The item was removed from the

8    expense report analysis which summarized the

9    investigation results; do you see that.

10             A.   I see it.

11             Q.   Okay.  And do you see that there's

12   an asterisk by the 326.20, and that that note --

13   the handwritten note refers to that amount?

14             A.   Yes.

15             Q.   Okay.  And I'll represent to you

16   that Gary Bradbury, during the Rule 30(b)(6)

17   deposition in this matter, testified that that

18   was his handwriting.

19             Do you have any reason to doubt

20   what Mr. Bradbury wrote?

21             A.   No reason to doubt what he -- that

22   he wrote that.

Wallis, Terilyn                                      February 20, 2023

286

```
1           Q.   Well, do you have any reason to
2    doubt that CFC did what Mr. Bradbury is stating
3    it did?
4           A.   I do.
5           Q.   Okay.   Why?
6           A.   CFC did not later discover, during
7    the investigation, unless that's mincing words,
8    because I informed CFC, through my attorney,
9    through proof of a check, that I had written
10   that back.   And then through your law firm it
11   was coordinated to acknowledge that that was not
12   a duplicate or that there was -- that the --
13   that the expense had been paid back.
14          Q.   Okay.   All right.   I think I
15   understand your testimony, but let me ask you:
16   Do you have any reason to doubt what
17   Mr. Bradbury stated here, which is that CFC
18   removed the $326.20 charge from the findings
19   from its internal audit, and then asked CST
20   Group to do the same?
21          A.   I agree that that's the end result.
22               MR. BROWN:   Okay.   I'm now --
```

Wallis, Terilyn                              February 20, 2023

292

1    in -- okay.

2             All right.  So do you understand --

3    or staying on the master spreadsheet, do you see

4    the heading for column G?

5        **A.    I do.**

6        Q.   Titled:  Misappropriated amounts

7    for IA, with a total of $16,809.67; do you see

8    that?

9        **A.    I do.**

10       Q.   Okay.  And do you understand that

11   IA means CFC's internal audit department?

12       **A.    I do.**

13       Q.   Okay.  And let's go back to Exhibit

14   24, which we already discussed, so I'm going to

15   go back and just, again, to orient you here,

16   it's a letter from CST Group to my firm, dated

17   June 15, 2018.  And I'm going to scroll to the

18   second page of that document, Bates stamped

19   CFC5057.

20             And do you see in the same --

21   basically the same spot as the last report, that

22   Mr. Persil writes:  The examination is conducted

Wallis, Terilyn                                    February 20, 2023

293

1    by CST and NRUCFC's internal audit department of

2    T. Wallis's expense reimbursements during the

3    period defined above revealed multiple instances

4    of fraudulent reimbursements as defined by the

5    ACFE, totaling $16,809.67; do you see that?

6             A.   Yes.

7             Q.   Okay.  And then like for the last

8    report, the February report, it has a breakdown

9    of that $16,800 and change; right?

10            A.   Yes.

11            Q.   All right.  And going back, if you

12   can just sort of eyeball those numbers, do you

13   understand that those numbers are the same as

14   the numbers in column G of that top chart in the

15   expert -- jeeze -- the expense report analysis

16   tab of the CST spreadsheet; do you see that?

17            A.   I see that, and without matching

18   each one I will agree that likely that's a copy

19   and paste of information, yes.

20            Q.   Okay.  Now, please direct your

21   attention to the columns in between G and K, so

22   columns H, I and J.

Wallis, Terilyn                                    February 20, 2023

294

1          Do you see that columns H, I and J

2     contained information about certain expense

3     reimbursement amounts that were subtracted from

4     the initial finding of $19,000 and change in

5     fraudulent transactions to get down to the 16-8

6     in fraudulent transactions?

7          **A.   Yes.**

8          Q.   Okay.  And do you see that one of

9     those three amounts in column H is in the amount

10    of $326.20?

11         **A.   Yes.**

12         Q.   That is titled:  Adjustment for

13    reimbursement made to CFC removed as one

14    instance of multiple reimbursement.

15         Do you understand this to be the

16    reimbursement you referenced in paragraph 29 of

17    your amended complaint?

18         **A.   Yes.**

19         Q.   Okay.  Do you understand that this

20    $326.20 expense reimbursement was not part of

21    the $16,809 that CST found constituted a

22    fraudulent instance of a reimbursement?

Wallis, Terilyn                                    February 20, 2023

313

1          A.    It would have been included.

2          Q.    Okay.  And are you aware that the

3     Wisconsin Department of Workforce DEVELOPMENT

4     dismissed your complaint on December 17th, 2018?

5          A.    Yes.

6          Q.    And you are aware that the agency

7     found that you were not an employee for the

8     purposes of wage claims under the Wisconsin

9     statutes?

10         A.    I'm aware of what the -- the letter

11    said they -- they said their findings to be,

12    yes.

13         Q.    Okay.  And then they dismissed your

14    complaint, and then didn't issue any order

15    against CFC; right?

16         A.    Correct.  They didn't look into the

17    matter.  They assessed it and closed it.

18         Q.    All right.  You also allege in

19    paragraph 60 of your amended complaint that you,

20    after your termination, you spoke to your

21    formerly similarly situated colleague, Michael

22    Bunney, a former E -- RVP, who had recently

Wallis, Terilyn                                    February 20, 2023

314

1    retired, to discuss the situation after your

2    termination.

3              Bunney disclosed to you his salary

4    during this discussion, and CFC paid Bunney

5    substantially more than it paid Wallis, despite

6    her excellent performance and the length of her

7    tenure at CFC.

8              When did this conversation with

9    Mr. Bunney take place?  How soon after your

10   termination do you think it was?

11       **A.   Approximately two weeks later.**

12       Q.   And was this in person or was it on

13   a call?

14       **A.   It was in person.**

15       Q.   Where was that?

16       **A.   At the Perkins, or something real**

17   **similar to that, in Hudson, Wisconsin.**

18       Q.   Was that at a conference or a

19   training session or something?

20       **A.   It was at breakfast.**

21       Q.   Okay.  So you just met up with him?

22       **A.   He was -- he was retired.**

Wallis, Terilyn                                    February 20, 2023

315

1           Q.    Okay.   Was anyone else present?

2           A.    No.

3           Q.    And what did Mr. Bunney tell you?

4     What do you recall from the conversation?

5           A.    During the conversation I -- I

6     asked Mr. Bunney about some of his practices in

7     submitting expenses in what was allowable or not

8     allowable, as I had done a full reconciliation

9     of my accounts, of my credit card expenditures,

10    and -- and the types of expenses I had

11    submitted.

12                And so I asked him how that

13    compared to what he would have submitted when he

14    was employed by CFC, as I was trying to

15    understand what had occurred and while I was

16    waiting for the promised documents from CFC.

17          Q.    What did Mr. Bunney -- oh, shoot,

18    wrong document.   Okay.   Sorry.

19                Was there something else you were

20    going to say?

21          A.    Yeah, this -- the statement that

22    Mr. Bunney made in regards to his compensation

Wallis, Terilyn                                    February 20, 2023

316

1    was not an inquiry that I made from him.

2            Mr. Bunney just simply said to me,

3    towards the end of the conversation, that he --

4    his base salary was around 180,000, plus his --

5    his short and long type incentive, and he did

6    not ask me what my pay was, he just said he

7    wanted me to know what he had been paid.

8            And he also knew what my abilities

9    were, and what I had been doing for CFC, and

10   that's it, he said, I just want you to know what

11   I was making compared to you, so that you can

12   know how much difference there was.

13       Q.   Are you aware that Mr. Bunney

14   started his CFC employment in 1990?

15       A.   Yes.

16       Q.   And that he worked for CFC during

17   the entire period between 1990 and his

18   retirement in January of 2018?

19       A.   Yes.

20       Q.   Okay.  So by my math, that gives

21   him about 28 years of tenure with the company?

22       A.   Yes.

Wallis, Terilyn                                      February 20, 2023

317

1           Q.   Okay.  Are you aware that he had 22

2      more years of tenure with CFC than you did?

3           **A.   Yes.**

4           Q.   Are you aware that Mr. Bunney's job

5      title was RVP strategic level?

6           **A.   No.**

7           Q.   Do you know what the strategic

8      level designator means?

9           **A.   No.**

10          MR. BROWN:  Okay.  I'm going to

11     open the handbook again, and this is Exhibit 17.

12          Oh, okay.  And I'm sorry, Anita,

13     I'm going to have to clawback this document and

14     mark it confidential.  And I'll do that

15     afterwards.

16          So for the purposes of this

17     deposition, I would like to treat this document

18     as confidential, please.

19          MS. CHAMBERS:  Okay.

20          (Confidential document Exhibit 17.)

21     BY MR. BROWN:

22          Q.   Okay.  Ms. Wallis, I'm going to

Wallis, Terilyn                                    February 20, 2023

318

1     turn to 6603, Bates stamped 6603.

2           Okay.  Do you see this page of the

3     handbook, and it's called contribution bands?

4           **A.   I do.**

5           Q.   Okay.  And do you see the strategic

6     band, it's the first bullet?

7           **A.   Yes.**

8           Q.   Okay.  And do you see in there, it

9     says:  Activity timeframe of three plus years,

10    and a scope of impact at the corporate and

11    industry level.  Positions within the S band set

12    the future direction of CFC, develop long-range

13    strategies and make long-range decisions which

14    impact the entire company; do you see that?

15          **A.   I do.**

16          Q.   Okay.  Did CFC give you a strategic

17    level RVP designator?

18          **A.   I think I was a T.**

19          Q.   Okay.  Not an S?

20          **A.   I guess I don't recall.  I --**

21    **I'm -- I may be confusing what I'm thinking**

22    **right now with what the bands were for**

Wallis, Terilyn                                    February 20, 2023

319

1      percentage payout on the short-term -- the

2      short-term incentive.  So I -- I guess I -- I

3      would need to see documents to know.

4              Q.   Okay.

5              A.   And from that perspective, yeah.

6              Q.   Then let me open Exhibit 13 again,

7      and I'll -- whoops, sorry.

8                   All right.  And I'm going to expand

9      this.

10                  Okay.  Do you see in job title

11     description it looks like there's four

12     strategic-level RVPs?

13             A.   Yes.

14             Q.   Okay.  There's Mr. Bunney,

15     Mr. Kilpatrick, Mr. Kessler, and Mr. Blum;

16     right?

17             A.   Yes.

18             Q.   RVPs -- okay.

19                  And no other RVPs are

20     strategic-level; right?

21             A.   I see that from the titles;

22     correct.

Wallis, Terilyn                    February 20, 2023

320

1          Q.    Okay.  And so that includes you,

2     you were not a strategic-level RVP; right?

3          **A.    Right.**

4          Q.    Okay.  Are you aware that

5     Mr. Bunney was also the CEO of an electric

6     cooperative before he joined CFC?

7          **A.    Yes.**

8          Q.    Were you ever the CEO of an

9     electric cooperative?

10         **A.    No.**

11         Q.    Does Mr. Bunney's 22 more years of

12    tenure, strategic-level designation, and history

13    as a CEO change your opinion that you were

14    similarly situated to him?

15         **A.    No.**

16         Q.    You also allege in your amended

17    complaint that you and NRECA, which is the

18    National Rural Electric Cooperative Association,

19    that you were negotiating to begin leading

20    seminars and educational events, however,

21    communications from NRECA suddenly stopped.

22              What type of position were you

Wallis, Terilyn                                    February 20, 2023

321

1    discussing with NRECA?

2         **A.   A contract, consulting.**

3         Q.   So that would have been a contract

4    for Terilyn Wallis Consulting?

5         **A.   Yes.**

6         Q.   What was the contract for, was it

7    for a training seminar, a series of seminars?

8         **A.   Correct.**

9         Q.   Sorry, which -- which?

10        **A.   Either one of those.**

11        Q.   What was your best recollection of

12   what the job would have been?

13        **A.   The work, because it wouldn't have**

14   **been a job, it would have been contract**

15   **piecemeal work, would have been to create and**

16   **develop curriculum for -- for their future**

17   **needs, which had a certain set pay amount per**

18   **project.**

19             **It would be to provide training and**

20   **delivery of director certification programs, and**

21   **also to be an instructor to buy -- to provide**

22   **programming for their supervisory and management**

Wallis, Terilyn                                    February 20, 2023

322

1      certifications that employees of cooperatives

2      participate in, potentially their programs, as

3      well.

4              Q.   With whom at RECA were you speaking

5      about this prospective --

6              A.   Mangan.

7              Q.   Sorry?

8              A.   Pat Mangan.

9              Q.   And what was -- sorry, I still

10     didn't get the last name.

11             A.   Mangan, M-a-n-g-a-n or e-n, I'm not

12     sure.

13             Q.   And is Pat a man or a woman?

14             A.   A man.

15             Q.   I don't want to misgender them.

16                  Did he -- what's his position?

17             A.   He works in the training and

18     education department.  He's not the executive

19     individual for NRECA.  He works directly for the

20     person that would have been on the executive

21     team at NRECA.

22             Q.   And is -- is he the only person you

Wallis, Terilyn                                    February 20, 2023

323

1    were coordinating with about this prospective

2    engagement?

3              A.    No.

4              Q.    Who else at NRECA were you

5    communicating with?

6              A.    At that time, the person on the

7    executive team that I was having conversation

8    with was Tracy Steiner.  So she was the head of

9    that particular area, so we had initial

10   conversations.

11             And then, in addition to training

12   and teaching, offerings that NRECA has, they

13   also have a division or arm that does consulting

14   services, and there was a woman named Monica, I

15   think Schmidt, at that time -- she's also no

16   longer with NRECA -- that Tracy coordinated and

17   was a part of a call, as they knew my abilities

18   on the consulting side of things, that she felt

19   that I could be a good fit there, as well.

20             Q.    So whether it was Tracy or Pat, how

21   many separate conversations do you think you had

22   with them about this?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Wallis, Terilyn                                    February 20, 2023

324

1          A.    Ten.

2          Q.    Ten over how -- how long of a

3    timeframe?

4          A.    Approximately six months.

5          Q.    Okay.  So when -- you say the

6    conversation stopped, when did the conversations

7    stop?

8          A.    By June of 2018.

9          Q.    And so had you been essentially

10   having discussions with NRECA since right after

11   your termination from CFC?

12         A.    Yes.  I actually was immediately

13   offered to come into the -- the NRECA annual

14   meeting in February of 2018, that's why I was at

15   the annual meeting where I saw other CFC

16   employees, so that I could observe two different

17   courses that they offered to directors, and so

18   that they could begin scheduling me to provide

19   those services to the -- the members and to

20   statewides for director certification.

21               In addition, when Pat was aware

22   that I was available to -- to do consulting work

Wallis, Terilyn                              February 20, 2023

325

1    for them or to provide training and teaching,

2    they at NRECA was putting together an extensive

3    video to -- to -- to showcase their offerings,

4    and the expertise that they had behind those

5    offerings, and he asked if I would do some video

6    work during that 2018 annual meeting in

7    February, so that they could -- so that they

8    could capitalize on the skills and abilities

9    that I had and use them in their programs.

10             Q.   Did NRECA ever offer you a position

11   or send you a draft contract?

12             A.   Yes, I had a draft contract.

13             Q.   And when did they send you that?

14             A.   Likely before I even came to the

15   February 2018 annual meeting.  Their contract

16   just simply stated what a daily rate would be

17   to -- to be trained on a particular program,

18   versus what your daily rate would be to perform

19   the program.  And then it also showed what they

20   were -- what the daily rate was for travel.

21                  And it just said that basically

22   their -- their work was, lack of a better word,

Wallis, Terilyn                                    February 20, 2023

326

1    was piecemeal, it was not a guaranteed job, it

2    was as it was assigned.

3         Q.   Okay.  So between February of '18,

4    and when NRECA presents you with a contract in

5    June, when the communications stopped, what

6    happened to where you didn't end up signing the

7    agreement?

8         A.   I did sign the agreement, and I did

9    attend the annual meeting in February.

10        Q.   Okay.  So you performed some work

11   for NRECA under the agreement?

12        A.   I did.  And then, after the annual

13   meeting, I know that I went to Montana, and I

14   don't recall if I went on one or two other

15   places to -- to do programming for them.  And

16   then Pat, simply, he stopped communicating with

17   me via e-mail.

18        Q.   And had NRECA, at that point, given

19   you any promise of additional work under that

20   contract?

21        A.   No.

22        Q.   Do you have any personal knowledge

Wallis, Terilyn                                    February 20, 2023

327

1          about why your communications with NRECA

2          stopped?

3                    A.    Yes.

4                    Q.    What personal knowledge do you

5          have?

6                    A.    I later followed up with Pat, and

7          the initial -- in -- in the summer, you know,

8          July, August of 2018, and Pat said that there

9          had been communications between NRECA, at the

10         executive level, and CFC, and that NRECA just

11         did not want to get involved, initially, in --

12         in anything that was going on between myself and

13         CFC.

14                    They hoped that it would get

15         resolved as soon as possible, because Pat said

16         that he had plenty of work for me, and would

17         love to onboard me, but didn't want to be a part

18         of anything that -- that would, you know, cause

19         jeopardy between CRC and NRECA.

20                    And then there was another

21         interaction, if you want me to share that, but I

22         don't know if you want to ask another question.

Wallis, Terilyn                                    February 20, 2023

328

1        Q.    Sure.  Let me just ask you a
2    follow-up about that, that first interaction.
3              Who did Pat tell you she had spoken
4    with at CFC?
5        A.    Pat is a male, and I believe Pat --
6        Q.    Sorry, he.
7        A.    Yeah.  I believe Pat had received
8    that communication from Tracy Steiner, his boss,
9    who was on the executive team at NRECA.  And
10   there was -- there was no discussion, because I
11   had no intention of rifting the waters or
12   bringing any of this up.  I -- I've handled this
13   in the most professional way possible.
14       Q.    Okay.  Ms. Wallis, just -- just so
15   I have this right:  You have a conversation with
16   Pat, and he tells you he had a conversation with
17   Tracy, also an NRECA employee, and Tracy told
18   Pat that she had a conversation with someone
19   from CFC; is that right?
20       A.    Yes or there -- I don't know if it
21   was -- let me clarify.
22              I don't know if it was Tracy,

Wallis, Terilyn                                    February 20, 2023

329

1    **directly, having a conversation with someone at**

2    **CFC or if it was Tracy's boss who would have**

3    **been the COO of NRECA having a conversation with**

4    **either Sheldon or someone on the executive team.**

5    **I'm not privy to any of that, didn't ask any**

6    **questions, don't even know if Pat knew.**

7          Q.   Okay.  So someone from CFC may have

8    told Tracy something directly or they may have

9    told Tracy's boss who then told Tracy who then

10   told Pat who then told you; is that right?

11         **A.   Right.**

12         Q.   Okay.  You also allege that on or

13   about July 9th, 2018, you submitted an

14   application for the position of CFO at

15   Wright-Hennepin Cooperative Electric

16   Association, after being contacted by the

17   recruiting firm of Gallagher MSA Search, and

18   that after completing two rounds of interviews

19   with the recruiting firm you were notified that

20   your candidacy was being submitted into the

21   final candidate pool, that the cooperative would

22   then finalize, but then you received a call a

Wallis, Terilyn                                    February 20, 2023

330

1    couple of days later from the recruiting firm

2    who stated that your candidacy was being removed

3    because the recruiting firm had become aware

4    that your departure from CFC was due to your

5    wrongful behavior that did not coincide with the

6    professional position that you were applying

7    for, you then questioned where the information

8    came from, and the recruiter shared that they

9    received confirming information from CFC and

10   Wright-Hennepin; is that all accurate?  Is that

11   all your allegation?  Are those your

12   allegations?

13        **A.    True.**

14        Q.    Okay.  I just want to make sure I

15   didn't misstate that.

16        **A.    As written.**

17        Q.    Okay.  All right.  Who was the

18   recruiter with Gallagher MSA Search with whom

19   you were coordinating?

20        **A.    I would need to look at a document**

21   **or ask Anita to provide that.  I know that I had**

22   **a screen shot from my LinkedIn that -- of that**

Wallis, Terilyn                    February 20, 2023

331

1    initial contact, and I don't recall that

2    person's name, that once I said that I was

3    interested it was then handed off to an

4    association at Gallagher, and I don't recall

5    that individual's name, and did two interviews.

6              And then -- but the individual's no

7    longer at Gallagher that initially contacted me.

8        Q.    Okay.  So were those -- the two

9    interviews that you just described, were those

10   the interviews that you described also in your

11   complaint?

12       A.    Yes.

13       Q.    Okay.  Those were both with the --

14   the recruiter; right?

15       A.    Yes.

16       Q.    What's your understanding of the

17   relationship between Gallagher and

18   Wright-Hennepin, is that a vendor for

19   Wright-Hennepin?

20       A.    It would have been to fill their

21   CFO position, a contract that they had made with

22   Gallagher to assist in filling the position.

Wallis, Terilyn                                    February 20, 2023

332

1            Q.   Okay.  Did you ever coordinate

2       directly with Wright-Hennepin?

3            **A.   No, I would not have.**

4            Q.   Did you have any --

5            **A.   I have more information, but that's**

6       **fine.**

7            Q.   Go ahead.  Okay.

8            **A.   The recruiter said that after**

9       **the -- that the final candidates from their pool**

10      **would do on-site interviews at Wright-Hennepin**

11      **for the final selection.**

12           Q.   Okay.

13           **A.   And that Gallagher had put me to**

14      **the final -- on the final presentation of who**

15      **was going to be presented to Wright-Hennepin.  I**

16      **was presented to Wright-Hennepin, and then**

17      **that's where the -- the feedback came back from.**

18           Q.   Okay.  So it was after your two

19      interviews with the recruiter, they submitted

20      your name, ostensibly along with others, and

21      then Wright-Hennepin, at least this is what

22      Gallagher told you, Wright-Hennepin then said:

Wallis, Terilyn                                    February 20, 2023

333

1     We're not going to consider her --

2              A.    After --

3              Q.    -- is that right?

4              A.    -- Gallagher received feedback from

5      the client, that was one piece of information.

6      And then Gallagher also told me that one of

7      their jobs is to put their ear to the ground and

8      find out as much as they can about a candidate,

9      and made their own contacts.

10             And I don't know who they would

11     have talked to, but they did tell me, when I

12     asked them if they had talked to someone

13     directly employed by a CFC, they said yes.

14             Q.    Okay.  So again, what the

15     conversation you just described, that was a

16     conversation that you had with the recruiter

17     about a conversation that the recruiter had with

18     someone from Wright-Hennepin; is that right?

19             A.    The -- yeah, that was a

20     conversation that the recruiter had with me, and

21     the recruiter was relaying the information that

22     that recruiter had had a conversation with

Wallis, Terilyn                                    February 20, 2023

334

1     Wright-Hennepin, and Wright-Hennepin had had

2     feedback, through the industry, about me.  And

3     also that the recruiter had received their own

4     independent feedback about me, in the industry.

5              Both of those feedback points, the

6     recruiter told me, were direct connections back

7     to a CFC employee.  I don't know if they were

8     the same or different, no idea.

9          Q.   Do you know who the recruiter was

10    speaking with at Wright-Hennepin?

11         A.   Yes, it would have been the CEO,

12    Tim Sullivan.

13         Q.   So Tim Sullivan is the person that

14    told the recruiter that he had done his own sort

15    of questioning about you in the industry, and

16    also as someone from CFC, and that based on that

17    he was going to remove your candidacy; is that

18    right?

19         A.   Correct.

20         Q.   Okay.  And do you have any

21    indication of who the Wright-Hennepin CEO spoke

22    with, either in the industry or at CFC?

Wallis, Terilyn                                    February 20, 2023

335

1          A.    It could have been a lot of people.

2          Q.    I'm asking if you have any personal

3    knowledge about who it actually was?

4          A.    No.

5          Q.    Do you know how many other

6    candidates Wright-Hennepin was considering, did

7    the recruiter ever tell you?

8          A.    I do not know how many other

9    candidates that the recruiter was submitting at

10   that point.  I do know that Wright-Hennepin was

11   not actually able to make a hire until the

12   following year.  So somehow that entire -- if

13   there were other solid candidates it fell

14   through or they started over, because they

15   didn't hire until 2019.

16         Q.    Okay.  So they didn't hire anybody

17   until about a year later?

18         A.    Right.

19         Q.    Okay.  The call between you and the

20   recruiter, wherein you were informed that your

21   candidacy was being removed, when do you recall

22   that happening?

Wallis, Terilyn                                    February 20, 2023

336

1            I think your complaint said that

2    you applied in July of '18, I'm just wondering

3    how soon after you submitted your application,

4    on July 9th, did you get the call from the

5    recruiter ending the process?

6            **A.   Yes, I -- I would give an estimated**

7    **timeframe of six weeks.**

8            Q.   Okay.  Did either -- did the

9    recruiter tell you the information that the CEO

10   of Wright-Hennepin relayed to -- to the

11   recruiter about you?

12           **A.   Yes.**

13           Q.   What was that?

14           **A.   That I had engaged in unethical**

15   **behavior at CFC is what the -- what the CEO**

16   **conversation with the recruiter was, and that's**

17   **what the recruiter shared with me.**

18           Q.   Okay.  Did he share anything else

19   about the conversation that the CEO of

20   Wright-Hennepin had with the CFC employee?

21           **A.   No.**

22           Q.   Okay.  Ms. Wallis, you make an

Wallis, Terilyn                                    February 20, 2023

337

1      allegation in your complaint that CFC

2      discriminated against you by paying you

3      unequally to your male RVP comparators.

4              First of all, a comparator's a

5      legal term of art.  Do you have an understanding

6      of what that -- what that means?

7          **A.    From a legal perspective, no.**

8          Q.   Okay.  And I'm sure Anita will

9      correct me if I'm wrong, but a comparator is

10     essentially somebody who has the same or similar

11     skills and experience, and also the same --

12     performs the same or similar -- similar

13     responsibilities at a similar seniority level.

14             So using that definition, which I

15     know doesn't, you know, precisely quote the

16     Equal Pay Act, or Title 7, who do you believe

17     your comparators are?

18         **A.    All RVPs.**

19         Q.   Okay.  So every RVP?  And I should

20     also mention that a comparator is somebody who

21     is not in your protected class, so that would be

22     every non-female RVP is who you're alleging are

Wallis, Terilyn                                    February 20, 2023

370

1    would have been?

2           A.    I don't.

3           Q.    Do you recall if it was, like, five

4    grand or in five figures?

5           A.    I recall it being somewhere between

6    five and ten thousand.

7           Q.    Okay.  So that would have brought

8    your salary to about 85 to 90 thousand dollars?

9           A.    About 80 to 85 thousand.

10          Q.    Okay.  And Clearwater Polk, is that

11   a co-op?

12          A.    That is a co-op, yep.

13          Q.    And when did Clearwater Polk extend

14   you -- I'm sorry, when did -- when did

15   St. Scholastica extent you that offer, to the

16   best of your recollection?

17          A.    Oh, right before school was going

18   to start in the fall of 2018.  I was also doing

19   the consulting work for Consolidated, and

20   Consolidated was asking me to please come and

21   work for them for a couple of years, so that was

22   all going on at the same time.

Wallis, Terilyn                                February 20, 2023

371

1          Q.   Okay.  So then, getting back to

2     Clearwater, when did Clearwater Polk extend you

3     an offer?

4          **A.   Without looking at that list, I**

5     **know it was right around Christmastime.  I just**

6     **don't remember which year.  So if you want to**

7     **either show me the document or if you want to**

8     **take a look at the document for what year it**

9     **was, it would have been December, the last week**

10    **of December that year.**

11         Q.   Okay.  And that was a CEO job?

12         **A.   It was.**

13         Q.   And did you turn that down?

14         **A.   I did.**

15         Q.   Why did you turn that down?

16         **A.   For $107,000, the impact that that**

17    **would have on my NRECA pension plan was not**

18    **something that I could consider, from a risk**

19    **perspective.**

20         Q.   Do you recall if that -- were you

21    provided a written offer letter from Clearwater?

22         **A.   I don't recall that I was, because**

Wallis, Terilyn                                    February 20, 2023

372

1       the initial conversation was the president of

2       the board of directors calling to have an

3       initial offer conversation.

4                       And then we had had discussion

5       about the impact of the benefit package and the

6       correlation of the salary in the interview.  And

7       they -- I was their first choice, so they wanted

8       to -- they wanted to let me make the decision

9       whether or not I wanted to move forward, and if

10      I did then they would have provided an offer

11      letter.

12                      So there -- there wasn't a formal

13      offer letter.  It was a conversation and an

14      explanation that that salary would not be able

15      to work for me.

16          Q.   Did -- did -- was it your

17      understanding, though, that if you had answered

18      that question differently, and you said, yeah,

19      you can -- you can live with 107, was it your

20      expectation that they would extend the actual

21      formal offer?

22          A.   Yes.

Wallis, Terilyn                                    February 20, 2023

379

1     expedite it, do you know about how long?

2              THE REPORTER:  About ten business

3     days.

4              MR. BROWN:  No, we can get the

5     regular processing.

6              (Signature having not been waived,

7     the deposition of TERILYN K. WALLIS was

8     concluded at 5:53 p.m.)

9          ACKNOWLEDGMENT OF DEPONENT

10         I, TERILYN K. WALLIS, do hereby

11    acknowledge that I have read and examined the

12    foregoing testimony, and the same is a true,

13    correct and complete transcription of the

14    testimony given by me and any corrections appear

15    on the attached Errata sheet signed by me.

16

17    _____    _____

18       (DATE)                   (SIGNATURE)

19

20

21

22

Wallis, Terilyn                                    February 20, 2023

380

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2              I, Cassandra E. Ellis, Registered

 3    Professional Reporter, the officer before whom the

 4    foregoing proceedings were taken, do hereby

 5    certify that the foregoing transcript is a true

 6    and correct record of the proceedings; that said

 7    proceedings were taken by me stenographically and

 8    thereafter reduced to typewriting under my

 9    supervision; and that I am neither counsel for,

10    related to, nor employed by any of the parties to

11    this case and have no interest, financial or

12    otherwise, in its outcome.

13              IN WITNESS WHEREOF, I have hereunto set

14    my hand this 5th day of February 2023.

15

16
      _____
17

18    CASSANDRA E. ELLIS, CSR-HI #475, CSR-CA

19    #14448, CCR-WA #3484, RPR #823848, RMR, CRR,

20    Realtime Systems Administrator

21    Notary Public

22
```