IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

TERILYN K. WALLIS,                        )
                                          )
             *Plaintiff*,                 )
                                          )
      v.                                  )        Case No. 1:22-cv-838 (PTG/WEF)
                                          )
NATIONAL RURAL UTILITIES                  )
     COOPERATIVE FINANCE                   )
     CORPORATION,                          )
                                          )
             *Defendant*.                 )

## <u>MEMORANDUM OPINION</u>

This matter was before the Court on Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Motion") (Dkt. 57). In this action, Terilyn Wallis ("Plaintiff") sued her former employer, Defendant National Rural Utilities Cooperative Finance Corporation ("Defendant" or "CFC"), for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2 to 2000e-3. Plaintiff specifically alleged Defendant discriminated against her when it terminated her employment in January 2018 for alleged expense report fraud and other policy violations. According to Plaintiff, Defendant treated Plaintiff differently than similarly situated male employees and Defendant's reasons for terminating Plaintiff's employment were pretextual. Plaintiff also alleged that Defendant retaliated against her by harming her ability to obtain employment within the rural electric cooperative industry after Defendant terminated Plaintiff's employment.

On March 14, 2023, Defendant moved for summary judgment.  Dkt. 57.  On April 13, 2023, the Court heard oral argument.  Dkt. 75.  For the reasons stated from the bench as well as those that follow, Defendant's Motion (Dkt. 57) was **GRANTED** in its entirety.[1]

## I.  BACKGROUND

### A.  Factual Background[2]

Plaintiff Terilyn Wallis began working for Defendant National Rural Utilities Cooperative Finance Corporation ("CFC") as a Regional Vice President ("RVP") on September 10, 2012. Dkt. 58 ¶ 3; Dkt. 58-5 at 2.  Plaintiff's position required eighty percent domestic travel.  Dkt. 58 ¶ 6; Dkt. 58-6 at 3.   Defendant provided Plaintiff with the following policies during her employment, including but not limited to, the Ethics Policy, Dkt. 58 ¶ 8; Dkt. 58-7 at 9, the Code of Conduct and Business Ethics, Dkt. 58 ¶ 8; Dkt. 58-8, the Corporate Travel Policy, Dkt. 58 ¶ 8; Dkt. 58-9, and the Employee Handbook, Dkt. 58 ¶ 8; Dkt. 58-11 at 2.

#### 1.  Internal Audit of Plaintiff's Expense Reimbursement Submissions

Defendant's Internal Audit Department ("I/A") "conducts two types of accounts payable audits, which examine accounting records related to . . . employees' expense reimbursement request submissions and [Defendant's] reimbursement payments[.]"  Dkt. 58 ¶ 9; Dkt. 58-16 ("CFC Tr.") at 75:13–78:15. "Operational audits" are one of the two audit types, which Defendant "does once every three years[.]"  Dkt. 58 ¶ 9; CFC Tr. at 75:13–78:15.  "When conducting an audit, I/A maintains its independence from [Defendant's senior] management[.]"  Dkt. 58 ¶ 10;

---

[1] After ruling on the Motion in open court, the Court indicated that it would issue a written opinion to explain its ruling.  Dkt. 75.

[2] The material facts in this case were not in dispute and were borne out by the record.  Plaintiff admitted or conceded much of Defendant's Undisputed Material Facts.  *See* Dkt. 70 at 7–17. Plaintiff, however, "denied" a number of facts in her Opposition.  Those disputes are noted herein but were immaterial or irrelevant to the disposition of the issues in this case.

*see* Dkt. 58-19 at 25:11–26:4 (stating that I/A does not have any input on personnel decisions like disciplining or terminating an employee, unless the employee was among internal audit staff); CFC Tr. at 114:1–16 (confirming that management determines the appropriate discipline, not I/A).[3]

In November 2017, I/A began its operational audit for fiscal year 2018 ("2018 Operational Audit"). Dkt. 58 ¶ 11; CFC Tr. at 72:2–17. "Operational [a]udits look at accounts payable activity, including . . . employee expense reimbursements and vendor payments," and the focus is on "ensuring that employees are complying" with Defendant's accounting department's processes, including Defendant's business expense reimbursement process. Dkt. 58 ¶ 12; CFC Tr. at 74:15–75:9. Gary Bradbury ("Mr. Bradbury"), then-Vice President of Internal Audit and Enterprise Risk Management, oversaw the 2018 Operational Audit and I/A staff auditors—Frank Xu ("Mr. Xu"), Garret Arnold ("Mr. Arnold"), who is a Certified Fraud Examiner ("CFE"), and Keaton Lay—all assisted with the audit. Dkt. 58 ¶ 13; CFC Tr. at 24:17–25:11, 92:17–93:8, 115:2–116:8.

Defendant uses the IDEA data analytics software to conduct operational audits. Dkt. 58 ¶ 14; Dkt. 58-19 at 10:4–12:5.[4] The IDEA software analyzes and looks for anomalies in the bulk data, which I/A obtains from Defendant's accounting staff, who in turn obtains it from Defendant's electronic general ledger system, Oracle Fusion. Dkt. 58 ¶¶ 15, 17; CFC Tr. at 72:18–74:10.[5] At

---

[3] Although Plaintiff "[d]enie[d]" that I/A maintained its independence from Defendant's management, *id.* ¶ 10, this fact is supported by the record to the extent that Defendant conducts an internal audit, Dkt. 58-19 at 25:11–26:4.

[4] Plaintiff attempted to dispute this fact by arguing that Defendant: (1) "used the IDEA software to identity [sic] potential duplicate expenses in their database . . . and then used an excel sheet to complete the internal audit"; (2) "inputs the data into the IDEA software"; and (3) used the IDEA software for the first time in November 2017. Dkt. 70 ¶ 14. None of these arguments dispute that Defendant used the software. Accordingly, Plaintiff did not effectively dispute Defendant's asserted fact.

[5] Plaintiff "[d]enie[d]" this fact, alleging that the IDEA software "only analyzes the data that it's given, by the individual using the software." *Id.* ¶ 15. Plaintiff's statement did not effectively dispute Defendant's asserted fact because there is no genuine dispute that the IDEA software "analyze[s] data and look[s] for abnormalities in the dataset[.]" *Id.*

the beginning of the 2018 Operational Audit, I/A uploaded all expense reimbursement submissions for all employees who submitted reimbursement requests from June 1, 2016 through October 31, 2017 ("the Review Period") into the IDEA software. Dkt. 58 ¶ 16; CFC Tr. at 73:20–74:10, 80:17–82:17. "The IDEA software analyzed all . . . expense reimbursement requests that . . . employees submitted during the Review Period and searched for exact duplicates based on the employee's name and the dollar amount[.]" Dkt. 58 ¶ 18; CFC Tr. at 82:13–83:1, 94:6–95:14.[6]  For the 2018 Operational Audit, the IDEA software flagged fifty-nine potential duplicate expense reimbursement submissions. Dkt. 58 ¶ 19; CFC Tr. at 94:6–95:14.[7]

Out of the fifty-nine potential duplicate expense reimbursement submissions, Mr. Xu "chose seven potential[] duplicate [submissions] to analyze further as a sample"—two belonging to Plaintiff; two belonging to John Kimsey, another male RVP; and one each belonging to three other male employees. Dkt. 58 ¶ 20; CFC Tr. at 83:16–86:5; Dkt. 58-17 at 2 (listing the seven submissions under "[d]escriptor of sample"). After choosing the seven potential duplicate submissions, Mr. Xu "reviewed the actual business expense reimbursement requests and the supporting documentation for the seven [potential duplicate submissions]." Dkt. 58 ¶ 22; CFC Tr. at 88:4–13, 89:7–16.[8]

---

[6] Although Plaintiff denied that the IDEA software could identify "duplicates[,]" she acknowledged that the software could search for "two numbers that match." *Id.* ¶ 18. Accordingly, there was no genuine dispute as to Defendant's asserted fact.

[7] Plaintiff "[d]enie[d]" that the IDEA software flags "duplicates," but acknowledged that "it identifies two numbers that are the same amount." *Id.* ¶ 19. Accordingly, there was no genuine dispute as to this asserted fact.

[8] Although Plaintiff "[d]enie[d]" this fact, she acknowledged that Mr. Xu "reviewed documentation based on the seven sample charges that he unilaterally chose." *Id.* ¶ 22. Accordingly, Defendant's fact is supported by the record, CFC Tr. at 88:4–13, 89:7–16, and there was no genuine dispute.

After Mr. Xu's review, out of the seven potential duplicate submissions, Defendant believed that Plaintiff's two expense reimbursement submissions contained "discrepancies" while the others had supporting documentation demonstrating that the expense reimbursement submissions were not duplicates. Dkt. 58 ¶ 23; CFC Tr. at 88:4–92:16; Dkt. 58-17 at 2.[9]

After I/A determined that Plaintiff's two expense reimbursement submissions contained discrepancies while the other five expense reimbursement submissions had sufficient supporting documentation or did not require supporting documentation, "I/A . . . decided to expand the sample [set] by [including] five additional potential[] duplicate [submissions] for Plaintiff only" from the set of fifty-nine potential duplicate submissions that the IDEA software generated. Dkt. 58 ¶ 24; CFC Tr. at 90:10–94:1; Dkt. 58-17 at 2 (labeled "[e]xpansion samples"). "I/A prompted the IDEA software to randomly generate" the additional five potential duplicate expense reimbursement submissions. Dkt. 58 ¶ 25; CFC Tr. at 97:13–98:3; Dkt. 58-17 at 3. From the expansion set of Plaintiff's five additional potential duplicate submissions, I/A found two of the five submissions contained "discrepancies[.]" Dkt. 58 ¶ 26; CFC Tr. at 100:11–101:12; Dkt. 58-17 at 2–3.[10] At this stage of the internal audit, I/A believed it had discovered discrepancies with four of Plaintiff's expense reimbursement submissions (out of seven potential duplicate expense reimbursement

---

[9] Plaintiff disputed Defendant's version of this material fact, which asserted that Plaintiff's two expense reimbursement submissions had actual discrepancies in these seven samples. Dkt. 58 ¶ 23; Dkt. 58-17 at 2. Plaintiff argued that only one of the charges was marked as "potentially duplicative[]" and the investigation was ongoing. Dkt. 70 ¶ 23. The above statement captures Defendant's belief at the time of the audit and removed any dispute as to material fact. Later, as Defendant stated on the record, during the subsequent investigation of Plaintiff's expense reimbursement submissions, "there was a new piece of information, so [Defendant] went back to the schedule and actually noted there was a reimbursement" for one of the two submissions previously thought to have discrepancies. Dkt. 70-2 at 213:1–20.

[10] Although Plaintiff disputed Defendant's contention that I/A found "two additional discrepancies" from the additional sample of Plaintiff's five "potentially duplicate" expenses, Dkt. 58 ¶ 26, this fact is supported by the record, CFC Tr. at 91:3–20; Dkt. 58-17 at 2.

submissions analyzed), but no discrepancies for other employees.  Dkt. 58 at ¶ 27; CFC Tr. at 114:17–115:14.[11]

I/A then decided to review the remainder of Plaintiff's ninety-eight expense reimbursement submissions that were submitted during the Review Period.  Dkt. 58 ¶ 28; CFC Tr. at 116:16–118:10.  After two weeks of reviewing the remainder of Plaintiff's expense reimbursement submissions and their supporting documentation, Defendant "continued to find discrepancies[.]"  Dkt. 58 ¶¶ 29–30; CFC Tr. 118:11–20.[12]

### 2.  External Audit of Plaintiff's Expense Reimbursement Submissions

In mid-December 2017, Defendant retained John Persil ("Mr. Persil"), CFE, and CST Group, Mr. Persil's forensic accounting firm, to investigate Plaintiff's expense reimbursement submissions.  Dkt. 58 ¶ 31; CFC Tr. at 122:9–124:1.  "Neither CST Group nor [Mr.] Persil had a prior relationship with [Defendant] before CST Group was retained on December 22, 2017."  Dkt. 58 ¶ 36; Dkt. 58-20 ("Persil Tr.") at 28:5–15.  Defendant directed CST Group "to review all the expense reimbursement submissions Plaintiff submitted during her . . . employment, and to review all the expense reimbursement submissions the [f]our [male] [c]omparators submitted" from the Oracle Fusion system.  Dkt. 58 ¶¶ 38–39; CFC Tr. at 125:16–128:3.[13]  The four male

---

[11] Plaintiff "[d]enie[d]" this fact, alleging that Defendant "found two alleged issues with [Plaintiff's] expense reports" and that Plaintiff "was not the only employee with these alleges [sic] issues, as John Kimsey's reports also were identified throughout the internal audit." Dkt. 70 ¶ 27. Defendant's material fact is supported by the record. CFC Tr. at 114:17–115:14; Dkt. 58-17 at 2.

[12] Plaintiff "[d]enie[d]" this fact, alleging that Defendant's "internal audit team never finished reviewing [Plaintiff's] expense reports, and the supporting documentation she submitted for those reports." Dkt. 70 ¶ 29. The above description is supported by the record. CFC Tr. 118:11–20.

[13] Plaintiff denied Defendant's version of the material fact, which stated that Defendant's "only direction" was to review all the expense reimbursement submissions that Plaintiff and the four male comparators submitted. Dkt. 58 ¶ 38. Plaintiff alleged that "Arnold, Bradbury, and Persil made the collective decision that [Plaintiff] had committed fraud." Dkt. 70 ¶ 38. The record supports Defendant's version of the material fact, that Defendant directed CST Group "to review all the expense reimbursement submissions Plaintiff submitted during her CFC employment[.]"

comparators "were all male RVPs who had the most expense reimbursement submissions by dollar amount during the Review Period, and who also had the same reporting structure as Plaintiff[.]" Dkt. 58 ¶ 33; CFC Tr. at 119:8–121:19.[14]

Mr. Persil and CST Group reviewed all Plaintiff's expense reimbursement submissions and supporting documentation and the four comparators' expense reimbursement submissions and supporting documentation. Dkt. 58 ¶ 41; CFC Tr. at 124:2–125:3; Persil Tr. at 74:13–76:16.[15] Defendant, Mr. Persil, and CST Group met regularly during the external audit. Dkt. 58 ¶ 42; CFC Tr. at 124:2–125:3; Persil Tr. at 66:14–67:2.

By mid-January 2018, Mr. Persil and CST Group's preliminary findings indicated fifty-four "issues" with Plaintiff's expense reimbursement submissions. Dkt. 58 ¶ 43; CFC Tr. at 140:19–144:8, 157:11–158:10.[16] Mr. Persil requested a meeting with Mr. Bradbury and Mr. Arnold to discuss his preliminary findings. Dkt. 58 ¶ 45; CFC Tr. at 157:11–158:10. "On or about

---

Dkt. 58 ¶ 38; CFC Tr. at 125:16–128:3. Whether Defendant and CST Group or only CST Group were involved in answering the question of whether Plaintiff committed fraud is not material and does not raise a genuine dispute concerning Defendant's original direction to CST Group.

[14] Plaintiff noted that CST Group only analyzed the four comparators' submissions from the Review Period, not all their expense reimbursement submissions, as was the case with Plaintiff. Dkt. 70 ¶ 33; CFC Tr. at 119:8–121:5, 128:4–129:9. This fact is not material and was not disputed by Defendant.

[15] Plaintiff disputed this material fact as she alleged that Defendant did not provide Mr. Persil with all supporting documentation for Plaintiff's expenses. Dkt. 70 ¶ 41. Defendant and Mr. Persil stated that supporting documentation was not available for all Plaintiff's expenses. Persil Tr. at 76:2–16, 106:18–107:9. Where supporting documentation was not available, Mr. Persil stated that his investigation "ha[d] no basis to conclude whether that submission was fraudulent or make any judgment on that submission." *Id.* at 76:2–16. Thus, Plaintiff's dispute regarding the supporting documentation Defendant provided to Mr. Persil is not genuine.

[16] Plaintiff "[d]enied" this fact, stating that Mr. Persil "had not finished his investigation" and that by mid-January 2018, "there was no written report on the external audit." Dkt. 70 ¶ 43. These disputes are not genuine because Defendant does not assert that Mr. Persil had finished his investigation by mid-January 2018 nor that Mr. Persil issued a written report, only that Mr. Persil had summarized his preliminary findings. Dkt. 58 ¶ 43; Dkt. 58-21.

January 17, 2018, [Mr.] Persil reported the preliminary results of his investigation to a larger group," which included I/A and Defendant's senior management. Dkt. 58 ¶ 46; CFC Tr. at 131:13–132:2, 158:19–161:8. Mr. Persil told the larger group "that he had concluded that Plaintiff had engaged in fraud against [Defendant]." Dkt. 58 ¶ 46; CFC Tr. at 137:16–138:10; Persil Tr. at 26:20–27:10.[17]

### 3. Defendant Terminates Plaintiff's Employment on January 18, 2018

On January 18, 2018, Graceann Clendenen ("Ms. Clendenen"), then-Senior Vice President of Corporate Services and head of Human Resources, and Mr. Persil interviewed Plaintiff. Dkt. 58 ¶ 47; CFC Tr. at 139:14–22; Persil Tr. at 90:7–91:17; Dkt. 58-24 at 28:19–29:9, 31:3–9.[18] After Mr. Persil and Ms. Clendenen met with Plaintiff, Joel Allen ("Mr. Allen"), Senior Vice President of Member Services, and John Evans ("Mr. Evans"), Chief Operating Officer, also met with Plaintiff. Dkt. 58 ¶ 53; Dkt. 58-24 at 28:19–29:9. Defendant's Chief Executive Officer Sheldon Petersen ("Mr. Petersen"), Mr. Evans, Ms. Clendenen, Mr. Allen, and internal legal counsel "all had input into the decision to terminate Plaintiff." Dkt. 58 ¶ 55; CFC Tr. at 65:18–66:14, 169:1–170:20.[19] On January 18, 2018, Defendant terminated Plaintiff's employment for "committing

---

[17] Plaintiff "[d]enie[d]" this fact, alleging that Mr. Persil did not have sufficient facts or data to conclude fraud. Dkt. 70 ¶ 46. The record supports the fact that in mid-January 2018, Mr. Persil's conclusion was that Plaintiff had engaged in fraud. CFC Tr. at 137:16–138:10; Persil Tr. at 26:20–27:10.

[18] Plaintiff "[d]enie[d]" this fact, alleging that Plaintiff "was not provide[d] . . . any specific examples of discrepancies[.]" Dkt. 70 ¶ 47 (citing Dkt. 70-1 at 248:11–249:10). Although there appears to be a dispute regarding whether Plaintiff was presented with examples of expense report submission discrepancies on January 18, 2018, *see* CFC Tr. at 139:14–22; Dkt. 58-24 at 31:12–32:4, the issue of whether or not Plaintiff was provided examples at that time is not material to resolving Plaintiff's claims of discrimination or retaliation. Nonetheless, the above formulation removes any dispute.

[19] Plaintiff "[d]enie[d]" this fact, alleging that after the second meeting with Mr. Allen, Mr. Evans, and Plaintiff on January 18, 2018, "Allen, Evans, Clendenen, and CFC General Counsel had a short meeting where they made the determination to terminate [Plaintiff], after a short phone call with Petersen, CFC's CEO." Dkt. 70 ¶¶ 53, 55. There is no genuine dispute, then, that Mr.

fraud and other expense report submission irregularities," a violation of Defendant's Code of Conduct and Ethics Policy. Dkt. 58 ¶ 56; CFC Tr. at 181:13–184:7.[20]

After the January 18, 2018 termination, Mr. Persil issued a report concluding that Plaintiff engaged in four fraudulent expense reimbursement schemes, including: "(i) a multiple reimbursement expense scheme, through which an '[e]mployee submits the same expenses and/or receipts on multiple expense reports;' (ii) a fictitious expense scheme, through which an '[e]mployee seeks reimbursement for a fake purchase often backed up with fake receipts;' (iii) an overstated expense scheme, through which an employee submits a '[r]eimbursement request for a legitimate business expense, but for a trumped-up amount'; and (iv) a mischaracterized expense scheme, through which an '[e]mployee requests reimbursement for a personal expense but claims it to be business-related.'" Dkt. 58 ¶¶ 50, 52; Dkt. 58-22 at 3; Dkt. 58-23.[21] CST Group's investigation did not find any "fraudulent disbursements" in the four comparators' expense reimbursement request submissions. Dkt. 58 ¶ 51; Persil Tr. at 88:16–89:20.[22]

---

Petersen, Mr. Evans, Ms. Clendenen, Mr. Allen, and internal legal counsel made the decision to terminate Plaintiff on January 18, 2018, as it is supported by the record. CFC Tr. at 65:18–66:14, 169:1–170:20.

[20] Defendant's corporate representative testified that the termination decision was based on: (i) the number of fraudulent expense reports Plaintiff submitted; (ii) the dollar value of the overpayments she received from Defendant; (iii) the lack of documentation for some of her expense reports; (iv) Plaintiff's lack of contrition and denials during her meeting with Mr. Persil and Ms. Clendenen and her meeting with Mr. Evans and Mr. Allen; and (v) Defendant's obligations to its member cooperatives. Dkt. 58 ¶ 57; CFC Tr. at 188:6–189:2. Plaintiff disputed Defendant's asserted fact. Dkt. 70 ¶ 56. Specifically, Plaintiff "[d]enie[d]" that this was the basis for her employment termination and claimed that it was a "pretext for illegal gender discrimination." *Id.* For the reasons discussed *infra* in section III.A.3, Plaintiff did not proffer sufficient evidence to dispute this asserted fact.

[21] Plaintiff disputed Defendant's asserted fact, alleging Mr. Persil issued an initial report that he later updated. Dkt. 70 ¶¶ 50, 52. Mr. Persil's findings, listed above, were taken verbatim from his reports. Dkt. 58-22 at 3; Dkt. 58-23.

[22] Plaintiff "[d]enie[d]" this fact, alleging that the decision to analyze four male comparators was not made until after Mr. Persil had already made a determination about Plaintiff, that the review

Since her termination, Plaintiff has served as a consultant for at least fourteen electric cooperatives who are also Defendant's members; served as the chief financial officer for an electric cooperative; and rejected an offer to be the chief executive officer of another electric cooperative. Dkt. 58 ¶ 73; Dkt. 58-1 at 141:2–12, 144:16–145:11, 148:1–151:6, 151:16–154:4, 370:10–372:22.

### 4.   Plaintiff's Allegations of Defendant's Misconduct

Throughout her employment with Defendant, Plaintiff never complained of discrimination or unfair treatment.  Dkt. 58 ¶ 59; Dkt. 58-1 at 268:1–14.  Plaintiff never received derogatory comments based on her sex while she was employed by Defendant.  Dkt. 58 ¶ 60; Dkt. 58-1 at 267:20–22.  Plaintiff filed an Administrative Complaint with the Wisconsin Department of Workforce Development Equal Rights Division ("Wisconsin DWD") and Equal Employment Opportunity Commission ("EEOC") on November 5, 2018.  Dkt. 58 ¶ 61; Dkt. 58-27.[23]  The Administrative Complaint alleged that Defendant's decision to terminate Plaintiff after the 2018 Operational Audit and CST Group's investigation was due to sex discrimination.  Dkt. 58 ¶ 64; Dkt. 58-27 at 2.  Plaintiff did not amend her Administrative Complaint to add a retaliation claim against Defendant, even though Plaintiff discovered facts that she believed may be the basis of a retaliation claim by March 2018.  Dkt. 58 ¶¶ 62–63; Dkt. 42 at 1.

---

period for the four male comparators was much shorter than the review period for Plaintiff, and that the four male comparators' data was "pulled" and given to Mr. Persil rather than generated from the IDEA software.  Dkt. 70 ¶¶ 33, 51.  None of these arguments raises a genuine dispute with Defendant's version of the material fact, that Defendant's investigation did not find any issues with the four male comparators' expense reimbursement request submissions.  Dkt. 58 ¶ 51. Furthermore, Defendant's version of the material fact is supported by the record.  Persil Tr. at 88:16–89:20.

[23] Plaintiff noted that Defendant first became aware of her "concerns of discrimination" before she filed her Administrative Complaint, Dkt. 70 ¶ 61, but these facts were not alleged in her Amended Complaint.

The Wisconsin DWD issued an Initial Determination–No Probable Cause on May 23, 2019, which found, in part, "that there was no probable cause to believe [Defendant] may have discriminated against Plaintiff." Dkt. 58 ¶ 67; Dkt. 58-28 at 2. Plaintiff appealed and the agency scheduled a hearing. Dkt. 58 ¶ 68; Dkt. 58-29 at 3; Dkt. 58-30 at 2. On June 28, 2021, Plaintiff requested to withdraw the Administrative Complaint and requested a right to sue letter from the EEOC. Dkt. 58 ¶ 69; Dkt. 58-31 at 2.

### B. Procedural Background

Plaintiff first alleged that Defendant retaliated against her in the original Complaint in this matter, filed on November 3, 2021. Dkt. 58 ¶ 70; Dkt. 1 ¶¶ 64–68. In the original Complaint, Plaintiff alleged that "[b]eginning in July 2018 . . . [Defendant] . . . retaliat[ed] against [her], because she filed a charge with the [EEOC]." *Id.* ¶ 65. Plaintiff alleged that, after discovery, she realized July 2018 was not the date the retaliation started. Dkt. 70 ¶ 71. On July 25, 2022, the case was transferred from the Western District of Wisconsin to the Eastern District of Virginia. Dkt. 20. Plaintiff filed an Amended Complaint on September 23, 2022, which added additional factual allegations related to her retaliation claim against Defendant. Dkt. 30 ¶¶ 62–67, 77–82.

On March 14, 2023, Defendant filed the instant Motion for Summary Judgment on both counts of Plaintiff's Amended Complaint. Dkt. 57.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). A genuine dispute about a material fact exists if "after reviewing the record as a whole, a

court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). All inferences must be made in favor of the nonmoving party. *Hawkins v. McMillan*, 670 F. App'x 167, 168 (4th Cir. 2016). A party survives summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

### A. Sex Discrimination

A plaintiff may prove discrimination through direct or indirect evidence of discriminatory animus, or through the burden-shifting framework set forth by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). "Direct evidence encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case by showing "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012). If the plaintiff establishes a *prima facie* case by a preponderance of the evidence, the burden shifts to the defendant to show that its purportedly discriminatory adverse action was in fact the result of a legitimate,

nondiscriminatory reason. *Foster*, 787 F.3d at 250. If the defendant does so, the burden shifts back to the plaintiff to rebut the defendant's evidence by demonstrating that its articulated legitimate, nondiscriminatory reason was "not its true reason[], but [was] a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### 1. Plaintiff Failed to Establish That Similarly Situated Male Employees Were Treated Differently

Plaintiff, a woman, argued that Defendant treated Plaintiff differently than similarly situated male employees in three ways. Dkt. 70 at 30–31. First, Plaintiff maintained that Defendant only expanded the audit into Plaintiff after the initial sampling found that Plaintiff had two potentially duplicate reimbursement submissions, whereas the audit into male employees was not expanded, even though male employees also had duplicate reimbursement submissions. *Id.* at 30. Second, Plaintiff maintained that Defendant enforced the Corporate Travel Policy "more harshly" against Plaintiff than against male employees. *Id.* Third, Plaintiff asserted that Defendant's reasoning for conducting an expanded audit of Plaintiff's reimbursement submissions was "flawed, subjective and bias[ed]" because Defendant did not consider that Plaintiff submitted a higher volume of reimbursement submissions for lesser amounts while Plaintiff's male colleagues submitted a lower volume of reimbursement submissions for greater amounts. *Id.* at 31.

Defendant argued that Plaintiff did not show that similarly situated employees outside her protected class were treated differently. Dkt. 58 at 27. Defendant pointed out that the 2018 Operational Audit reviewed all Defendant employees' expense reimbursement submissions, but only Plaintiff's submissions were found to have discrepancies. *Id.* at 29. Defendant rebutted Plaintiff's argument that it enforced its Corporate Travel Policy unequally as to Plaintiff's male colleagues by pointing to the exhibits, which demonstrated that Plaintiff's male colleagues sought

approval for exceptions to the policy where appropriate and received approval.  Dkt. 72 at 11–12

(citing Dkts. 72-1, 72-2).  In contrast, Defendant offered evidence that only Plaintiff, not her male

colleagues, submitted: (i) the same expense on multiple occasions; (ii) fictitious expenses for

reimbursement, Dkt. 72-3; (iii) an expense for an increased amount; and (iv) personal expenses for

reimbursement, Dkt. 58 ¶ 50.

　　　　Where the non-moving party bears the burden of proof, the party moving for summary

judgment may prevail by showing an absence of evidence to support an essential element of that

party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Rhodes v. E.I. du

Pont de Nemours & Co.*, 636 F.3d 88, 94 (4th Cir. 2011).  Once the moving party has successfully

demonstrated that absence, "the nonmoving party must come forward with 'specific facts[,]'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ.

P. 56(e)), rather than just "metaphysical doubt[s]" or conclusory allegations, that prove there is a

genuine dispute for trial, *id.* at 586; *see also Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027,

1037 (4th Cir. 2020) (stating that "conclusory assertions and denials" are insufficient to survive a

summary judgment motion).  Although all inferences must be drawn in favor of the nonmoving

party, *Hawkins*, 670 F. App'x at 168, "those inferences must, in every case, fall within the range

of reasonable probability and not be so tenuous as to amount to speculation or conjecture,"

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

　　　　Plaintiff did not assert a *prima facie* sex discrimination case because she failed to establish

that similarly situated male employees were treated differently than she with respect to the 2018

Operational Audit and Defendant's enforcement of the Corporate Travel Policy.  The record

demonstrates that the 2018 Operational Audit was a review of all employees' reimbursement

submissions during the Review Period and did not focus solely on Plaintiff.  Dkt. 58 ¶ 16; CFC

Tr. at 73:20–74:10, 80:17–82:17.  After Defendant's IDEA software flagged fifty-nine potential duplicate expense reimbursement submissions, Dkt. 58 ¶ 19; CFC Tr. at 94:6–95:14, seven of those were selected to be analyzed further as a sample—two belonging to Plaintiff and five belonging to four male employees, Dkt. 58 ¶ 20; CFC Tr. at 83:16–86:6; Dkt. 58-17 at 2.  Out of the seven, Defendant's initial investigation found that only Plaintiff's two expense reimbursement submissions contained discrepancies whereas the other five expense reimbursement submissions from the four male employees had sufficient supporting documentation.  *Id.* at 88:4–92:16; Dkt. 58-17 at 2 (noting that four of the samples were "tested without exception" and one of the samples was for an expense below $25.00, which did not require documentation per Defendant's policy).  Plaintiff's argument that Defendant failed to conduct further inquiry into male employees with duplicative expenses is not supported by the record.  After Defendant hired Mr. Persil and CST Group, it asked Mr. Persil to analyze the four male employees' reimbursement submissions. Dkt. 58 ¶ 33; CFC Tr. at 119:8–121:5.  CST Group's investigation did not find any "fraudulent disbursements" in the four comparators' expense reimbursement request submissions.  Dkt. 58 ¶ 51; Persil Tr. at 88:16–89:20.

Plaintiff's argument that Defendant unfairly enforced the Corporate Travel Policy more harshly against her than against male employees, *see* Dkt. 70 at 30–31, is, similarly, not supported by the record.  The Corporate Travel Policy allowed for exceptions where appropriate, Dkt. 58-9, and Plaintiff's own exhibits demonstrated that Plaintiff's male colleagues sought approval for exceptions and obtained them. Dkts. 70-6 to 70-11. Whether Plaintiff's male colleagues submitted a higher volume of reimbursement requests than she is not a material factual dispute.  Importantly, the record demonstrates that, regardless of the volume of reimbursement requests submitted,

Defendant's investigation found that only Plaintiff's reimbursement requests had discrepancies, while other female and male colleagues were not found to have discrepancies. Dkt. 58 ¶¶ 23–30.

Given this record, Plaintiff failed to demonstrate that similarly situated male employees were treated differently than she. Thus, she did not meet her burden of showing a *prima facie* case of sex discrimination. Therefore, Defendant's Motion for Summary Judgment as to the sex discrimination claim was granted.

> **2.   Even if Plaintiff Could Establish a *Prima Facie* Sex Discrimination Claim, Defendant Had Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff's Employment**

Even if Plaintiff could establish a *prima facie* sex discrimination claim, Defendant met its burden of proffering legitimate, nondiscriminatory reasons for terminating Plaintiff's employment. *See Foster*, 787 F.3d at 250. Defendant provided testimony that it terminated Plaintiff's employment on January 18, 2018 for committing fraud and other expense report submission irregularities, which violated its Code of Conduct and Ethics Policy. Dkt. 58 ¶ 56; CFC Tr. at 177:11–180:21, 181:13–184:7, 187:21–190:2. Altogether, Defendant's 2018 Operational Audit and CST Group's third-party investigation found Plaintiff committed more than fifty instances of "fraud," which allegedly caused Defendant to pay Plaintiff over $16,500.00 to which she was not entitled. Dkt. 58 at 29. Defendant testified that it had "zero tolerance for fraud, no matter the amount of the fraud." *Id.* ¶ 54; CFC Tr. at 189:3–9; Dkt. 58-19 at 30:19–32:19; *see also* Persil Tr. at 141:3–142:14. Plaintiff herself agreed with a statement from Defendant's Code of Conduct stating that "[t]he integrity and accuracy of CFC financial statements is critical to the confidence of CFC's investors and members." Dkt. 58-1 at 198:16–200:6; Dkt. 58-8 at 19. Thus, Defendant provided a legitimate, nondiscriminatory reason for Plaintiff's employment termination.

**3.    Plaintiff    Failed    to    Demonstrate    that    Defendant's    Legitimate,
Nondiscriminatory Reasons for Termination Were Pretextual**

Even if Plaintiff met the *prima facie* burden for a sex discrimination claim, Defendant

successfully argued that Plaintiff did not demonstrate that Defendant's termination decision was a

pretext for discrimination. Dkt. 58 at 32.

"[T]he causation standards for establishing a *prima facie* [sex discrimination] case and

proving pretext are not identical. Rather, the burden for establishing causation at the *prima facie*

stage is 'less onerous.'" *Foster*, 787 F.3d at 251 (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d

452, 457 (4th Cir. 1989)). At the pretext stage, the employee's circumstantial evidence of unlawful

intent is not sufficient to create a jury question. *See Williams*, 871 F.2d at 458. "It is the perception

of the decisionmaker which is relevant." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th

Cir. 2007) (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998), *overruled

on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).    When an

employer articulates a legitimate, nondiscriminatory reason for an employment action, the issue is

not "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason

for the [action]." *Al-Habashy v. Va. Dep't of Juv. Just.*, No. 7:13-cv-00459, 2015 WL 5916007,

at *9 (W.D. Va. Oct. 8, 2015) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.

2000)), *aff'd*, 646 F. App'x 332 (4th Cir. 2016). A plaintiff may prove "pretext by demonstrating

that the defendant's explanation is 'unworthy of credence' or by offering circumstantial evidence

sufficiently probative of" discrimination. *Darvishian v. Geren*, 404 F. App'x 822, 828 (4th Cir.

2010) (quoting *Reeves*, 530 U.S. at 148).

In this case, Plaintiff argued that Defendant's reason for Plaintiff's termination was pretext

for illegal sex discrimination, which can be demonstrated in five ways. Dkt. 70 at 32–36.    The

Court will address each of Plaintiff's arguments concerning pretext.    In short, Plaintiff failed to

17

demonstrate that Defendant's legitimate, nondiscriminatory reasons for Plaintiff's termination were pretextual because she did not raise material factual disputes that Defendant deviated from policy and procedure, conducted a biased, flawed or unfair investigation using subjective criteria, or engaged in impermissible post-hoc rationalizations of its decision to terminate Plaintiff.

### a. Plaintiff Failed to Demonstrate that Defendant Deviated From Established Practices and Procedures

Plaintiff asserted that Defendant deviated from its established practices and procedures with respect to Plaintiff's investigation by: (1) using new software, the IDEA software, to complete the 2018 Operational Audit; (2) hiring an external auditor to review Plaintiff's reimbursement submissions; and (3) disciplining or terminating an employee for the first time due to reimbursement submission issues. Dkt. 70 at 32–33. Defendant argued that Plaintiff provided no evidence to demonstrate that its decision to use the IDEA software during the 2018 Operational Audit or its decision to hire Mr. Persil was a pretext for sex discrimination. Dkt. 72 at 16–17. As for Plaintiff's termination, Defendant argued that Plaintiff had, and admitted that she had, a responsibility to submit accurate expense reports, and she was terminated when she failed to do so. *Id.* at 18.

Pretext can be demonstrated when an employer deviates from its established practice or procedures with respect to the plaintiff. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role."); *see also Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2006) (stating that evidence of a memorandum's fabrication and "procedural irregularities" regarding the plaintiff's termination "constitute relevant evidence of pretext"). But that is not the case here. The cases that Plaintiff cited to support her argument that Defendant deviated from established policies and procedures are not analogous to the facts at hand.

18

In *Village of Arlington Heights*, the U.S. Supreme Court noted that if the government zoned property for a certain use, but suddenly changed that property's zone when the town learned of plans to erect integrated housing, that change would amount to a "[d]eparture[] from the normal procedural sequence[.]" 429 U.S. at 267. Here, Defendant did not institute new procedures or policies after finding the first of Plaintiff's potential duplicate reimbursement submissions. Instead, Defendant determined that, given the newness of an investigation into an individual employee's reimbursement submissions, it should hand over such an investigation into a third party's hands. Dkt. 58 ¶ 32; CFC Tr. at 118:11–20 ("We had started on that process and quickly found that the amount of time it was taking -- and we were also finding exceptions or issues along the way, and then at that point we recognized the need to get a forensic accounting firm involved in helping us with that.").

In *Plotke v. White*, the Tenth Circuit held that the plaintiff's showing that she was terminated without any documentation, contrary to the U.S. Army's procedure, was sufficient to raise genuine doubt as to the Army's stated reasons for her termination. 405 F.3d at 1104–05. Here, Plaintiff did not demonstrate that Defendant deviated from its established practices and procedures when terminating employees that it had found engaged in fraud. Plaintiff cannot demonstrate pretext by arguing that she was the first employee to be terminated for the misconduct at hand. Rather, Defendant testified that it had never experienced misconduct of this sort, so its decision to hire an external auditor was motivated by a desire to ensure an accurate investigation. CFC Tr. at 105:19–22 (stating that in his fifteen years as the head of I/A, Mr. Bradbury "had never seen anything like this"). Thus, Plaintiff failed to provide evidence that Defendant deviated from its established policies and procedures such that its reasons for terminating her employment were pretextual.

### b.  Plaintiff Failed to Demonstrate that Defendant Conducted a Biased Investigation

Plaintiff asserted that Defendant conducted a biased investigation because Defendant provided Mr. Persil with its review and findings as to Plaintiff, rather than only providing Mr. Persil with the relevant data.  Dkt. 70 at 33.  Plaintiff also argued that Mr. Persil did not work independently but worked together with I/A employees.  *Id.* (citing Dkt. 58 ¶ 32).  While Defendant stated that I/A informed Mr. Persil of "possible irregularities" with Plaintiff's reimbursement submissions, Persil Tr. at 33:16–22, Defendant maintained that Mr. Persil and CST Group reviewed all of Plaintiff's submission requests and relevant supporting documentation, Dkt. 72 at 18–19.

A biased investigation can be used to infer pretext.  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006) (finding that the defendant's investigation "lacked the careful, systematic assessments of credibility one would expect in an inquiry on which an employee's reputation and livelihood depended").  Here, the record supports the fact that Mr. Persil and CST Group reviewed all Plaintiff's reimbursement submission requests and relevant supporting documentation.  Persil Tr. at 60:11–61:5, 69:6–14, 74:13–76:16.  Where supporting documentation did not exist, Mr. Persil and CST Group did not make any conclusions as to those reimbursement submission requests as they had "no basis to conclude whether that submission was fraudulent or make any judgment on that submission."  *Id.* at 76:12–16.  The record supports, as Plaintiff contended, that Mr. Persil and I/A collaborated to some extent.  *Id.* at 26:1–27:10, 62:1–6.  However, it is unclear how Defendant and Mr. Persil's collaboration led to a biased investigation, particularly when Mr. Persil issued a final report on February 5, 2018 and Defendant asked Mr. Persil to check the accuracy of some submissions that, in the end, weighed in Plaintiff's favor.  CFC Tr. at 154:8–157:10; Persil Tr. at 188:2–189:10.  More importantly, Mr. Persil and

20

Defendant's collaboration on Plaintiff's investigation does not demonstrate that the reason for Plaintiff's termination was pretextual. Here, Plaintiff failed to provide evidence that Defendant conducted a biased investigation by providing Mr. Persil and CST Group with its review and findings related to Plaintiff's expense reimbursement submissions or by collaborating with Mr. Persil and CST Group during Mr. Persil's third-party investigation.

### c. Plaintiff Failed to Demonstrate that Defendant Conducted a Flawed and Unfair Investigation

Next, Plaintiff argued that Defendant conducted a flawed and unfair investigation, and asserted, in relevant part, that Mr. Persil failed to consider the volume of Plaintiff's reimbursement submissions compared to those of her male colleagues and did not compare Plaintiff's reimbursement submissions for the same time frame as her male colleagues. Dkt. 70 at 34. In response, Defendant argued it had a legitimate reason for not expanding the four male comparators' testing sample: Mr. Persil did not find any inaccuracies with the four male comparators' testing sample. Dkt. 72 at 19.

"[T]he quality of [an employer's] investigation may have some bearing on the truthfulness of [the employer's] proffered reasons for terminating" an employee. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir 2007), *aff'd*, 553 U.S. 442 (2008); *see Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008) (noting the employer's "failure to conduct what appeared to be a fair investigation" of the plaintiffs' misconduct "create[d] genuine issues of material fact" as to pretext). None of Plaintiff's grievances about Defendant's investigation raised a genuine, material factual dispute that Defendant's reason for terminating Plaintiff was pretextual.

Plaintiff's cited cases are not analogous to the facts here. In *Trujillo*, the plaintiffs presented evidence that the defendant employer enforced a policy against the plaintiffs for recording time worked that, in practice, managers, supervisors, and employees did not follow. *Id.*

21

at 1159. From this evidence, the court found there was a reasonable inference of pretext that defeated the employer's legitimate business reason for the plaintiffs' termination. *Id.* In *Humphries*, the plaintiff presented evidence that, prior to his firing, no investigation was conducted into a co-worker's claim that the plaintiff left a safe open and unattended, despite the plaintiff's testimony to the contrary. 474 F.3d at 407. In addition, the plaintiff was fired one week after he complained about his employer's discriminatory practices. *Id.*

Here, Plaintiff's complaints about Defendant and Mr. Persil's investigation into her reimbursement submissions do not implicate the same types of issues as the investigations discussed in the case law and do not raise the same inferences of possible unfairness about which a jury should deliberate. Plaintiff may disagree with the decisions Defendant made in conducting its investigation into Plaintiff's reimbursement submissions, but the Court "does not sit as a . . . super-personnel department weighing the prudence of employment decisions[.]" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1993) (quoting *Giannopoulous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Defendant's decisions not to consider the volume of Plaintiff's submissions and not to expand the four male comparators' time frame do not have any "bearing on the truthfulness" of Defendant's reasons for Plaintiff's termination. *Humphries*, 474 F.3d at 407. As such, Plaintiff failed to demonstrate conduct by Defendant that would call into question the fairness of its investigation into Plaintiff.

### d. Plaintiff Failed to Demonstrate that Defendant Terminated Plaintiff's Employment Based on Subjective Criteria

Plaintiff argued that Defendant terminated Plaintiff based on subjective criteria because, among other reasons, Defendant engaged in "judgmental" selection of data for reviewing potential duplicate reimbursement submissions and "subjective feelings and speculations" led to Defendant's judgment that Plaintiff committed fraud. Dkt. 70 at 34–35.

22

Pretext can be inferred from an employer's use of subjective criteria to justify an adverse action. *See Brown v. Gaston Cnty. Dyeing Mach. Co.*, 457 F.2d 1377, 1382 (4th Cir. 1972) ("[C]ourts must . . . examine statistics, patterns, practices and general policies to ascertain whether [] discrimination exists."). The Court does not agree that Defendant used subjective criteria when it selected data to review potential duplicate reimbursement submissions, which Defendant admitted to, given the considerable number of reimbursement submissions and the time involved in verifying each submission. Dkt. 58 ¶¶ 21, 24; CFC Tr. at 83:16–84:9, 84:17–86:5, 88:4–92:20. This is not "subjective," but is merely a practical consideration when conducting an investigation with substantial amounts of data. Plaintiff's allegations that Mr. Persil and Defendant made unfair assumptions based upon "subjective feelings and speculations" are conclusory allegations. Dkt. 70 at 35. Even if Plaintiff had presented evidence that Mr. Persil and Defendant made assumptions as they conducted the investigation, it is unclear how such assumptions played into their conclusion that Plaintiff had violated Defendant's policy by submitting over fifty fraudulent reimbursement submissions during her employment. Finally, the case Plaintiff cited is not analogous to the facts at hand and so, does not aid in the Court's determination. *See Brown*, 457 F.2d at 1381–83 (finding "that race is the only identifiable factor explaining the disparity between the jobs held by white employees and . . . black employees" based upon the court's analysis of statistics of job classifications at the defendant's factory). For all these reasons, Plaintiff failed to demonstrate that Defendant used "subjective criteria" such that Defendant's reason for Plaintiff's termination was pretextual.

### e. Plaintiff Failed to Demonstrate that Defendant Proffered Post-Hoc Rationalizations for Plaintiff's Employment Termination

Finally, Plaintiff argued that Defendant proffered post-hoc rationalizations for Plaintiff's termination, which Plaintiff asserted is evidenced in part by the fact that Mr. Persil did not issue a

written report until after Defendant terminated Plaintiff, Dkt. 70 at 36; CFC Tr. at 136:3–16, 157:11–18, and Mr. Persil later revised his written findings to adjust the amount of the alleged fraud, Dkt. 70 at 36 (citing Dkts. 58-22, 58-23). Defendant argued that Mr. Persil presented his preliminary findings to Defendant's management before Plaintiff's termination, Dkt. 72 at 21 (citing Dkt. 58 ¶ 46), and Mr. Persil's refinement of the original February report was Mr. Persil and Defendant's attempt to ensure that the report was completely accurate and so, is not evidence of pretext. *Id.*

Employees can create an inference of pretext by presenting a deviation or a change in the reason for the employer's adverse action. *See EEOC v. Town & Country Toyota, Inc.*, 7 F. App'x 226, 232–33 (4th Cir. 2001) ("Contradictions between an employer's proffered explanation and the contemporaneous statements of the employer are convincing evidence of pretext."); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext[.]").

The facts in Plaintiff's cited case law are not like the facts at issue here. In *Town & Country Toyota*, the employer offered multiple, contradictory statements concerning the plaintiff's termination: stating in its brief that the plaintiff "lacked basic sales skills and abilities[,]" stating in response to the plaintiff's EEOC charge that the plaintiff's "selling skills seemed satisfactory," and stating to the plaintiff when he was fired, "[I'm] not saying you're not a good salesman." 7 F. App'x at 233. The Fourth Circuit held that these contradictory statements were sufficient to permit the trier of fact to find that the employer's reasons for the plaintiff's termination were pretextual. *Id.* Here, Defendant has not offered multiple reasons for Plaintiff's termination. Rather, it has consistently offered the same, non-contradictory statements that Plaintiff was terminated based on

multiple violations of the Code of Conduct and Ethics Policy.  Dkt. 58 ¶¶ 56–57; CFC Tr. at 137:16–138:10, 157:11–158:10, 181:13–184:7; Persil Tr. at 27:1–10.

In *Dennis*, the employer was unable to recall many details about the hiring process for the candidate who received a promotion over the plaintiff. 290 F.3d at 646.  Over a year and a half later at trial, the employer's memory "seemed to dramatically improve" and he asserted multiple, specific reasons for hiring the other candidate over the plaintiff. *Id.*  The Fourth Circuit found that these "inconsistent post-hoc explanations" for hiring the other candidate were probative of pretext. *Id.* at 647.  Here, Defendant has not offered inconsistent reasons for Plaintiff's termination.  The fact that Mr. Persil revised his final report is not probative of pretext, given that the revisions were consistent with Mr. Persil's conclusion that Plaintiff had committed fraud.  Dkt. 58-22 at 3 (February 5, 2018 CST Group Report, concluding Plaintiff's expense reimbursements "revealed multiple instances of fraudulent reimbursements . . . totaling $19,169.45"); Dkt. 58-23 at 3 (June 15, 2018 CST Group Report, concluding Plaintiff's expense reimbursements "revealed multiple instances of fraudulent reimbursements . . . totaling $16,809.67").  Moreover, the revisions were made in Plaintiff's favor, lessening the amount of Plaintiff's duplicate reimbursement submissions, Dkt. 58 ¶¶ 50, 52; CFC Tr. at 154:8–157:10, 173:3–174:6; Persil Tr. at 188:2–192:10; Dkt. 58-22; Dkt. 58-23.    Thus, Plaintiff failed to demonstrate that Defendant proffered post-hoc rationalizations for Plaintiff's employment termination as evidence of pretext.

In sum, Plaintiff did not offer evidence to raise a reasonable inference that Defendant's reasons for terminating her employment were pretextual.  There was no genuine dispute of material fact that Plaintiff's duplicate reimbursement submissions were the major contributing factor to her termination, and that factor remained consistent throughout Defendant's investigation and

termination of Plaintiff. For these reasons, the Court granted Defendant's Motion for Summary Judgment as to the sex discrimination claim.

### B. Retaliation Claim

Plaintiff alleged that Defendant retaliated against her "by preventing her from being hired within the rural electric cooperative industry." Dkt. 30 ¶ 80. Under Title VII, an employer is prohibited from retaliating against an employee "because he has made a charge" under the statute. 42 U.S.C. § 2000e–3(a). Before filing suit under Title VII, a plaintiff must exhaust administrative remedies by bringing a charge with the EEOC. *Id.* § 2000e-5(b), (f). Even without exhausting administrative remedies, a plaintiff may bring a Title VII claim "for the first time before a district court, so long as [the claim is] like or reasonably related to charges in the original administrative complaint, and if [it] reasonably could have developed from the agency's investigation of the original [administrative] complaint." *Stewart v. Iancu*, 912 F.3d 693, 706 (4th Cir. 2019).

A retaliation claim is like or reasonably related to charges in the administrative complaint when "the purported retaliation claim is *in response to an administrative complaint itself*." *Holloman v. Huntington Ingalls Inc.*, 499 F. Supp. 3d 269, 279 (E.D. Va. 2020) (quoting *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992)). A claim may not be "like or reasonably related" when the administrative complaint and the federal complaint "deal[] with different time frames, actors, and conduct" such that they "describe two different cases[.]" *Chacko v. Patuxent Inst.*, 429 F.3d 505, 511–12 (4th Cir. 2005) (holding that the plaintiff failed to exhaust administrative remedies where his administrative complaint alleged three discrete instances of supervisory harassment and his federal complaint alleged long-term co-worker harassment).

**1. Plaintiff Failed to Exhaust Administrative Remedies Related to the Retaliation Claim**

Defendant argued Plaintiff failed to exhaust her administrative remedies for the retaliation claim because she did not allege retaliation in her Administrative Complaint and the retaliation allegations in the original complaint were not "reasonably related" to the allegations in her Administrative Complaint. Dkt. 58 at 23; *see* Dkt. 58-27. Plaintiff maintained that she was not required to exhaust her retaliation claim because it was a "natural extension" of the underlying sex discrimination claim. Dkt. 70 at 37 (citing *Nealon*, 958 F.2d at 590). Additionally, Plaintiff asserted that Defendant knew about her intention to file an EEOC claim and retaliated against her by discouraging other employers from hiring her before she filed the Administrative Complaint. *Id.* at 37–38.

As an initial matter, the Court disregards Plaintiff's allegation that Defendant was on notice of her sex discrimination concerns after an alleged conversation with Plaintiff's legal counsel in May 2018 because Plaintiff failed to include these allegations in her Amended Complaint. *Id.* The law does not permit Plaintiff to amend her complaint in this manner. *See, e.g., Barclay White Skansa, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004))). Indeed, the Amended Complaint explicitly stated that "Defendant unlawfully retaliated against Plaintiff on the basis of her Equal Employment Opportunity Commission and Wisconsin Equal Rights Division charge." Dkt. 30 ¶ 79. Thus, considering only the allegations in the Amended Complaint, as the Court is bound to do, the allegedly retaliatory conduct Plaintiff complained of occurred prior to her ever filing a claim.

Plaintiff did not allege a retaliation claim in her Administrative Complaint filed with the Wisconsin DWD. Dkt. 58-27. Moreover, Plaintiff's retaliation claim was not "like or reasonably related" to her charges of sex discrimination in the Administrative Complaint. The retaliation claim did not concern conduct that arose *in response* to the Administrative Complaint because the alleged retaliatory conduct occurred in July or August 2018 and the Administrative Complaint was filed later—on November 5, 2018. Dkt. 58 at 24; Dkt. 58-1 at 320:16–329:11 (describing the basis of the retaliation allegations involving the National Rural Electric Cooperative Association ("NRECA") that occurred in July or August 2018), 329:12–336:21 (describing the basis of the retaliation allegations involving Wright Hennepin that occurred in August 2018).[24] Thus, Plaintiff discovered facts that she believed might be the basis of a retaliation claim in July and August 2018—at least eight months before she filed the Administrative Complaint in November 2018.

In addition, a reasonable investigation by the Wisconsin DWD would not have uncovered—and did not uncover—facts related to the alleged retaliation claim. Here, a reasonable

---

[24] Plaintiff alleged that Defendant had conversations with two third parties, NRECA and Wright Hennepin, after Plaintiff's employment termination. Dkt. 70 ¶¶ 149–52. During Plaintiff's deposition, she stated that after her employment termination, she "performed some work for NRECA, but that work stopped." *Id.* ¶ 149 (citing Dkt. 58-1 at 326:3–327:22). Plaintiff relayed that "an NRECA representative" informed Plaintiff that her work with NRECA stopped "because NRECA did not want to be involved in the dispute between [Plaintiff] and [Defendant]." *Id.* (citing Dkt. 58-1 at 326:3–327:22). Plaintiff's allegations about NRECA are not supported by any evidence other than Plaintiff's third-hand account of the information she received. Plaintiff also alleged that after she applied for employment with Wright Hennepin in July 2018, the Wright Hennepin recruiter informed her that Plaintiff was no longer being considered due to a conversation between Timothy Sullivan, Wright Hennepin's CEO ("Mr. Sullivan"), and an employee of Defendant. *Id.* ¶¶ 150–52; Dkt. 58-1 at 333:14–336:21. Plaintiff's allegations about Wright Hennepin are supported to some extent by Mr. Sullivan's deposition, in which he confirmed that he spoke to Steven Kettler ("Mr. Kettler"), Plaintiff's former colleague and supervisor. Dkt. 70-14 at 34:8–38:7. When Mr. Sullivan called Mr. Kettler and asked about Plaintiff in the context of possible employment with Wright Hennepin, Mr. Kettler stated, "I can't tell you much." *Id.* When pressed, Mr. Kettler responded, "[N]o, Tim, I really – I really can't get into it." *Id.* Even viewing this statement in the light most favorable to Plaintiff, the statement is only an indication that Mr. Kettler was unwilling to discuss Plaintiff.

investigation of Plaintiff's termination in January 2018—after Defendant and Mr. Persil's audit and investigation into Plaintiff's duplicate reimbursement submissions—would not be expected to lead to uncovering two third parties, NRECA and Wright Hennepin, who failed to re-hire or hire Plaintiff as a result of possibly hearing about the audit and investigation in July or August 2018. In NRECA's case, Plaintiff provided testimony that NRECA allegedly heard about Defendant's investigation from an unnamed employee of Defendant in July or August 2018. Dkt. 58-1 at 320:16–329:11. In Wright Hennepin's case, according to Mr. Sullivan's testimony, Mr. Steven Kettler, Plaintiff's colleague and former supervisor, stated that he could not discuss Plaintiff during a telephone call with Mr. Sullivan in July or August 2018. Dkt. 70-14 at 34:8–38:7. In short, Plaintiff's sex discrimination claim and retaliation claim referenced "different time frames, actors, and conduct" such that they "describe[d] two different cases[.]" *Chacko*, 429 F.3d at 511–12. Additionally, Plaintiff's reliance on *Nealon* was misplaced because *Nealon*'s exception to the exhaustion rule does not apply when Plaintiff could have alleged retaliation in an earlier administrative complaint but did not. 958 F.2d at 590; *see also Riley v. Tech. Mgmt. Servs. Corp.*, 872 F. Supp. 1454, 1460 (D. Md. 1995) ("Plaintiffs must exhaust their administrative remedies when the alleged retaliation could have been raised in the original [administrative] complaint."), *aff'd sub nom. Riley v. Tech. & Mgmt. Servs. Corp.*, 79 F.3d 1141 (4th Cir. 1996).

Accordingly, Plaintiff failed to administratively exhaust her retaliation claim.

### 2. Plaintiff Failed to Establish a Causal Connection Between Her Protected Activity and Defendant's Alleged Conversations with Third Parties

Even if Plaintiff had exhausted her retaliation claim, Defendant was still entitled to summary judgment as to this count.

As with discrimination, a plaintiff may prove retaliation through direct or indirect evidence of retaliatory animus, or through the burden-shifting framework set forth by the U.S. Supreme

Court in *McDonnell Douglas*. 411 U.S. at 792; *see Foster*, 787 F.3d at 249. In this case, Plaintiff did not allege direct evidence of retaliation and relied instead on the application of the *McDonnell Douglas* framework to prove her claim.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of retaliation by showing that (1) the plaintiff "engaged in protected activity"; (2) the employer took a materially adverse action against them; and (3) "a causal relationship existed between the protected activity and the [materially] adverse . . . activity."[25] *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (quoting *Foster*, 787 F.3d at 250). "After a *prima facie* case is made, the burden shifts to the employer to show that it took [a materially] adverse action for a legitimate non-retaliatory reason." *Id.* "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating the employer's purported non-retaliatory reasons were pretext for discrimination." *Id.* (citing *Foster*, 787 F.3d at 250).

As noted for the sex discrimination claim, "the causation standards for establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is 'less onerous.'" *Foster*, 787 F.3d at 251 (quoting *Cerberonics*, 871 F.2d at 457). Like sex discrimination claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). In this case, Defendant did not contest that Plaintiff engaged in protected activity or that her termination constituted a materially adverse action within the meaning

---

[25] This Court has noted that the proper recitation of the second element for Title VII retaliation claims is a "materially adverse action," rather than an "adverse employment action," which is required for discrimination claims. *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 825–28 (E.D. Va. 2016) (discussing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006)). This Court will use "materially adverse action."

of Title VII. Dkt. 58 at 31. Thus, the only element of Plaintiff's *prima facie* case Defendant challenged was causation. *Id.*

To satisfy the third element of a *prima facie* case of retaliation, "either the retaliation must closely follow the protected activity *or* the plaintiff must put forth a sufficient explanation for the time elapsed between the protected activity and the alleged retaliation." *Hinton*, 185 F. Supp. 3d at 837. A plaintiff may establish causation by showing "temporal proximity" between the two incidents, or by "establish[ing] the existence of other facts that alone, or in addition to temporal proximity, suggest[] that the [materially] adverse . . . action occurred because of the protected activity." *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021).

Defendant argued that it was impossible for Defendant to have retaliated against Plaintiff in July or August 2018 when Plaintiff failed to file her Administrative Complaint, the only well-pled protected activity, until November 2018. Dkt. 58 at 31. Defendant is correct. The alleged retaliatory conduct—Defendant's alleged conversations with third parties in July and August 2018—occurred before Plaintiff engaged in protected activity in early November 2018, thus supporting a finding that there was no causal connection between the two events.[26] Even assuming Plaintiff exhausted her administrative remedies, she failed to establish a *prima facie* case of retaliation.

---

[26] As stated previously, the Court did not consider allegations and facts raised only in Plaintiff's Opposition, not her Complaint, concerning Plaintiff's communications with Defendant in March and May 2018 disputing the basis of her employment termination. *Barclay White Skansa, Inc.*, 262 F. App'x at 563.

## IV.     CONCLUSION

For the foregoing reasons, the Court granted Defendant's Motion for Summary Judgment
(Dkt. 57).


Entered this _18th_ day of September, 2023
Alexandria, Virginia

_/s/_
_____
Patricia Tolliver Giles
United States District Judge

32